IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN LEGAL SOCIETY CHAPTER OF UNIVERSITY OF CALIFORNIA, HASTINGS COLLEGE OF THE LAW, a/k/a HASTINGS CHRISTIAN FELLOWSHIP,<br><br>Plaintiff,<br><br>v.<br><br>MARY KAY KANE, et al.,<br><br>Defendants.<br>_____/ | No. C 04-04484 JSW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |

Now before the Court is the motion of defendants Maureen E. Corcoran, Eugene L. Freeland, Carin T. Fujisaki, John T. Knox, Jan Lewenhaupt, James E. Mahoney, Brian D. Monaghan, Bruce L. Simon, John K. Smith, and Tony West ("Director Defendants"), Mary Kay Kane, and Judy Chapman (collectively "Defendants") to dismiss the third, fourth and sixth claims in the complaint of plaintiff Christian Legal Society Chapter of University of California, Hastings College of the Law, a/k/a Hastings Christian Fellowship ("HCF"). Having carefully considered the parties' arguments, the relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS IN PART and DENIES IN PART the motion to dismiss.

**FACTUAL BACKGROUND**

HCF is an unincorporated student organization and a local chapter of the national organization of the Christian Legal Society. (Complaint, ¶ 2.1.) The Christian Legal Society is a nationwide association of Christian lawyers, law students, law professors, and judges. The

1   Christian Legal Society's purposes include providing a means of society, fellowship, and
2   nurture among Christian lawyers; promoting justice, religious liberty, and biblical conflict
3   resolution; encouraging, disciplining, and aiding Christian law students; and encouraging
4   lawyers to furnish legal services to the poor.  (Complaint, ¶ 3.1.)  HCF requires all of its
5   members and officers to agree to and affirm a Statement of Faith that it interprets as requiring its
6   officers and members to adhere to orthodox Christian beliefs, which HCF construes as
7   prohibiting sexual conduct between persons of the same sex.  (Complaint, ¶¶ 3.7-3.8.)  In
8   September 2004, HCF informed Defendants that it would consider religion and sexual
9   orientation in the selection of its officers and members.  (Complaint, ¶¶ 4.1-4.3.)

10   Student groups at the Hastings College of the Law of the University of California
11   ("Hastings") must be recognized as a "registered student organization" to be eligible to receive
12   the following benefits from Hastings: (a) use of designated Hastings' bulletin boards for
13   announcements of interest to organization members and the student body; (b) use of the Student
14   Information Center for distribution of materials to the Hastings community; (c) listing on the
15   Office of Student Services' website and any hard copy lists; (d) participation in the Student
16   Organizations' Faire; (e) access to all services offered by the Office of Student Services,
17   including organizational consultation, workshops, financial consulting and training, and
18   publications; (f) access to Hastings' publications, including the "Hastings Weekly;" (g)
19   placement of organizational materials in 1L orientation packets; (h) listing organizational
20   announcements on classroom chalkboards; (i) placement of announcements in the Student Event
21   Calendar, delivered weekly to Hastings' students via email; (j) eligibility to enter into a License
22   Agreement with Hastings for use of the Hastings name; (k) use of Hastings facilities for
23   meetings; and (l) funding.  (Complaint, ¶ 3.15.)  As a condition of becoming a "registered
24   student organization," Hastings requires a student organization to agree to and abide by the
25   "Policies and Regulations Applying to College Activities, Organizations and Students," which
26   requires, *inter alia*, student organizations to comply with the Policy on Nondiscrimination.
27   (Complaint, ¶¶ 3.16-3.17.)  The Policy on Nondiscrimination provides:
28   
> The College is committed to a policy against legally impermissible, arbitrary or unreasonable discriminatory practices.  All groups, including administration, faculty,

> student governments, College-owned student residence facilities and programs sponsored by the College, are governed by this policy of nondiscrimination....
>
> The University of California, Hastings College of the Law shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation. This nondiscrimination policy covers admission, access and treatment in Hastings-sponsored programs and activities."

(Complaint, Ex. E at § 20.00.)

Defendants would not allow HCF to register as a student organization unless it "open[ed] its membership to all students irrespective of their religious beliefs or sexual orientation." (Complaint, ¶ 4.5.) HCF alleges that "[b]y enacting and enforcing the Policy on Nondiscrimination forbidding HCF to discriminate on the basis of religion or sexual orientation, refusing to recognize HCF's constitutional right to an exemption from said policy, and withholding from HCF the status and benefits of a registered student organization" Hastings discriminated against HCF. (Complaint ¶ 4.12.) HCF filed the instant complaint asserting that Defendants are violating (1) HCF's rights to Freedom of Expressive Association pursuant to the First Amendment of the United States Constitution (Count I); (2) HCF's Free Speech pursuant to the First Amendment (Count II); (3) the Establishment Clause of the First Amendment (Count III); (4) the Due Process Clause of the Fourteenth Amendment (Count IV); (5) the Free Exercise Clause of the First Amendment (Count V); and (6) the Equal Protection Clause of the Fourteenth Amendment (Count IV). In thier motion to dismiss, Defendants challenge only the legal sufficiency of HCF's third claim (Establishment Clause), fourth claim (Due Process Clause), and sixth claim (Equal Protection Clause). Defendants also contend the Director Defendants are not proper defendants pursuant to the *Ex parte Young* doctrine.

**ANALYSIS**

**I.      Legal Standard**

Rule 12(b)(6) motions challenge the legal sufficiency of the claims asserted in the complaint. A motion to dismiss should not be granted unless it appears beyond a doubt that a plaintiff can show no set of facts supporting his claim. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Under this liberal standard, motions to dismiss are viewed with disfavor, and are rarely granted. *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986). The complaint is

viewed in a light most favorable to the nonmoving party, and all factual allegations therein are taken as true. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1989).

As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds, Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). However, documents subject to judicial notice or those attached to the complaint may be considered on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1555 (9th Cir. 1989); *Mullis v. U.S. Bankruptcy Court for Dist. of Nevada*, 828 F.2d 1385, 1388 (9th Cir. 1987). In doing so, the Court does not convert a motion to dismiss to one for summary judgment. *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986).

## II. HCF's Claim Under the Establishment Clause

The Establishment Clause of the First Amendment to the United States Constitution prohibits any law "respecting an establishment of religion." United States Const. amend. I. "[A]lthough the federal Establishment Clause cases for the most part have addressed governmental efforts to *benefit* religion or particular religions, it is clear that the 'First Amendment forbids an official purpose to *disapprove* of a particular religion or religions in general.'" *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1386 (9th Cir. 1994) (emphasis in original) (*quoting Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1992)). The Establishment Clause requires government neutrality, and this neutrality would be violated as much by government approval as it would by government disapproval of religion. *Vernon*, 27 F.3d at 1396.

In *Lemon v. Kurtzman,* 403 U.S. 602 (1971), the Supreme Court articulated the test for analyzing governmental conduct under the under the Establishment Clause. To survive the test, the government conduct at issue must (1) have a secular purpose, (2) not advance or inhibit religion as its principal or primary effect, and (3) not foster an excessive government entanglement with religion. *Id.* at 612-13. The challenged conduct must survive all three

4

prongs of the test to be constitutional. *Vernon*, 27 F.3d at 1396 (*citing Edwards v. Aguillard*, 482 U.S. 578, 583 (1987)).

### a. The Policy Has a Secular Purpose

"The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion." *Kreisner v. City of San Diego,* 1 F.3d 775, 782 (9th Cir. 1993) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). The government conduct will fail this prong "only if it is motivated wholly by an impermissible purpose." *Kreisner,* 1 F.3d at 782 (quoting *Bowen v. Kendrick,* 487 U.S. 589, 602 (1988)); *but see Vernon,* 27 F.3d at 1397 (acknowledging Ninth Circuit precedent that any secular purpose suffices, but noting that panel believes Supreme Court test is really that the "actual" or "primary" purpose must be secular). In any event, the Ninth Circuit's "analysis under this prong focuses purely on *purpose*; [it does] not question the propriety of the means to achieve that purpose or whether the defendants were correct or even reasonable in the assumptions underlying their actions .... Moreover, [a] reviewing court must be reluctant to attribute unconstitutional motives to government actors in the face of a plausible secular purpose." *American Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1121 (9th Cir. 2002) (internal quotes and citations omitted).

In *American Family Association*, the San Francisco Board of Supervisors sent the plaintiffs a letter stating: "Supervisor Leslie Katz denounces your hateful rhetoric against gays, lesbians and transgendered people .... It is not an exaggeration to say that there is a direct correlation between these acts of discrimination, such as when gays and lesbians are called sinful and when major religious organizations say they can change if they tried, and the horrible crimes committed against gays and lesbians." San Francisco then adopted two resolutions condemning a hate crime and anti-gay television advertisements. The resolution on the hate crime "call[ed] for the Religious Right to take accountability for the impact of their long-standing rhetoric denouncing gays and lesbians, which leads to a climate of mistrust and discrimination that can open the door to horrible [hate] crimes...." *Id*. at 1119-1120. The court held that "although the letter and resolutions may appear to contain attacks on the Plaintiffs'

1 religious views, in particular that homosexuality is sinful, there is also a plausible secular
2 purpose in the Defendants' actions – protecting gays and lesbians from violence – and that
3 therefore the Plaintiffs could not state a claim under the purpose prong." *Id*. at 1121.

4 Here, it is even more clear that Defendants had a plausible secular purpose for the
5 nondiscrimination policy – protecting against and eliminating discrimination at Hastings. *Cf.*
6 *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999) (noting
7 Ninth Circuit had already held that Title VII has an obvious secular legislative purpose of
8 eliminating employment discrimination). The nondiscrimination policy therefore passes the
9 first prong.

### b. Principal or Primary Effect

"Under the second prong of the *Lemon* test, [courts] must consider whether the government action has the principal or primary effect of advancing or inhibiting religion." *American Family Ass'n*, 277 F.3d at 1122 (*citing Lemon,* 403 U.S. at 612). To make this determination, courts ask "whether it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or approval of religion." *Vernon*, 27 F.3d at 1398. This inquiry must be conducted "from the perspective of a 'reasonable observer' who is both informed and reasonable." *American Family Ass'n*, 277 F.3d at 1122 (*citing Kreisner,* 1 F.3d at 784). "Unlike the secular purpose prong, in which it appears that any secular purpose, no matter how minimal, will pass the test, the focus of this prong is on the *primary* effect of the government's conduct." *Id*. (emphasis in original).

In *Vernon*, the city of Los Angeles conducted an investigation into whether an officer's religious beliefs were inappropriately affecting the operations of the police department. The court concluded that "[n]otwithstanding the fact that one may infer possible city disapproval of [the officer's] religious beliefs from the direction of the investigation, this cannot be objectively construed as the primary purpose of the government action. The primary purpose ... was the investigation of any possible impermissible or illegal on-duty conduct of [the officer]." *Vernon*, 27 F.3d at 1398-1399.

6

Similarly, in *American Family Association*, the court found it was "fairly easy to conclude that the primary effect of [the] resolution [was] not inhibition of religion. Although the resolution contain[ed] a provision calling 'for the Religious Right to take accountability for the impact of their long-standing rhetoric denouncing gays and lesbians,' this provision appear[ed] to be more of an afterthought and any disparagement of the Religious Right [was] not the primary effect of the resolution. Read as a whole, the primary effect [was] a denouncement of hate crimes ...." *American Family Ass'n*, 277 F.3d at 1122.

As compared to the government conduct in *Vernon* and *American Family Association*, it is even easier to conclude that the nondiscrimination policy at issue here does not inhibit religion as its *primary* effect. *Id*. at 1122. Although HCF argues that the "clear effect of the policy is to punish religious student organizations, such as HCF, by denying recognition and its attendant benefits if the organizations refuse to accept members or leaders who oppose their religious beliefs and message," (Opp. at p. 8.), this assertion is unsupported by authority. The fact that HCF's conduct *may be* affected by the application of the policy does not mean that a reasonable observer would perceive the *primary* message or effect of the policy is to inhibit religion. Rather, a reasonable observer would construe the primary message of the nondiscrimination policy to be one of promoting nondiscrimination.

HCF also argues that the nondiscrimination policy has the effect of preferring religious sects that condone homosexual conduct over more orthodox sects and singles out religious associations as disfavored forms of association. However, even if the policy may result in more tolerant religious groups obtaining recognized status, HCF has not shown a reasonable observer would perceive the primary purpose of the policy which bans discrimination to be a preference for certain types of religions. As the Supreme Court stated, "the Establishment Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenants of some or all religions.... Thus, for temporal purposes murder is illegal. And the fact that this agrees with the dictates of the Judaeo-Christian religions while it may disagree with others does not invalidate the regulation." *McGowan v. State of Maryland*, 366 U.S. 420, 442 (1961). Thus, the fact that HCF believes its religion justifies discriminating

7

on the basis of sexual orientation, does not mean a policy which prohibits discrimination on this basis violates the Establishment Clause.

Finally, HCF's own allegations defeat its argument that the policy singles out religious associations as disfavored forms of association. According to its complaint, prior to the 2004-2005 academic year, HCF was registered as a student organization at Hastings. (Complaint, ¶ 3.3.) It was not until HCF informed Defendants that it intended to exclude members and officers based on their religious beliefs and sexual orientation that HCF was denied the opportunity to register. (Complaint, ¶¶ 4.1-4.5.) Thus, HCF has not alleged facts which, if true, show that a reasonable observer would perceive that Hastings' facially neutral policy banning discrimination inhibits religion as its primary effect.

### c. Excessive Entanglement

Under the third prong of the *Lemon* test, courts examine whether the government conduct results in "an excessive government entanglement with religion." *Lemon,* 403 U.S. at 613. "[T]he entanglement prong seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs." *Cammack v. Waihee,* 932 F.2d 765, 780 (9th Cir.1991). Under this prong, courts ask "whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 675 (1970); *see also Cammack*, 932 F.2d at 781 (finding no excessive entanglement where the government's involvement was not "comprehensive" or "enduring"); *Vernon*, 27 F.3d at 1399 ("entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion"). In *Vernon*, the court held that the investigation of the officer did not involve excessive entanglement because there was "no continuing or systematic investigation of religious beliefs .... Given the relatively short duration of the investigation, it [was] unlikely that the government action at issue created either the reality or the appearance of on-going government interference in church affairs." *Id*. at 1400.

In arguing the nondiscrimination policy fosters excessive entanglement, HCF posits a hypothetical situation. HCF argues that anytime a Hastings student is denied membership or

8

1  defeated in an officer election for a religious organization, the student can complain of
2  discrimination under the policy.  According to HCF, the law school would then be forced to
3  "troll through" the operations, beliefs, and purposes of the religious organization, and even
4  individual students, to determine whether discrimination occurred.  (Opp. at 9).  However, these
5  are not facts that are alleged in the complaint.  Nor does HCF even argue that such events
6  actually occurred.  As alleged by HCF, HCF admitted to Defendants that it would not abide by
7  the nondiscrimination policy and that it intended to exclude members and officers based on their
8  religion and sexual orientation.

9    HCF relies on the Supreme Courts statement in *Widmar v. Vincent*, 454 U.S. 263 (1981)
10 that: "Merely to draw the distinction would require the university--and ultimately the courts--to
11 inquire into the significance of words and practices to different religious faiths, and in varying
12 circumstances by the same faith.  Such inquiries would tend inevitably to entangle the State with
13 religion in a manner forbidden by our cases." *Id*. at 270 n. 6.  HCF's reliance on *Widmar* is
14 misplaced.  The *Widmar* Court was not addressing Establishment Clause issues but was
15 responding to a suggestion by the dissent that speech about religion or describing religious
16 experiences could be distinguished from religious worship, and thus was not protected speech.
17 *Bob Jones University v. United States*, 461 U.S. 574 (1983), cited by Defendants, is more on
18 point.  In that case, the Supreme Court upheld a policy by the Internal Revenue Service to deny
19 tax exempt status to private schools which racially discriminate.  Two school challenged the
20 policy, arguing that their racially discriminatory practices were based on their religious beliefs.
21 The Court rejected an Establishment Clause challenge to nondiscrimination policy, noting that
22 "the uniform application of the rule to all religiously operated schools *avoids* the necessity for a
23 potentially entangling inquiry into whether a racially restrictive practice is the result of sincere
24 religious belief." *Id*. at 604 n. 30 (emphasis in original).

25
26
27
28

9

The Court therefore finds that applying uniformly applying the nondiscrimination policy to all student groups does not result in excessive government entanglement with religion.[1] Thus, accepting all HCF's factual allegations as true, HCF has not stated a violation of the Establishment Clause. Accordingly, the Court GRANTS Defendants' motion to dismiss HCF's Establishment Clause claim.

**III.     HFC's Claim Under the Due Process Clause**

HCF alleges that the nondiscrimination policy violates its due process rights because it "fails to provide HCF with fair notice as to whether or not its leadership and membership practices comply with the nondiscrimination requirement and tasking University officials with enforcing the Policy on Nondiscrimination without providing criteria or guidelines to govern its enforcement." (Complaint, ¶ 8.2.) To be void for vagueness, a statute must be impermissibly vague in all of its applications. *United States v. Makowski*, 120 F.3d 1078, 1080 (9th Cir. 1997). Moreover, a statute is void for vagueness only "when it does not sufficiently identify the conduct that is prohibited." *Makowski*, 120 F.3d at 1080. Due process does not require language that advises with "mathematical certainty." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Rather, due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and that "laws ... provide explicit standards for those who apply them" so as to prevent arbitrary and discriminatory enforcement. *Grayned*, 408 U.S. at 108; *see also Makowski*, 120 F.3d at 1080 ("the Fifth Amendment due process clause requires a statute to be sufficiently clear so as not to cause persons of common intelligence ... necessarily to guess at its meaning and to differ as to its application") (internal quotations omitted). Thus, the Court must evaluate whether the policy fails "to give adequate notice to people of ordinary intelligence of

---

[1] HCF also argues that it states a violation of the Establishment Clause because by enacting and enforcing the nondiscrimination policy, Defendants are infringing on HCF's "power ... to decide for [itself], free from state interference, matters of church government as well as those of faith and government." However, the cases cited by HCF were based on the Free Exercise Clause, not the Establishment Clause. *See, e.g.*, *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). Whether HCF has stated a claim under the Free Exercise Clause of the First Amendment is not before the Court.

10

1  what conduct is prohibited, or if it invites arbitrary and discriminatory enforcement."
2  *Makowski*, 120 F.3d at 1081.

3  HCF argues that because the policy covers only "admissions, access and treatment in Hastings-sponsored programs and activities" it is not clear that the policy applies to student organizations, and in particular, to leadership and membership decisions made by student organizations. HCF points out that Defendants expressly disclaim any connection between Hastings and student organizations in the policy. (Complaint, Ex. E: "Registration is subject to the condition and provision that Hastings College of the Law and the University of California neither sponsor nor endorse any such organization.") In reviewing the language of the entire policy, as well as the other provisions of Hastings' Polices and Regulations attached as Exhibit E to the Complaint, the Court finds that a person of ordinary intelligence would have adequate notice that the policy applies to student organizations. The policy itself states that "*[a]ll groups*, including administration, faculty, student governments, College-owned student resident faciles and programs sponsored by the College, are governed by this policy of nondiscrimination." (Complaint, Ex. E at § 20.00) (emphasis added.) Moreover, Hastings' Policies and Regulations provide that "[r]egistered campus organizations are required to comply with college policies and campus regulations or they will be subject to revocation of registration ...." (Complaint, Ex. E at § 34.11.) The Court further concludes that a person of ordinary intelligence would be able to understand the conduct at which the policy is directed, and in particular, would be able to understand that denying someone the ability to join and participate a group, whether as a member or an officer, would be covered by "admissions, access and treatment." *See Dayton Christian Schools v. Ohio Civil Rights Comm'n*, 578 F.Supp. 1004, 1026-27 (S.D. Ohio 1984) (holding that statute prohibiting discrimination relating to employment on basis of race, color, religion, sex, or national origin was not void for vagueness where, "[i]n view of the mass of publicity that various forms of discrimination have received over time, it seems clear that a person of ordinary intelligence would be able to understand the conduct at which the statute aims").

11

1   HCF also argues that the policy is vague because it provides that Hastings shall not
2   discriminate "unlawfully." According to HCF, because no federal or state law forbids HCF
3   from selecting its leaders and members on the basis of religion and sexual orientation, the
4   meaning of "discriminate unlawfully" is unclear. However, the policy also prohibits "arbitrary
5   and unreasonable discriminatory practices." (Complaint, Ex. E at § 20.00.) Again, the Court
6   finds that the language of the policy is not so vague that a person of ordinary intelligence would
7   have inadequate notice of what conduct is prohibited. Therefore, the Court finds that the policy
8   is not void for vagueness and GRANTS Defendants' motion to dismiss HCF's Due Process
9   claim.

### IV. HFC's Claim Under the Equal Protection Clause

HCF alleges that Defendants are violating its rights under the Equal Protection Clause. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Serrano v. Francis*, 345 F.3d 1071, 1081 (9th Cir. 2003) (*quoting Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985)). To state a successful Equal Protection claim, a plaintiff must allege that he or she was treated differently than similarly situated persons. *Dillingham v. I.N.S.*, 267 F.3d 996, 1007 (9th Cir. 2001). Additionally, a plaintiff must allege that the defendant acted with the intent or purpose to discriminate against him or her based upon membership in a protected class. *Serrano*, 345 F.3d at 1082; *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 2001).[2] "Where the challenged governmental policy is 'facially neutral,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that

---

[2] HCF argues that it need not show intentional discrimination to state an equal protection claim, but the cases it cites do not stand for this proposition. (Opp. at 15, citing *Romer v. Evans*, 517 U.S. 620 (1996); *Niemotko v. State of Md.*, 340 U.S. 268 (1951); *Fowler v. State of R.I.*, 345 U.S. 67 (1953).) In each of these cases, the Court found evidence of intentional discrimination. *See Romer*, 517 U.S. 632-34 (concluding that the reason for the ordinance was animosity towards gays and lesbians); *Niemtko*, 340 U.S. at 272 (stating the conclusion was "inescapable" that the Jehovah's Witnesses were denied access to the park because of the city's dislike for or disagreement with them or their views); *Fowler*, 345 U.S. at 69 (finding the city discriminated against the Jehovah's Witnesses "because of the dislike which the local officials had of these people and their views").

12

1  some invidious or discriminatory purpose underlies the policy." *Lee v. City of Los Angeles*, 250
2  F.3d 668, 686 (9th Cir. 2001) (finding fatal to plaintiffs' claim their failure to allege defendants'
3  conduct was motivated by discriminatory animus).

4  In *Lee*, a mentally disabled person was arrested, incarcerated and extradited based on his
5  mistaken identity. The plaintiffs alleged that the police failed to take proper steps to verify that
6  the individual in their custody was the proper person. *Id*. at 677-78. In support of the equal
7  protection claim, the plaintiffs pled that the city's failure to provide sufficient training regarding
8  mentally disabled persons or to implement other procedures to safeguard the rights of the
9  mentally disabled person amounted to deliberate indifference to these persons' rights and denied
10 them equal protection. *Id*. at 687. The court concluded that the plaintiffs failed to allege the
11 defendants failed to treat a protected class differently, but rather, that "the gravamen of
12 plaintiffs' complaint [was] that defendants *failed* to treat disabled persons differently from
13 others similarly situated." *Id*. (emphasis in original).

14 Here, HCF does not allege it has been treated differently than other similarly situated
15 groups or persons. Rather, HCF alleges that Defendants' "refus[al] to recognize HCF's
16 constitutional right to an exemption from [the nondiscrimination] policy" violates the Equal
17 Protection Clause. As in *Lee*, the gravamen of HCF's complaint is that Defendants *failed* to
18 treat it differently from others similarly situated. *Lee*, 250 F.3d at 687. HCF argues that the
19 application of the nondiscrimination policy to it violates the Equal Protection clause by
20 distinguishing between religious and non-religious student organizations. (Opp. at 14-15.)
21 However, Hastings' policy would similarly bar an atheist group from excluding those who are
22 religious.

23 Even if HCF could allege that it was treated differently than other similarly situated
24 student groups under the policy, HCF has not alleged any intent to discriminate. Where, as here,
25 the policy is facially neutral, HCF would need to allege that some invidious or discriminatory
26 purpose underlies the policy. *Lee*, 250 F.3d at 686. Because HCF has not alleged any intent to

13

1 discriminate, it has not properly stated a claim under the Equal Protection Clause.[3] The Court

2 therefore GRANTS Defendants' motion to dismiss HCF's Equal Protection claim, but will give

3 HCF leave to amend.

**V.     The Director Defendants**

Defendants argue that the Director Defendants are not properly named as defendants under the *Ex parte Young* doctrine. This doctrine requires "some connection between a named state officer and enforcement of the challenged state law.... This connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) (internal quotes and citation omitted). For example, if "an attorney general cannot direct, in a binding fashion, the prosecutorial activities of the officers who actually enforce the law ..., he may not be a proper defendant" in challenges to state criminal laws. *Id*. However, if the attorney general has the authority to enforce the law, concurrent with the county prosecutors, then he or she would be a proper defendant. *Id*.

Here, Defendants argue that the Director Defendants have delegated all their authority to enforce the nondiscrimination policy to the Dean of Hastings, and that therefore, the case against them should be dismissed. At the hearing, though, Defendants conceded that the Director Defendants would have the authority to amend the policy to allow for exceptions for groups such as HCF. Moreover, the exact scope of the Director Defendants' delegation of their authority and whether the Director Defendants retain concurrent authority to enforce the nondiscrimination policy is unclear at this point. Hastings' Policies and Regulations Applying to College Activities, Organizations and Students, adopted by the Board of Directors, states: "the Board is empowered to conduct all business of the College. The Standing Orders and

---

[3] HCF's reliance on *Alpha Iota Omega Christian Fraternity v. Moeser*, Civil No. 1:04CV00765 (M.D.N.C. March 2, 2005) (slip opinion) (attached as Exhibit A to Declaration of Seven H. Aden) for the proposition that it states an equal protection claim is misplaced. In addition to the fact that the case is unpublished and does not contain a comprehensive analysis of the legal issues, this case is inapposite because the court based its opinion upon the First Amendment, not the Equal Protection Clause.

14

Bylaws of the Board delegate specific authority to the Dean of the College, including the full authority and responsibility over the administration of academic and student affairs and business and fiscal operations of the College." (Complaint, Ex. C at § 11.00.) The Defendants submitted a copy of the Standing Orders and By-Laws of the Board of Directors of the University of California Hastings College of the Law ("Standing Orders and By-Laws") which states that "[t]he Chancellor and Dean shall serve as the chief executive and academic officer of the College, with full authority for all its departments and activities."[4] Because the Standing Orders and By-Laws do not address whether the Director Defendants also retain concurrent authority to conduct the business of Hastings or under what circumstances the Director Defendants may revoke their delegation to the Dean, the Court cannot determine as a matter of law at this stage in the litigation that the Director Defendants do not have sufficient connection with the policy under the *Ex parte Young* doctrine. Therefore, the Court DENIES Defendants' motion to dismiss the Director Defendants without prejudice to Defendants' raising this issue in a motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Defendants' motion to dismiss HCF's third claim (Establishment Clause), fourth claim (Due Process Clause), and sixth claim (Equal Protection Clause), and DENIES IN PART Defendants' motion on the grounds that the Director Defendants are not proper defendants. The Court GRANTS HCF leave to amend its Equal Protection claim. HCF shall file its amended pleading, if any, within twenty-one days from the date of this Order. If HCF files an amended pleading, it shall supercede and not incorporate the prior complaint by reference.

**IT IS SO ORDERED.**

Dated: April 12, 2005                                   /s/ Jeffrey S. White
                                                        JEFFREY S. WHITE
                                                        UNITED STATES DISTRICT JUDGE

---

[4] HCF stipulated at the hearing that it would be proper for the Court to take judicial notice of the Standing Orders and By-Laws.

15