Steven H. Aden (DC Bar No. 466777)
*Lead Counsel*
Gregory S. Baylor (TX Bar No. 1941500)
Timothy J. Tracey (GA Bar No. 715195)
RELIGIOUS LIBERTY ADVOCATES
 OF THE CHRISTIAN LEGAL SOCIETY
8001 Braddock Rd., Suite 300
Springfield, VA  22151
Tel: (703) 642-1070
Fax: (703) 642-1075

Timothy Smith (No. 125534)
MCKINLEY & SMITH, A Professional Corporation
3445 American River Dr., Suite A
Sacramento, CA  95864
Tel: (916) 972-1333
Fax: (916) 972-1335

Of Counsel:

Benjamin W. Bull (AZ Bar No. 009940)
Gary S. McCaleb (AZ Bar No. 018848)
ALLIANCE DEFENSE FUND
15333 North Pima Road, Suite 165
Scottsdale, AZ  85260
Tel: (800) 835-5233
Fax: (480) 444-0028

Steven Burlingham (No. 88544)
GARY, TILL & BURLINGHAM
5330 Madison Ave., Suite F
Sacramento, CA 95841
Tel: (916) 332-8112
Fax: (916) 332-8153

ATTORNEYS FOR PLAINTIFF

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTIAN LEGAL SOCIETY CHAPTER OF THE UNIVERSITY OF CALIFORNIA, HASTINGS COLLEGE OF THE LAW f/k/a HASTINGS CHRISTIAN FELLOWSHIP, a student organization at University of California, Hastings College of the Law,<br><br>      Plaintiff,<br><br>   *vs.*<br><br>MARY KAY KANE, *et al.*,<br><br>      Defendants. | Civil Action  No.: C 04 4484 JSW<br><br>Action Filed: October 22, 2004<br><br>PLAINTIFF'S NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date:  December 2, 2005<br>Time:  9:00 a.m.<br>Judge: Hon. Jeffrey S. White |

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES......................................................................................... iii

NOTICE OF MOTION FOR SUMMARY JUDGMENT ......................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................1

I.   STATEMENT OF FACTS.........................................................................1

    A.   The Christian Legal Society and the CLS Chapter at the University of California, Hastings College of the Law Generally.............................1

        1.   National Christian Legal Society. ................................................1

        2.   The CLS chapter at Hastings.......................................................2

    B.   Hastings and Student Groups Generally. ....................................................3

    C.   CLS at Hastings' Difficulty in Registering with Hastings. ......................5

    D.   Hastings' Treatment of Other Registered Student Organizations. ...........6

    E.   Consequences of Hastings' Denial of Registration and Attendant Rights, Benefits and Privileges.................................................................7

II.   ARGUMENT AND CITATION OF AUTHORITY ...........................................8

    A.   Right of Expressive Association. ..............................................................9

        1.   CLS at Hastings is engaged in protected expressive activity......10

        2.   Defendants' policies "significantly affect" CLS at Hastings' expression...............................................................11

    B.   Free Speech Clause:  Exclusion of CLS at Hastings from Defendants' Speech Forum.........................................................................14

    C.   Free Exercise Clause. ...............................................................................17

        1.   Defendants' exclusion of CLS at Hastings runs afoul of *Smith*..17

        2.   The Free Exercise Clause also forbids intrusion into CLS at Hastings' matters of faith and doctrine. ...................................18

D.   Equal Protection Clause. ........................................................19

E.   Defendants' Denial of Registration to CLS at Hastings Fails Strict
     Scrutiny. ..............................................................................21

F.   CLS at Hastings is Entitled to Injunctive and Declaratory Relief...........24

     1.   Irreparable Injury..........................................................24

     2.   No Adequate Remedy at Law. ....................................25

III.   CONCLUSION ........................................................................25

CERTIFICATE OF SERVICE..........................................................................27

## TABLE OF AUTHORITIES

*American-Arab Anti-Discrimination Committee v. Reno,*
70 F.3d 1045 (9th Cir. 1995)..........................................................................24, 25

*American Civil Liberties Union of Virginia, Inc. v. Radford College,*
315 F. Supp. 893 (W.D. Va. 1970)..........................................................................14

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ..........................................................................................8, 9

*Board of Directors of Rotary International v. Rotary Club of Duarte,*
481 U.S. 537 (1987) ..............................................................................................24

*Board of Regents v. Southworth,*
529 U.S. 217 (2000) ..............................................................................................14

*Bollard v. California Province of the Society of Jesus,*
196 F.3d 940 (9th Cir. 1999)..........................................................................19, 22

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ....................................................................................... *passim*

*Brown v. California Dept. of Transp.,*
321 F.3d 1217 (9th Cir. 2003)..............................................................................24

*Business Objects, S.A. v. Microstrategy, Inc.,*
381 F. Supp. 2d 1107 (N.D. Cal. 2005)....................................................................8

*Capital Sq. Review Bd. v. Pinette,*
515 U.S. 753 (1995) ........................................................................................14, 16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ..............................................................................................17

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) ................................................................................................23

*Corporation of the Presiding Bishop v. Amos,*
483 U.S. 327 (1987) ..............................................................................................19

*Democratic Party v. Wisconsin,*
450 U.S. 107 (1980) ..............................................................................................12

*Elrod v. Burns,*
427 U.S. 347 (1976) ..............................................................................................24

*Elvig v. Calvin Presbyterian Church,*
397 F.3d 790 (9th Cir. 2005) ............................................................................22

*Employment Division v. Smith,*
494 U.S. 872 (1990) ..............................................................................17, 18

*E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.,*
213 F.3d 795 (4th Cir. 2000) ............................................................................19

*Fowler v. Rhode Island,*
345 U.S. 67 (1953) ............................................................................18

*Gay Alliance of Students v. Matthews,*
544 F.2d 162 (4th Cir. 1976) ............................................................................25

*Gellington v. Christian Methodist Episcopal Church,*
203 F.3d 1299 (11th Cir. 2000) ............................................................................22

*Good News Club v. Milford Central School,*
533 U.S. 98 (2001) ............................................................................16

*Healy v. James,*
408 U.S. 169 (1972) ............................................................................ *passim*

*Hishon v. King & Spalding,*
467 U.S. 69 (1984) ............................................................................10

*Hurley v. Irish-American Gay, Lesbian, Bisexual Group of Boston,*
515 U.S. 557 (1995) ............................................................................ *passim*

*Hutchison v. Thomas,*
789 F.2d 392 (6th Cir. 1986) ............................................................................22

*IDK, Inc. v. County of Clark,*
836 F.2d 1185 (9th Cir. 1988) ............................................................................9

*Kedroff v. St. Nicholas Cathedral,*
344 U.S. 94 (1952) ............................................................................19

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) ............................................................................10

*Maurer v. Individually and as Members of Los Angeles County Sheriff's Dept.,*
691 F.2d 434 (9th Cir. 1982) ............................................................................25

*McClure v. Salvation Army,*
460 F.2d 553 (5th Cir. 1972) ................................................................. 22

*Meinhold v. Dept. of Defense,*
34 F.3d 1469 (9th Cir. 1994) ................................................................. 22

*Minker v. Baltimore Annual Conf. of United Methodist Church,*
894 F.2d 1354 (D.C. Cir. 1990) ............................................................ 22

*Natal v. Christian and Missionary Alliance,*
878 F.2d 1575 (1st Cir. 1989) ............................................................... 22

*Niemotko v. Maryland,*
340 U.S. 268 (1951) .............................................................................. 20

*Orantes-Hernandez v. Thornburgh,*
919 F.2d 549 (9th Cir. 1990) ................................................................. 24

*Rayburn v. General Conf. of Seventh-day Adventists,*
772 F.2d 1164 (4th Cir. 1985) ............................................................... 22

*Roberts v. United States Jaycees,*
468 U.S. 609 (1984) ................................................................ 9, 10, 12, 18

*Roe v. Cheyenne,*
124 F.3d 1221 (10th Cir. 1997) ............................................................. 13

*Rosenberger v. Rector and Visitors of the University of Virginia,*
515 U.S. 819 (1995) ..................................................................... 14, 16, 17

*Scharon v. St. Luke's Episcopal Presbyterian Hosp.,*
929 F.2d 360 (8th Cir. 1991) ................................................................. 22

*S.E.C. v. Koracorp Industries, Inc.,*
575 F.2d 692 (9th Cir. 1978) ................................................................. 13

*Serbian Eastern Orthodox Diocese v. Milivojevich,*
426 U.S. 696 (1976) .............................................................................. 19

*Sherbert v. Verner,*
374 U.S. 398 (1963) .............................................................................. 18

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.,*
363 F.3d 299 (4th Cir. 2004) ................................................................. 19

PLAINTIFF'S NOTICE OF MOTION FOR SUMMARY JUDGMENT          No.: C 04-04484 JSW
AND MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

v

*Sioux City Bridge Co. v. Dakota County,*
260 U.S. 441 (1923) ............................................................................19

*Squaw Valley Development Co. v. Goldberg,*
375 F.3d 936 (9th Cir. 2004) ...............................................................20

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
309 F.3d 144 (3rd Cir. 2002) ................................................................18

*The Florida Star v. B.J.F.,*
491 U.S. 524 (1989) ............................................................................23

*Village of Willowbrook v. Olech,*
528 U.S. 562 (2000) .......................................................................19, 20

*Widmar v. Vincent,*
454 U.S. 263 (1981) ..................................................................... *passim*

*Young v. Northern Illinois Conf. of United Methodist Church,*
21 F.3d 184 (7th Cir. 1994) .................................................................22

STATUTES

42 U.S.C. § 2000e-1(a) (2005) ......................................................15, 21

Cal. Educ. Code § 66270 (2005) .........................................................15

Cal. Gov. Code § 12926 (2005) ...........................................................21

Conn. Gen. Stat. § 46a-81p (2005) ......................................................23

Fed. R. Civ. P. 56 (2005) .......................................................................8

Haw. Rev. Stat. § 378-3(5) (2005) .......................................................23

Me. Rev. Stat. Ann. tit. 5, § 4553(10)(G) (2005) ................................23

Md. Ann. Code art. 49B, § 18(2) (2005) .............................................23

Mass. Gen. Laws. Ann. ch. 151B, § 1(5) (2005) .................................23

Minn. Stat. Ann. § 363A.20(2) (2005) .................................................23

Nev. Rev. Stat. 613.320.2 (2005) .........................................................23

N.H. Rev. Stat. Ann. § 354-A:2:VII (2005) .........................................23

N.J. Rev. Stat. Ann. § 10:5-12(a) (2005) ....................................................................23

N.M. Stat. Ann. § 28-1-9(C) (2005) ...........................................................................23

N.Y. Exec. Law § 296(11) (2005)................................................................................23

R.I. Gen. Laws § 28-5-6(15) (2005) ...........................................................................23

Vt. Stat. Ann. tit. 21 § 495(e) (2005) .........................................................................23

Wis. Stat. Ann. § 111.36(2) (2005) .............................................................................23

<u>OTHER AUTHORITIES</u>

Amicus Brief of the American Psychological Association, *et al.* in *Romer v. Evans*,
1995 WL 17008445 ......................................................................................................23

SUMMARY OF ARGUMENT

Defendants denied the Christian Legal Society chapter at Hastings access to the open speech forum it created for student groups because the chapter requires its leaders – and those who select them – to share the group's religious commitments and the moral conduct standards that are derived from those commitments. By doing so, Defendants put the chapter to an unenviable choice of relinquishing one of two things critical to its existence and mission: either its defining religious commitments or access to the channels of communication, funding, and meeting space necessary for the group to have a meaningful presence on campus.

The First Amendment to the United States Constitution does not permit governments to put religious individuals and organizations in such a position. The Free Speech Clause protects the right of individuals to gather together around shared beliefs so that they can live out those beliefs in community. *See* Part II.A, *infra*. It also prevents government from ejecting speakers from open fora created for speakers like themselves. *See* Part.II.B, *infra*. The Free Exercise Clause protects the freedom of religious individuals to exercise their beliefs without undue government interference. *See* Part II.C, *infra*. The Equal Protection Clause requires that the government treat similarly situated individuals in the same manner, without making any irrational or arbitrary distinctions.

Defendants have concluded that the CLS chapter's religiously profound acts of self-definition and self-expression violate school policies aimed at religious and sexual orientation discrimination. The College cannot show that its abridgement of the chapter's constitutionally protected rights is the least compelling means of achieving a compelling state interest. *See* Part II.E, *infra*.

This Court should extend the protections of the First and Fourteenth Amendments to the CLS chapters and enter an order granting the group summary judgment. *See* Part II.F, *infra*.

<u>NOTICE OF MOTION FOR SUMMARY JUDGMENT</u>

TO ALL PARTIES AND THEIR COUNSEL:  Please take notice that, pursuant to the order of this Court filed on August 5, 2005, on December 2, 2005, at 9:00 am, or as soon thereafter as the matter may be heard, at the United State Courthouse, 450 Golden Gate Avenue, San Francisco, California, 17th Floor, Courtroom 2, before the Honorable Jeffrey S. White, Plaintiff Christian Legal Society Chapter of University of California, Hastings College of the Law f/k/a Hastings Christian Fellowship will move this Court for summary judgment as a matter of law.   The grounds for the Motion are more fully set forth in the Complaint, Plaintiff's Memorandum of Law set forth below, the Joint Stipulation of Facts for Cross-Motions for Summary Judgment, the attached Declaration of Steven H. Aden and exhibits thereto, and the rest of the record before this Court.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

COMES NOW Plaintiff Christian Legal Society Chapter of University of California, Hastings College of the Law f/k/a Hastings Christian Fellowship ("CLS at Hastings," "the CLS chapter," or "the chapter") and enters its Memorandum in Support of Motion for Summary Judgment as follows:

I.   <u>STATEMENT OF FACTS</u>

A.   The Christian Legal Society and the CLS Chapter at the University of California, Hastings College of the Law Generally.

1.   National Christian Legal Society.

Founded in 1961, Christian Legal Society is a nationwide association of lawyers, law students, law professors, and judges who profess faith in Jesus Christ.  *See* Joint Stipulation of Facts for Cross-Motions for Summary Judgment ("Joint Stip."), at ¶ 31.  That shared devotion is reflected in the organization's Statement of Faith, the signing of which indicates a member's commitment to beliefs commonly regarded as orthodox in both the Protestant evangelical and Roman Catholic traditions.  *See id. at* ¶ 33.

In light of contemporary controversies regarding human sexuality, Christian Legal Society reaffirmed in March 2004 its understanding of biblical principles of sexual morality and explained how that understanding derives from and reflects its Statement of Faith.  *See* Exh. S to

Declaration of Steven H. Aden ("Aden Dec.").  Speaking through the Executive Committee of its Board of Directors, Christian Legal Society stated, "In view of the clear dictates of Scripture, unrepentant participation in or advocacy of a sexually immoral lifestyle is inconsistent with an affirmation of the Statement of Faith, and consequently may be regarded by CLS as disqualify such an individual from CLS membership."  *Id.; see also* Joint Stip., at ¶ 34.  Christian Legal Society reaffirmed that *all* people – not just those who have participated in homosexual conduct – fall short of biblical standards, and that Christ alone is able to restore the fellowship with God that has been disrupted by humankind's universal departure from those standards.  *See id.*

As expressions of the beliefs its members hold in common, Christian Legal Society's purposes include providing a means of society, fellowship, and nurture among Christian lawyers; promoting justice, religious liberty, and biblical conflict resolution; encouraging, discipling, and aiding Christian law students; and encouraging lawyers to furnish legal services to the poor.  *See* First Amended Verified Complaint ("FAC"), at ¶ 3.1.

2.      The CLS chapter at Hastings.

In furtherance of these purposes, the national Christian Legal Society organization maintains both attorney and law student chapters across the country.  *See* Joint Stip., at ¶ 31. Plaintiff CLS at Hastings is a law student chapter of the national organization.  *See id.; see also* FAC, at ¶ 3.3.  The group affiliated with the national Christian Legal Society for the first time in September 2004. *See* Exh. E to Aden Dec., at 60; *see also* Exh. D to Aden Dec., at 158. The mission of CLS at Hastings is to maintain a vibrant Christian law fellowship that enables its members, individually and as a group, to fulfill Christ's mandate to love God and to love their neighbors as themselves. Exh. E to Joint Stip., at 1.

CLS at Hastings welcomes all students to attend and participate in its meetings and other activities, without regard to their religious beliefs, sexual orientation, or sexual conduct. Joint Stip., at ¶ 36.  If students wish to become official voting members of CLS at Hastings, and thus eligible to choose and serve as leaders of the chapter, amend the group's constitution, or lead Bible studies, they must affirm their commitment to the group's foundational principle: a shared faith in Jesus Christ.  *Id.*  Those desiring these privileges affirm that commitment by signing the

Christian Legal Society Statement of Faith.  *See id.* at ¶ 33.  As noted above, Christian Legal

Society reaffirmed in March 2004 that its Statement of Faith entails certain standards regarding

sexual conduct; therefore, a Hastings chapter leader or voting member's embrace of the

Statement of Faith necessarily entails a commitment to abide by those standards.  *See* Exh. S to

Aden Dec.

CLS at Hastings holds weekly Bible studies led by one of the group's officers.  *See* Joint

Stip., at ¶¶ 44, 49.  The Bible studies cover a wide variety of topics, but are always centered on

the Christian beliefs reflected in the Christian Legal Society's Statement of Faith.  *See id.* at ¶

53.  The group periodically sponsors speakers at the law school covering such topics as

integrating Christian faith and the legal practice.  *See id.* at ¶ 44.  The group invites students to

attend Good Friday and Easter Sunday church services where its Christian beliefs are taught.

*See id.*  The chapter also hosts a beginning of the year beach barbeque; an annual Thanksgiving

feast; monthly fellowship dinners; and an end-of-year banquet, all of which are open to any

student who desires to come and learn more about the group's Christian beliefs.  *See id.*

B.      Hastings and Student Groups Generally.

The University of California, Hastings College of the Law ("Hastings" or "College"), a

public law school, encourages the formation of student groups by providing them a number of

rights, privileges, and benefits.  *See id.* at ¶ 9.  Student organizations access these benefits by

registering with the law school.  *See id.*  These benefits include a number of channels by which

student groups communicate with the law school community about their existence, ideals, and

activities.  *See id.*  Among these channels of communication are (1) participation in the annual

Student Organizations Faire where student groups set up tables to hand out materials, recruit

interested students, and generally make students, especially new students, aware of their

organization's existence; (2) the ability to send "mass" email messages to all members of the law

school community through student government; and (3) appearing in lists of student

organizations in the law school publications, including its website and College Bulletin.  Other

benefits include funding and access to meeting space.  *See id.*

During the 2004-2005 school year, there were approximately 60 registered student

organizations at Hastings, representing an array of purposes and viewpoints. *See* Joint Stip., at ¶ 7. Among them were the Black Law Students Association, the Clara Foltz Feminist Society, Silenced Right- Pro-Life Group, Hastings Republicans, Hastings Democratic Caucus, La Raza Students Association, Vietnamese American Law Society, and Hastings OUTLAW (a lesbian, gay, bi-sexual, transgendered student organization). *See* Exh. A to Joint Stip.

Registration entails submitting a registration form, licensing agreement for use of the College name and logo, and a copy of the student organization's constitution to the College's Office of Student Services. *See* Exh. B to Joint Stip., at 3. The Office of Student Services reviews student organization constitutions to determine, among other things, whether they comply with the College's Policy on Nondiscrimination. *See* Joint Stip., at ¶ 12. The Policy on Nondiscrimination provides:

> The College is committed to a policy against legally impermissible, arbitrary or unreasonable discriminatory practices. All groups, including administration, faculty, student governments, College-owned student residence facilities and programs sponsored by the College, are governed by this policy of nondiscrimination. The College's policy on nondiscrimination is to comply fully with applicable law.
>
> The University of California, Hastings College of the Law shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation. This nondiscrimination policy covers admission, access and treatment in Hastings-sponsored programs and activities.

*See id.* at ¶ 15.

In spite of the delineation of specific protected statuses in the policy, and in the absence of any policy language so stating, Hastings interprets the Policy on Nondiscrimination such that student organizations must allow *any* student, regardless of their status or beliefs, to participate in the group's activities and meetings and to become voting members and leaders of the group. *See* Joint Stip., at ¶ 18. For example, Hastings requires that the Hastings Democratic Caucus must allow an ardent Republican to be president of the organization. *See id.* A student organization's failure to comply with the Policy on Nondiscrimination will result in the denial of the status and benefits of registration. *See id.* at ¶ 17. Once a group is registered, however, Hastings does not actively check to determine whether the student organization is in fact abiding

1    by the terms of the policy.  *See* Exh. A to Aden Dec., at 93.

2           C.     CLS at Hastings' Difficulty Registering with Hastings.

3           Early in the 2004-2005 school year, CLS chapter vice-president Dina Haddad inquired

4    with the Hastings Director of Student Services, Judy Chapman, about the process for registering

5    CLS at Hastings with the law school.  *See* Exh. D to Aden Dec. at 60.  Haddad informed

6    Chapman at that time that the group was affiliating with the national Christian Legal Society.

7    *See id.* at 60-61.  Chapman handed Haddad a copy of the College's Policy on Nondiscrimination

8    and cautioned her that national organizations, like the Christian Legal Society, often have

9    membership or leadership policies that conflict with the Policy on Nondiscrimination.  *See id.* at

10   61, 64.

11          Shortly after her meeting with Chapman, Haddad applied to the Office of Student

12   Services for travel funds to cover a portion of the costs for her and CLS chapter president Isaac

13   Fong to attend the Christian Legal Society's 2004 annual conference in McLean, Virginia.  *See*

14   Joint Stip., at ¶ 37.  On or about September 9, 2004, Chapman awarded Haddad and Fong

15   $250.00 in travel funds to help with their travel expenses.  *See id.*

16          About a week later, on September 17, 2004, Haddad submitted CLS at Hastings'

17   registration form, license agreement for use of college name and logo, and constitution to the

18   Office of Student Services in order to register with the College.  *See id.* at ¶ 38.  Chapman

19   reviewed the CLS chapter's constitution and determined that the omission of the terms

20   "religion" and "sexual orientation" from group's nondiscrimination pledge and the chapter's

21   Statement of Faith requirement for members and officers likely ran afoul of the Policy on

22   Nondiscrimination and referred the matter to Hastings General Counsel, Elise Traynum, for her

23   review.  *See* Exh. A to Aden Dec., at 48, 106; *see also* Exh. D to Aden Dec., at 91.

24          Four days later, on September 21, 2004, Chapman emailed Fong informing him that

25   Traynum concluded that CLS at Hastings' constitution did in fact violate the religion and sexual

26   orientation provisions of the Policy on Nondiscrimination and that the group's constitution

27   would need to be revised to bring it into compliance with the policy.  *See* Joint Stip., at ¶ 39; *see*

28   *also* Exh. F to Joint Stip.  Chapman also invited Fong to meet with her to discuss the conflict

between CLS at Hastings' constitution and the Policy on Nondiscrimination.  *See See* Joint Stip., at ¶ 39.

On or about September 23, 2004, Fong, Haddad, and the CLS chapter secretary-treasurer met with Chapman to discuss the College's concerns about CLS at Hastings' constitution.  *See* Joint Stip., at ¶ 40.   At the meeting, Chapman informed the chapter officers that CLS at Hastings' constitution was not compliant with the Policy on Nondiscrimination because the group failed to open its membership and leadership to all students regardless of their religious beliefs or views on homosexuality.  *See id.*  Chapman further informed the officers that until the chapter's constitution was brought into compliance with the Policy on Nondiscrimination, the group could not register with the College.  *See* Exh. D to Aden Dec., at 89.  Near the close of the September 23, 2004 meeting, Haddad handed Chapman a letter prepared by counsel.  *See* Joint Stip., at ¶ 40.  The letter explained that all students are welcome to attend and participate in CLS chapter meetings.  *See* Exh. G to Joint Stip.  The letter also stated that a person "who has homosexual inclinations but does not engage in or affirm homosexual conduct, would *not* be prevented from serving as an officer or member."  *See id.* The letter described CLS at Hastings' shared belief in certain core principles as well as the application of those principles to the subject of human sexuality, and explained how compliance with these principles was among the criteria for choosing leaders and official voting members.  *See id.*

On October 1, 2004, Hastings General Counsel Traynum sent a letter to CLS at Hastings reaffirming that "to be one of our student-recognized organizations, CLS must open its membership to all students irrespective of their religious beliefs or sexual orientation."  *See* Joint Stip., at ¶ 41; *see also* Exh. H to the Joint Stip.

D.       Hastings' Treatment of Other Registered Student Organizations.

Hastings allows other registered student organizations to require that their members and/or leaders agree with the organization's beliefs and purposes.   Silenced Right- Pro-Life Group may require its members to support its pro-life purposes  (Exh. J to Aden Dec.); La Raza Student Association may restrict its voting membership, called "Policy Members," to students of La Raza background (Exh. 0 to Aden Dec.); Vietnamese American Law Society is free to

1    require its members to support the promotion of Vietnamese culture (Exh. I to Aden Dec.);

2    Hastings Motorcycle Riders Club may require its members to share an interest in owning and

3    riding motorcycles (Exh. L to Aden Dec.); Hastings Republicans may require that their members

4    and/or officers be registered Republicans (Exh. K to Aden Dec.); Hastings Health Law Journal

5    Development Team is fee to restrict membership to students desiring to provide a forum for

6    discussion amongst academics and professionals in the areas of law and medicine (Exh. G to

7    Aden Dec.); Legal Vines, a wine tasting club, may limit its membership to students over age 21

8    (Exh. P to Aden Dec.); Association of Trial Lawyers of America at Hastings may limit

9    membership to students supporting the national and local organization's objective of promoting

10   the civil justice system (Exh. N to Aden Dec.); Students Raising Consciousness at Hastings may

11   require members to support the group's mission to educate the student body about the issues

12   facing certain communities, particularly race, sexual orientation, and gender (Exh. H to Aden

13   Dec.); and Hastings OUTLAW is free to remove officers if they fail to support the

14   organization's pro-homosexual goals and objectives (Exh. Q to Aden Dec.).

15         For the academic years 1994-1995 to 2002-2003, a student organization calling itself the

16   Hastings Christian Legal Society, although not officially affiliated with the national Christian

17   Legal Society, was registered with Hastings.  *See* Joint Stip., at ¶ 23.  Its constitution restricted

18   voting membership to students who acknowledged in writing their agreement with the national

19   Christian Legal Society's Statement of Faith.[1]  *See* Exh. C to Joint Stip.

20         E.    Consequences of Hastings' Denial of Registration and Attendant Rights,
                  Benefits and Privileges.
21

22         Since the end of September 2004, CLS at Hastings has been unregistered.  *See* Joint

23   Stip., at ¶ 39, 40.  The CLS chapter is the only unregistered student group at the College.  *See*

24   Joint Stip, at ¶ 59.  About a week after Hastings denied the group registration, Haddad received

25   an email from Chapman informing her that the $250.00 set aside for she and Fong to travel to

26   _____

27         [1]    The Policy on Nondiscrimination was adopted by Hastings in June 1990 and, thus, was
     in effect for the entire period Hastings Christian Legal Society was registered with Hastings.  *See* Joint
28   Stip., at ¶ 16.

1   the Christian Legal Society's National Conference had been withdrawn.  *See id.* at ¶ 42.

2   Although Hastings offered to allow the CLS chapter access to meeting space at the law school in

3   its October 1, 2004 letter, CLS at Hastings met off-campus at one of the officer's apartments,

4   because of the College's policies limiting eligibility to reserve meeting space to registered

5   student organizations and commercial groups, such as Westlaw.  *See* Joint Stip., at ¶ 42.

6       On or about August 19, 2005, Fong inquired with Chapman about setting up an "advice

7   table" in front of the law school on August 23-24, 2005 to answer questions from first year

8   students about classes and jobs and to advertise CLS at Hastings' meeting schedule.  *See* Exhs. J

9   and K to Joint Stip.  Fong also sought permission to send "mass" emails through student

10  government; to place an announcement in the Office of Student Service's weekly newsletter, the

11  "Hastings Weekly"; to post signs on the designated student organization bulletin boards; and to

12  post an announcement on classroom chalkboards, all to promote the "advice table" and a bonfire

13  at Ocean Beach.  *See id.*  Fong was denied permission to send out mass emails, to use the

14  bulletin boards designated for use by student organizations, and to place announcements in the

15  Hastings Weekly.  *See id.* at ¶ 62.

16      On or about August 29, 2005, Fong received an email from Chapman informing him that

17  she had consulted Hastings General Counsel Traynum and determined that because CLS at

18  Hastings is not a registered student organization, it must remove any reference to "Hastings"

19  from its name.  *See* Joint Stip., at ¶ 60; *see also* Exh. J. to Joint Stip.

20          II.    UNDERLINE ARGUMENT AND CITATION OF AUTHORITY

21      "Summary judgment is appropriate when the 'pleadings, depositions, answers to

22  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

23  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

24  of law.'"  *Business Objects, S.A. v. Microstrategy, Inc.,* 381 F. Supp. 2d 1107, 1109 (N.D. Cal.

25  2005), *quoting*, Fed. R. Civ. P. 56(c) (2005).  An issue is "genuine" only if there is sufficient

26  evidence for a reasonable fact finder to find for the non-moving party.  *See Anderson v. Liberty

27  Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome

28  of the case.  *See id.* at 248.

1    There are no genuine issues of material fact in this case.  CLS at Hastings submitted its

2    registration form, licensing agreement, and constitution to Defendants in order to acquire the

3    status and benefits of a registered student organization.  Defendants denied the chapter such

4    status and benefits because the group refused to certify that it would open its voting membership

5    and officer positions to persons who oppose its religious beliefs.  Moreover, Defendants' denial

6    of registration violates "well-established First Amendment principles," and, therefore, CLS at

7    Hastings is entitled to judgment as a matter of law.  *Healy v. James,* 408 U.S. 169, 170-71

8    (1972)(holding that a state college's denial of official recognition to a local chapter of Students

9    for a Democratic Society was "governed by existing precedent").

10    A.    Right of Expressive Association.

11    Over thirty years ago, the United States Supreme Court held in *Healy v. James* that

12    "[t]here can be no doubt" that a state college's decision to withhold the status and benefits of

13    official recognition from a student organization because "the organization's philosophy was

14    antithetical to the school's policies" burdens or abridges the First Amendment right of

15    association.  *Healy,* 408 U.S. at 175, 181; *see also Widmar v. Vincent,* 454 U.S. 263, 268-69

16    (1981)(holding that "our cases leave *no doubt* that the First Amendment rights of speech and

17    association extend to the campuses of state universities")(emphasis added).  What were

18    considered "well-established First Amendment principles" by the Supreme Court in 1972 have

19    only been reinforced by the Court's more recent precedent.  *Healy,* 408 U.S. at 170.

20    As recently as 2000, the Supreme Court held that "'implicit in the right to engage in

21    other activities protected by the First Amendment' is 'a corresponding right to associate with

22    others in pursuit of a wide variety of political, social, economic, educational, religious, and

23    cultural ends.'"  *Boy Scouts of America v. Dale,* 530 U.S. 640, 647 (2000), *quoting, Roberts v.*

24    *United States Jaycees,* 468 U.S. 609, 622 (1984).  *See also IDK, Inc. v. County of Clark*, 836

25    F.2d 1185, 1193 (9th Cir. 1988)("The freedom of expressive association permits groups to

26    engage in the same activities that individuals may engage in under the first amendment.")

27    Accordingly, "[i]mpediments to the exercise of one's right to choose one's associates can violate

28    the right of association protected by the First Amendment."  *Hishon v. King & Spalding,* 467

U.S. 69, 80 n. 4 (1984)(Powell, J., concurring)(citation omitted).  Indeed, the Supreme Court recognized in *Roberts*, "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire.  Such a regulation may impair the ability of the original members to express only those views that brought them together."  *Roberts*, 468 U.S. at 623.  These constitutional protections of the First Amendment are "nowhere more vital than in our schools and universities."  *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972)(internal citations and quotations omitted).

1.     CLS at Hastings is engaged in protected expressive activity.

A group seeking to assert the right of expressive association must demonstrate that it "engage[s] in some form of expression, whether it be public or private."  *Dale*, 530 U.S. at 648. This threshold is minimal, however, as a group's speech qualifies for First Amendment protection even where it lacks a "narrow, succinctly articulable message."  *Hurley v. Irish-American Gay, Lesbian, Bisexual Group of Boston*, 515 U.S. 557, 570 (1995).

In *Dale*, the Supreme Court held that the Boy Scouts were an expressive association because its leaders spent time with members, instructing and engaging them in outdoor activities in an effort to instill traditional moral values, including the understanding that homosexual conduct is unhealthy behavior.  *Id.* at 649-50.  Like the Boy Scouts in *Dale*, CLS at Hastings seeks to affirm and encourage certain values in its members.  For the CLS at Hastings, as well as the national Christian Legal Society with which the group is affiliated, these values are embodied in a five point Statement of Faith.  *See* Joint Stip., at ¶ 33.  The Statement of Faith encapsulates what Christians have considered orthodox religious beliefs for millennia.  CLS at Hastings requires each of its of voting members and officers to agree with the Statement of Faith, because it is literally the means by which the *Christian* Legal Society at Hastings ensures that it is remains Christian.

CLS at Hastings expresses the Christian beliefs articulated in its Statement of Faith both publicly and privately.  For example, the chapter officers lead weekly Bible studies where these Christian beliefs are taught and discussed.  *See* Joint Stip., at ¶¶ 44, 49.  The CLS chapter

1   sponsors speakers at the law school, like Jeffery Ventrella from the Alliance Defense Fund, who

2   has spoken on integrating Christian faith and the legal practice.  *See id.* at ¶ 44.  The group has

3   invited students to attend Good Friday and Easter Sunday church services where these same

4   Christian beliefs are professed and celebrated.  *See id.*  CLS at Hastings has also hosted a beach

5   barbeque; an annual Thanksgiving feast; monthly fellowship dinners; and an end-of-year

6   banquet, all with the hope that members of the law school community might come and become

7   interested in learning more about the group's beliefs.  *See id.* Because "it is indisputable that an

8   association that seeks to transmit such a system of values engages in expressive activity," CLS at

9   Hastings is unquestionably an expressive association.  *Dale,* 530 U.S. at 650.

10                2.      Defendants' policies "significantly affect" CLS at Hastings'
11                        expression.

12          Since CLS at Hastings engages in protected expressive activity, the Court must next

13   determine whether Defendants' requirement that the chapter permit persons who do not share its

14   theological beliefs, or the moral standards concerning sexual conduct that derive from those

15   beliefs, to serve as voting members and officers, will "significantly affect" the organization's

16   ability "to advocate public or private viewpoints."  *Dale,* 530 U.S. at 650.  In its analysis, the

17   Court "must . . . give deference to [CLS at Hastings'] view of what would impair its expression."

18   *Id.* at 653.

19          Defendants maintain that CLS at Hastings' requirement that its voting members and

20   officers agree with the Statement of Faith is inconsistent with Hastings' Policy on

21   Nondiscrimination.  Yet if the chapter is to comply with the Policy on Nondiscrimination, the

22   group will cease exist.  Although a student organization with the name "CLS at Hastings" may

23   continue to exist, it would not be the same organization that its founding officers and members

24   intended it to be.  It would be stripped of the Christian beliefs and doctrine that define what its

25   means to be *Christian* Legal Society at Hastings as opposed to Hastings Social Club or Hastings

26   Sports Club.  Forcing CLS at Hastings to simply forego its Statement of Faith as a condition of

27   registration is asking the group to abandon its central message.  Because compliance with the

28   religion and sexual orientation provisions of the Policy on Nondiscrimination "impair[s] the

     ability of the original members to express only those views that brought them together," it

1   significantly affects the group's expressive association.  *Roberts,* 468 U.S. at 623.

2       Of particular note, CLS at Hastings' members and officers are the persons given

3   responsibility to set the future course of the group.  They have the power to elect and remove

4   officers, to amend the group's bylaws and constitution, and to teach and lead group Bible

5   studies.  *See* Joint Stip., at ¶  36.  For Defendants to force CLS at Hastings to bestow this

6   authority on any student who walks in the door, whether they accept or reject the group's core

7   Christian beliefs, will "seriously distort its collective decisions" and, ultimately, "impair[] the

8   group's essential function[]," to "maintain a vibrant *Christian* law fellowship on the School's

9   campus."  *Democratic Party v. Wisconsin,* 450 U.S. 107, 122 (1980); *see also* Exh. E to Joint

10   Stip. (emphasis added).

11       The Supreme Court has repeatedly held that this is exactly what the First Amendment

12   precludes the government from doing.  For example, in *Democratic Party v. Wisconsin*, 450

13   U.S. at 122-23, the Court held that the State of Wisconsin could not force the state Democratic

14   Party to admit Republicans and other non-Democrats into its membership ranks.  In *Hurley,* 515

15   U.S. at 574-75, the Court held that the Commonwealth of Massachusetts could not force the

16   organizers of a St. Patrick's Day Parade to admit a "gay pride" contingent into their parade

17   where that contingent would contradict the message the organizers intended the parade to

18   convey.  And in *Dale,* 530 U.S. at 653, the Supreme Court held the State of New Jersey could

19   not force the Boy Scouts to enlist a gay scoutmaster, because it would "force the organization to

20   send a message, both to the youth members and the world, that the Boy Scouts accepts

21   homosexual conduct as a legitimate form of behavior."  Likewise Defendants cannot force CLS

22   at Hastings to include in its leadership and membership, persons that reject its Statement of

23   Faith, including its application to human sexuality, because "the choice of [a] speaker not to

24   propound a particular point of view . . . is presumed to lie beyond the government's power to

25   control."  *Hurley,* 515 U.S. at 574-75.

26       The practical effects flowing from Defendants' denial of recognition to CLS at Hastings

27   also demonstrate that the group's associational rights are significantly burdened.  In *Healy,* 408

28   U.S., at 176, 181, in determining that Students for a Democratic Society's "rights protected by

the First Amendment" were violated, the Supreme Court observed that the "[d]enial of official recognition posed serious problems for the organization's existence and growth," including denying use of campus bulletin boards and the school newspaper.  Similarly, Defendants' refusal to register the CLS chapter directly affects the group's "access to the customary media for communication with the administration, faculty members and other students." *Id.* at 181.  CLS at Hastings is denied use of the "Hastings Weekly," Student Information Center folders, mass emails, designated student organization bulletin boards, listings on the Hastings website and College Bulletin, and participation in the annual Student Organizations Faire. *See* Joint Stip., at ¶¶ 9, 62.  "If an organization is to remain a viable entity in a campus community in which new students enter on a regular basis, it must possess the means of communicating with these students." *Id.*  Hastings' refusal to extend these means to CLS at Hastings serves as yet another impediment to the group's associational rights.

Moreover, while Defendants have offered CLS at Hastings access to meeting space, they also maintain that eligibility to reserve such space is limited by law school policy to registered student organizations.  *See* Joint Stip., at ¶ 10.  "Although defendant[s] voluntarily 'suspended' enforcement of the [p]olicy at the commencement of the litigation, defendant[s] ha[ve] never revoked the offending provisions."  *Roe v. Cheyenne*, 124 F.3d 1221, 1231 (10th Cir. 1997)(holding that plaintiff's rights were still violated where employer stopped enforcing drug policy, but would not amend or repeal its policy); *see also S.E.C. v. Koracorp Industries, Inc.,* 575 F.2d 692, 699 (9th Cir. 1978)("fact that illegal conduct ceased provides no further support for defendants' assurances that injunctive relief is unnecessary where the acts of contrition and process of reformation did not begin until" after commence of litigation).  Accordingly, without being granted registration, CLS at Hastings enjoys access to meeting space only at that good pleasure of the Defendants.  At any time, including at the conclusion of this litigation, Defendants may decide that they would prefer to allocate the CLS chapter's meeting space to some other purpose.   Because "denial of use of campus facilities for meetings and other appropriate purposes" is an "impediment to free association," Defendants' right of association is significantly affected.  *Healy,* 408 U.S. at 181; *see also American Civil Liberties Union of*

1   *Virginia, Inc. v. Radford College,* 315 F. Supp. 893, 898 (W.D. Va. 1970)(holding that forcing

2   ACLU student group to use college facilities on different terms than other student groups was a

3   "restraint on first amendment rights").

        B.      Free Speech Clause:  Exclusion of CLS at Hastings from Defendants'
4
              Speech Forum.
5

6   CLS at Hastings' "religious worship and discussion . . . are forms of speech and

7   association protected by the First Amendment." *Widmar,* 454 U.S. at 269.  "[P]rivate religious

8   speech, far from being a First Amendment orphan, is as fully protected under the Free Speech

9   Clause as secular private expression." *Capital Sq. Review Bd. v. Pinette,* 515 U.S. 753, 760

10  (1995).

11  By instituting a formal registration process for student groups and offering a number of

12  benefits, including access to channels of communication and funding, Defendants "created a

13  forum generally open for use by students groups." *Widmar,* 454 U.S. at 267 (holding that the

14  University of Missouri created a forum for students by accommodating student group meetings

15  and offering other benefits through a registration process); *Rosenberger v. Rector and Visitors of*

16  *the University of Virginia*, 515 U.S. 819, 830 (1995)(holding that the University of Virginia's

17  "Student Activities Fund" was a speech forum created for the benefit of student organizations);

18  *Board of Regents v. Southworth,* 529 U.S. 217, 230 (2000)(holding that the University of

19  Wisconsin created a forum for student groups through its student activities fund).

20  Almost 60 student organizations are registered with Hastings.  The groups range in

21  interests from the Clara Foltz Feminist Association to Hastings Republicans.  *See* Exh. A to Joint

22  Stip.  The forum includes at least three religious student groups, including one that reserves the

23  right to expel members for "gross misconduct."  *See* Exh. A to Joint Stip.  Accordingly, as a

24  student organization at Hastings, CLS at Hastings falls within the parameters of the forum.

25  Of course, Hastings may "act[] to preserve the limits of the forum it has created."

26  *Rosenberger,* 515 U.S. at 829.  Indeed, Defendants will likely contend that their forum is limited

27  to student groups that do not "discriminate" and that its exclusion of CLS at Hastings is simply

28  intended to preserve the lawful limits of the forum.  Yet that is demonstrably untrue.  Some of

the students groups already in the forum "discriminate" in their selection of leaders and/or

1   members.   For example, members of the Hastings Republicans must be registered Republican

2   voters.  *See* Exh. K to Aden Dec.  Voting membership in the La Raza Student Association is

3   restricted to students of La Raza background.  *See* Exh. o to Aden Dec.  Silenced Right- Pro-Life

4   Group limits membership to students committed to the organization's pro-life goals.  *See* Exh. J

5   to Aden Dec.  The Vietnamese American Law Society confines membership to students who

6   will respect the organization's purpose of promoting Vietnamese culture.  *See* Exh. I to Aden

7   Dec.  Hastings OUTLAW reserves the right to remove officers for working against the spirit of

8   the organization's pro-homosexual goals and objectives.  *See* Exh. Q to Aden Dec.  Ironically,

9   even a predecessor organization to CLS at Hastings, called Hastings Christian Legal Society,

10  was permitted to limit its voting membership to students that agree with the national Christian

11  Legal Society's Statement of Faith.  *See* Exh. C to Aden Dec.  Accordingly, in practice,

12  Hastings' forum is not limited to groups that do not "discriminate."

13          Defendants have suggested that federal and state law preclude the school from registering

14  student groups that discriminate on the basis of religion or sexual orientation.  In response to

15  interrogatories, Defendants even listed specific federal and state laws that allegedly bar

16  recognition of CLS at Hastings, including California Education Code § 66270, Section 31 of the

17  California Constitution, Title VII of the Civil Rights of Act of 1964, and Title IX of the

18  Educational Amendments of 1972.  *See* Exh. E to Aden Dec.  However, none of these laws reach

19  campus student groups.  For example, California Education Code § 66270 applies only to a

20  "program or activity conducted by any postsecondary educational institution."  Defendants go to

21  great pains to make clear that registered student organizations are not a program or activity of

22  the school.  Indeed, the school requires each registered group to "inform members and those

23  doing business with the organization that it is not College-sponsored and the College assumes no

24  responsibility for its activities."  Other laws, such as Title VII of the Civil Rights of Act of 1964,

25  do not even prohibit sexual orientation discrimination and actually explicitly exempt religious

26  organizations from the ban on religious discrimination.  *See* 42 U.S.C. § 2000e-1(a)

27  (2005)(exempting "religious corporation[s], association[s], educational institution[s] or

28  societ[ies]" from Title VII's coverage as to religious discrimination).  Accordingly, compliance

with federal and state law is not sufficient grounds to exclude CLS at Hastings from recognition.

"[S]peech discussing otherwise permissible subjects cannot be excluded from a . . . forum on the ground that the subject is discussed from a religious viewpoint."  *Good News Club v. Milford Central School*, 533 U.S. 98, 112 (2001).   Defendants may contend that CLS at Hastings' membership and leadership criteria have nothing to do speech.   However, in both *Hurley* and *Dale,* the Supreme Court made clear that the selection of officers and members is speech because it shapes the message an organization delivers. "[E]very participating unit affects the message conveyed."  *Hurley,* 515 U.S. at 572; *see also Dale*, 515 U.S. at 648.   Accordingly, for Defendants to deny registration to CLS at Hastings because of the religious criteria it uses to select its officers and members is religious viewpoint discrimination.   Indeed, it is indistinguishable from the University of Virginia's exclusion of Wide Awake Productions from the Student Activities Fund because of the group's desire to use monies for "religious activity," *Rosenberger,*  515 U.S. at 832, or the University of Missouri's denial of meeting space to Cornerstone because of the group's desire "to engage in religious worship and discussion." *Widmar,* 454 U.S. at 269.   For a school to "discriminat[e] against religious speech" is to "discriminat[e] on the basis of viewpoint" and it is always presumed unconstitutional. *Rosenberger,* 515 U.S. at 832.  *See Capital Sq. Review Bd.*, 514 U.S. at 761 (holding that strict scrutiny applied where expression was rejected "precisely because its content was religious").

Moreover, Defendants' contention that all student organizations must forego consideration of religious belief in their selection of leaders and members does not render the school's policy viewpoint neutral.   Religion is the only protected class in the Policy on Nondiscrimination that constitutes belief.   Thus, religious student organizations are placed at a distinct disadvantage to other groups in that in order to access the forum for student organization speech they must open their membership and leadership to those who reject their religious beliefs.   They are as disadvantaged as club sports teams or political student organizations would be were the school to prohibit student organizations from considering athletic ability or political beliefs by all student organizations.   The Defendants' policies are no more neutral than the policy in *Rosenberger* was viewpoint neutral because it would have denied funding for

1    "religious activity," by religious student organizations *and* the club volleyball team,

2    *Rosenberger,* 515 U.S. at 832, or the policy in *Widmar* was "viewpoint neutral" because both

3    Cornerstone *and* the College Libertarians were prohibited from using university facilities for

4    "religious worship or religious teaching." *Widmar,* 454 U.S. at 263.  A nondiscrimination policy

5    that forbids selecting members and leaders based their *religious* beliefs, and not on the basis of

6    other beliefs, is a viewpoint discriminatory policy.

7         C.    Free Exercise Clause.

8         Defendants also violated CLS at Hastings' free exercise rights when they denied the

9    group registration and its attendant benefits.  There can be no doubt that a religious organization

10   exercises its faith by identifying its core beliefs and by limiting its voting membership and

11   leadership to those who share those core beliefs and who adhere to conduct standards that derive

12   from those beliefs.  Defendants' Policy on Nondiscrimination, as applied to the CLS chapter,

13   directly impairs the group's ability to exercise its faith in this manner.

14         1.    Defendants' exclusion of CLS at Hastings runs afoul of *Smith*.

15         Hastings may argue that its ban on religious and sexual orientation discrimination is

16   facially neutral and generally applicable, and thus not subject to scrutiny under the Free Exercise

17   Clause under *Employment Division v. Smith*, 494 U.S. 872 (1990).  However, *Smith* expressly

18   preserved the application of strict scrutiny under the Free Exercise Clause for cases like this one.

19         First, the *Smith* court held that laws "imposing special disabilities on the basis of

20   religious views or religious status" are presumptively unconstitutional.  *Smith*, 494 U.S. at 877;

21   *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)(holding

22   that a local law targeting the use of animal sacrifice for religious purposes violated the Free

23   Exercise Clause).  The Policy on Nondiscrimination imposes such a special disability because it

24   explicitly refers to religion, but not other forms of belief.  While discrimination on the basis of

25   numerous *statuses*, such as sex, race, and national origin, are prohibited, the only *beliefs*

26   circumscribed by the policy are religious.  Because "the First Amendment obviously excludes all

27   'governmental regulation of religious *beliefs* as such,'" Defendants' policy violates the Free

28

1   Exercise Clause.   *Smith,* 494 U.S. at 877, *quoting, Sherbert v. Verner*, 374 U.S. 398, 402

2   (1963)(emphasis added).

3         Second, in its discussion of "hybrid rights" cases that must be subjected to strict scrutiny,

4   the *Smith* court stated, "it is easy to envision a case in which a challenge on freedom of

5   association grounds would likewise be reinforced by Free Exercise Clause concerns." *Smith,* 494

6   U.S. at 882.  Using the "cf." signal, the Court invoked *Roberts,* 468 U.S. at 622, a case involving

7   both freedom of association and a nondiscrimination rule, and quoted the following language:

8   "An individual's freedom to speak, to worship, and to petition the government for the redress of

9   grievances could not be vigorously protected from interference by the State [if] a correlative

10   freedom to engage in group effort toward those ends were not also guaranteed."  In so doing, the

11   Court affirmed that strict scrutiny should be applied to claims that involve both freedom of

12   expressive association and the free exercise of religion.  The instant dispute is just such a case.

13         Third, the *Smith* court observed that "where the State has in place a system of individual

14   exemptions, it may not refuse to extend that system to cases of 'religious hardship' without

15   compelling reason."  *Smith,* 494 U.S. at 884.  This is true whether the exemptions are available

16   by policy or by practice.  *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 167

17   (3rd Cir. 2002)(Borough's prohibition on Orthodox Jewish postings of lechis on power poles to

18   demarcate an *eruv*, or area in which certain acts were prohibited on the Sabbath, was subject to

19   strict scrutiny where "the Borough has tacitly or expressly granted exemptions from the

20   ordinance's unyielding language for various secular and religious . . . purposes."); *see also*

21   *Fowler v. Rhode Island,* 345 U.S. 67, 69 (1953)(Free Exercise Clause violated by enforcing

22   ordinance banning meetings in park against Jehovah's Witnesses while exempting other

23   religious groups).  Thus, because Defendants exempt, at least by practice, numerous student

24   organizations from the Policy on Nondiscrimination, such as the La Raza Student Association

25   and the Vietnamese American Law Society, the refusal to extend an exemption to CLS at

26   Hastings is subject to strict scrutiny.  *See* Exhs. I and 0 to Aden Dec.

27           2.    The Free Exercise Clause also forbids intrusion into CLS at
                    Hastings' matters of faith and doctrine.

28

Religious freedom encompasses the "power [of religious bodies] to decide for themselves, free from state interference, matters of . . . faith and doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *see also Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 714-14 (1976).   Indeed, federal statutes recognize and even affirmatively protect the right of religious organizations to use religious criteria in their employment decisions.  *See, e.g., Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 335 (1987)(upholding the constitutionality of the religious exemption in Title VII of the Civil Rights Act of 1964).  Justice Brennan has observed:

> Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself.  Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedoms as well.

*Id.* at 342 (Brennan, J., concurring).

The Ninth Circuit has also recognized that the "ministerial exception" to Title VII mandated by the Free Exercise Clause prohibits government from inquiring beyond a religious organization's stated religious basis for its personnel decisions.  *See Bollard v. California Province of the Society of Jesus,* 196 F.3d 940, 946 (9th Cir. 1999); *see also E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.,* 213 F.3d 795, 801 (4th Cir. 2000).  The ministerial exception protects not only churches, but other forms of religious association as well.  *See Shaliehsabou v. Hebrew Home of Greater Washington, Inc.,* 363 F.3d 299, 310 (4th Cir. 2004).  Defendants' insistence that CLS at Hastings relinquish its Statement of Faith requirement in order to be registered trenches on the chapter's right of religious autonomy.  Indeed, it is difficult to conceive of greater state interference with matters of faith and doctrine than forcing a religious organization to abandon its core religious beliefs.

D.     Equal Protection Clause.

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000), *quoting, Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 445 (1923).  In *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951),

1   the Supreme Court held that the denial of a park permit to the Jehovah's Witnesses while

2   permitting other groups, including religious groups, to use the park violated the Equal Protection

3   Clause.   The Court ruled, "[t]he right to equal protection of the laws, in the exercise of those

4   freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer

5   foundation than the whims or personal opinions of a local governing body." *Id.*

6        Defendants' application of the Policy on Nondiscrimination to CLS at Hastings is

7   arbitrary.   Defendants permit numerous other student organizations to choose members and/or

8   officers dedicated to their organization's cause.   For example, Silenced Right- Pro-Life Group

9   may select members who share its pro-life goals.   *See* Exh. J to Aden Dec.   The Vietnamese

10  American Law Society can require its members to respect the organization's purpose in

11  promoting Vietnamese culture.   *See* Exh. I to Aden Dec.   Hastings OUTLAW can remove

12  officers if they work against the group's pro-homosexual objectives.   *See* Exh. Q to Aden Dec.

13  Defendants, however, refuse to recognize CLS at Hastings unless the group will refrain from

14  considering religious beliefs in its selection of leaders and members.   Accordingly, Defendants'

15  treatment of CLS at Hastings is "arbitrary and wholly irrational" in light of its gracious treatment

16  of similarly situated student groups.   *Olech,* 528 U.S. at 565.

17       Defendants' treatment of the CLS chapter is also intentional.   Defendants will likely

18  again argue that CLS at Hastings has no evidence that the school acted with any animosity or

19  hostility in adopting and enforcing the Policy on Nondiscrimination.   Yet the CLS chapter need

20  not show that Defendants acted with "subjective ill will" toward the group.   *Id.*   Moreover,

21  evidence of intent can be found in a statute's "improper execution" just the same as it can be

22  deduced from the circumstances surrounding a statute's passage.   *Id.* at 564; *see also Squaw*

23  *Valley Development Co. v. Goldberg,* 375 F.3d 936, 944 (9th Cir. 2004).   For example, in *Olech*,

24  the Court found intent in the Village's deliberate demand of an easement from Grace Olech, not

25  in the passage of the land use regulation giving the Village the power to claim the easement.   *See*

26  *id.* at 565.   If that were not the case, many equal protection claims would never succeed since the

27  government can usually show that laws, such as land use regulations, are passed without the

28  intent to harm any particular person or class of persons.   Accordingly, Defendants' deliberate

decision to enforce the Policy on Nondiscrimination in a distinctly different manner from which it was enforced against other student groups is sufficient to show intent and, thus, CLS at Hastings is entitled to judgment as a matter of law.

      E.      **Defendants' Denial of Registration to CLS at Hastings Fails Strict Scrutiny.**

Defendants' infringement of the CLS chapter's First Amendment rights is subject to strict scrutiny, and thus is unconstitutional unless it is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar,* 454 U.S. at 270; *see also Dale,* 530 U.S. at 659 (regulation must "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieve through a means significantly less restrictive of associational freedoms"); *Healy,* 408 U.S. at 184 ("'heavy burden' rests on the college" to demonstrate appropriateness of denying SDS recognition).

Government does not have a compelling interest in forbidding religious organizations from "discriminating" on the basis of a person's religious beliefs or participation in sexual conduct deemed immoral by the religious group. Federal and state nondiscrimination laws almost unanimously accommodate religious organizations. For example, Title VII of the Civil Rights Act of 1964, which forbids covered employers from discriminating on the basis of religion, explicitly permits religious organizations to take religion into account in all of their employment decisions. *See* 42 U.S.C. § 2000e-1(a) (2005). California's state employment nondiscrimination law contains a blanket exemption from the prohibition on employment discrimination. *See* Cal. Gov. Code § 12926(d) (2005). Religious associations and corporations may consider religion as well as *any* of the other protected statuses listed in the statute in making employment decisions. *See id.* With the State conceding that it has no interest in preventing religious organizations from considering such characteristics as race and sex in their employment decisions, the State's College certainly cannot now claim such an interest in barring religious groups from considering the more obviously relevant quality of religious beliefs.

Additionally, almost every circuit court in the country, including the Ninth Circuit, has recognized the "'ministerial exception' to Title VII . . . carved out from the statute based on the commands of the Free Exercise and Establishment Clauses of the First Amendment." *Elvig v.*

*Calvin Presbyterian Church*, 397 F.3d 790, 790-91 (9th Cir. 2005).  *See also Natal v. Christian and Missionary Alliance,* 878 F.2d 1575, 1577-78 (1st Cir. 1989)*; Rayburn v. General Conf. of Seventh-day Adventists,* 772 F.2d 1164, 1168-69 (4th Cir. 1985)*; McClure v. Salvation Army,* 460 F.2d 553, 560 (5th Cir. 1972); *Hutchison v. Thomas,* 789 F.2d 392, 393 (6th Cir. 1986)*; Young v. Northern Illinois Conf. of United Methodist Church,* 21 F.3d 184, 185 (7th Cir. 1994)*; Scharon v. St. Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360, 363 (8th Cir. 1991)*; Gellington v. Christian Methodist Episcopal Church,* 203 F.3d 1299, 1302-04 (11th Cir. 2000)*; Minker v. Baltimore Annual Conf. of United Methodist Church,* 894 F.2d 1354, 1358 (D.C. Cir. 1990). The exception relieves religious organizations not only from Title VII's prohibition on religious discrimination but also from its prohibitions on consideration of race, sex, and national origin. Significantly, in the Ninth Circuit, the "ministerial exception" is interpreted to exempt religious organizations from state nondiscrimination laws in addition to Title VII.  *See Bollard v. California Province of the Society of Jesus,* 196 F.3d 940, 950 (9th Cir. 1999).  In light of this widespread recognition that government has no compelling interest in preventing religious organizations from discriminating even on the basis race, sex, and national origin, it is difficult to imagine how the Defendants could now claim such an interest in preventing religious organizations, such as CLS at Hastings, from "discriminating" on the basis of religion.

Regarding sexual orientation, the CLS chapter does not exclude anyone from membership or leadership on the basis of their "sexual orientation," *i.e.* inclinations toward persons of the same sex.  Rather CLS at Hastings believes that engaging in or advocating any sexual conduct, whether heterosexual or homosexual, outside the confines of traditional marriage is immoral.  For example, if a student were to advocate "wife swapping" that would preclude the student from membership or leadership just the same as promoting homosexual conduct.[2]  Moreover, to the extent Defendants may claim CLS at Hastings' policies, even as

---

[2]       The Ninth Circuit has recognized the distinction between homosexual "orientation" and homosexual conduct in the context of policies disfavoring such conduct.  *See, e.g., Meinhold v. Dept. of Defense,* 34 F.3d 1469, 1477-78 (9th Cir. 1994)("there is no question that the Navy's policy is constitutionally permissible to the extent it relates to homosexual *conduct*")(emphasis in original).  The American Psychiatric Association also acknowledges that "[s]exual orientation is different from sexual behavior because it refers to feelings and self concept. Persons may or may not express their sexual

1    stated, impinge on some state interest in precluding sexual orientation discrimination, only

2    fifteen states have amended their employment discrimination statutes to ban discrimination on

3    the basis of sexual orientation.   And each and every one of these statutes exempts religious

4    employers. [3]

5            Hastings itself evidently does not deem compelling its interest in preventing

6    discrimination.   After a student organization is registered with the school, Defendants take no

7    action to ensure that the group is in fact complying with the Policy on Nondiscrimination.

8    Moreover, among the almost 60 registered student organizations are a number whose

9    constitutions – which are on file with the law school – that explicitly require students to be of a

10   particular national origin, age, or political persuasion.   Indeed, the school even previously

11   approved a group using a former constitution from the national Christian Legal Society that

12   required students to affirm the same five-point Statement of Faith that is at issue in this case.

13   *See* Exh. C to Joint Stip.   Defendants' loose enforcement of their policy and their system of *ad*

14   *hoc* exemptions, ultimately, must "diminish the credibility of the government's rationale for

15   restricting speech in the first place."   *City of Ladue v. Gilleo,* 512 U.S. 43, 52-53 (1994); *see also*

16   *The Florida Star v. B.J.F.,* 491 U.S. 524, 540 (1989)(same).

17           In *Boy Scouts of America v. Dale*, 530 U.S. at 657-61, the Supreme Court held that New

18   Jersey's interest in eliminating sexual orientation discrimination in public accommodations was

19   outweighed by the significant burden it imposed upon the Scouts' expressive association rights.

20   *See also Hurley*, 515 U.S. at 579-581.   In so holding, the Court observed that the only times it

21   has upheld the application of nondiscrimination laws to private associations is when it "would

22

23   orientation in their behaviors."  Amicus Brief of the American Psychological Association, *et al.* in *Romer*
24   *v. Evans*, 1995 WL 17008445, at 9.  CLS at Hastings is aware of no authority for the proposition that
     government has a compelling interest in preventing private associations, particularly religious
25   associations, from withholding membership or leadership on the basis of an individual's sexual conduct,
     and *Meinhold* militates against such a conclusion.

26

27           [3]       *See* Cal. Gov't Code § 12926(d); Conn. Gen. Stat. § 46a-81p; Haw. Rev. Stat. § 378-
     3(5); Me. Rev. Stat. Ann. tit. 5, § 4553(10)(G); Md. Ann. Code art. 49B, § 18(2); Mass. Gen. Laws. Ann.
28   ch. 151B, § 1(5); Minn. Stat. Ann. § 363A.20(2); Nev. Rev. Stat. 613.320.2; N.H. Rev. Stat. Ann. § 354-
     A:2:VII; N.J. Rev. Stat. Ann. § 10:5-12(a); N.M. Stat. Ann. § 28-1-9(C); N.Y. Exec. Law § 296(11); R.I.
     Gen. Laws § 28-5-6(15); Vt. Stat. Ann. tit. 21 § 495(e); Wis. Stat. Ann. § 111.36(2).

1    *not* materially interfere with ideas that the organization sought to express." *Id.* at 657 (emphasis

2    added).  For example, in *Board of Directors of Rotary International v. Rotary Club of Duarte,*

3    481 U.S. 537, 548 (1987), the Supreme Court upheld the application of a state antidiscrimination

4    law to require the Rotary Club to accept women members, but the Court was quick to emphasize

5    that "the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any

6    significant way the existing members' ability to carry out their various purposes."

7            Here, unlike the Rotary Clubs at issue in *Duarte,* forcing CLS at Hastings to open its

8    membership and leadership to persons who oppose or reject its religious beliefs would

9    undermine the very purpose of the group – to maintain a Christian fellowship.  Thus, whatever

10   interest Defendants may claim in barring CLS at Hastings from "discriminating" on the basis of

11   religious beliefs, including beliefs about human sexuality, that interest is outweighed by the

12   tremendous burden the school imposes on the CLS chapter's First Amendment rights.

13           Defendants lack a sufficiently compelling justification for their application of the religion

14   and sexual orientation provisions of the Policy on Nondiscrimination to student religious groups

15   like CLS at Hastings.  Therefore, the school's enforcement of these rules against the chapter

16   plainly violates the First Amendment and the chapter is entitled to judgment as a matter of law.

17           F.      CLS at Hastings is Entitled to Injunctive and Declaratory Relief.

18           In order to receive permanent injunctive relief, a plaintiff must demonstrate "the

19   likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at

20   law." *Orantes-Hernandez v. Thornburgh,* 919 F.2d 549, 558 (9th Cir. 1990); *see also American-*

21   *Arab Anti-Discrimination Committee v. Reno,* 70 F.3d 1045, 1066-67 (9th Cir. 1995)(same).

22           1.      Irreparable Injury.

23           CLS at Hastings has suffered a loss of its First and Fourteenth Amendment rights at least

24   since September 2004 when Defendants denied the group the status and benefits of a registered

25   student organization.  The Supreme Court has held that "the loss of First Amendment freedoms,

26   for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*,

27   427 U.S. 347, 373 (1976)(plurality opinion); *see also Brown v. California Dept. of Transp.,* 321

28   F.3d 1217, 1226 (9th Cir. 2003)(same).  Until this Court enters injunctive relief in CLS at

1   Hatsings' favor, the group is denied access to student activity fee funding, channels of

2   communication, office space, the college name and logo, and definite access to meeting space.

3   *See* Joint Stip., at ¶¶ 9, 62.  Moreover, the group is denied registered status, which is itself

4   constitutionally significant.   *See Healy,* 408 U.S. at 182-83; *see also Gay Alliance of Students v.*

5   *Matthews,* 544 F.2d 162, 164-65 (4th Cir. 1976)("Consistent with *Healy . . .* we thus reject

6   VCU's argument that the members of GAS have suffered no infringement of their associational

7   rights because all that has been withheld is VCU's official seal of approval").  Accordingly, CLS

8   at Hastings has suffered and continues to suffer substantial and immediate irreparable injury.

9                           2.       No Adequate Remedy at Law.

10      There is no adequate remedy at law to compensate CLS at Hastings for the deprivation of

11   constitutional rights the group has suffered and continues to suffer at the Defendants' hands.  *See*

12   *American-Arab Anti-Discrimination Committee,* 70 F.3d at 1071; *see also Maurer v.*

13   *Individually and as Members of Los Angeles County Sheriff's Dept.,* 691 F.2d 434, 437 (9th Cir.

14   1982).   Injunctive and declaratory relief are the only means to ensure that Defendants will

15   respect CLS at Hastings' constitutional rights now and into the future.

16                      III.    <u>CONCLUSION</u>

17      For the foregoing reasons, Plaintiff respectfully requests that this Court enter an order

18   granting its Motion for Summary judgment.

19           Respectfully submitted, this 7th day of October, 2005.

20

21                           <u>      /s/ Steven H. Aden      </u>

22                           Steven H. Aden (DC Bar No. 466777)
                             (*Lead Counsel*)

23                           Gregory S. Baylor (TX Bar No. 1941500)
                             Timothy J. Tracey (GA Bar No. 715195)

24                           RELIGIOUS LIBERTY ADVOCATES

25                            OF THE CHRISTIAN LEGAL SOCIETY
                             8001 Braddock Road, Suite 300

26                           Springfield, Virginia 22151
                             Tel: (703) 642-1070

27                           Fax: (703) 642-1075

28                           Timothy Smith (No. 125534)

MCKINLEY & SMITH, A Professional Corporation
3445 American River Dr., Suite A
Sacramento, CA  95864
Tel: (916) 972-1333
Fax: (916) 972-1335

Steven Burlingham (No. 88544)
GARY, TILL & BURLINGHAM
5330 Madison Ave., Suite F
Sacramento, CA 95841
Tel: (916) 332-8112
Fax: (916) 332-8153

Of Counsel:

Benjamin W. Bull (AZ Bar No. 009940)
Gary S. McCaleb (AZ Bar No. 018848)
ALLIANCE DEFENSE FUND
15333 North Pima Road, Suite 165
Scottsdale, AZ  85260
Tel: (800) 835-5233
Fax: (480) 444-0028

ATTORNEYS FOR PLAINTIFF

1

## CERTIFICATE OF SERVICE

2    I hereby certify that the foregoing PLAINTIFF'S NOTICE OF MOTION FOR

3    SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF MOTION FOR

4    SUMMARY JUDGMENT was electronically filed through the District Court's ECF system and,

5    pursuant to Local Rule 5-5(b) and the Court's General Order No. 45 Electronic Case Filing (¶

6    IX.A), was thereby served by means of the ECF Notice of Electronic Filing to the parties and

7    counsel of record as follows:

8

9    Ethan P. Schulman
     eschulman@howardrice.com
10   Matt R. Schultz
     mschultz@howardrice.com
11   HOWARD RICE NEMEROVSKI CANADY
     FALK & RABKIN, A Professional Corporation
12   Three Embarcadero Center, 7th Floor
     San Francisco, CA  94111-4024
13

14   Christopher F. Stoll
     christopher.stoll@hellerehrman.com
15   HELLER EHRMAN LLP
     333 Bush Street
16   San Francisco, CA  84104-2878

17

18   Shannon Minter
     minter@nclrights.org
19   NATIONAL CENTER FOR LESBIAN RIGHTS
     870 Market Street, Suite 570
20   San Francisco, CA  94014

21

22   This 7th day of October, 2005.

23

24                                    _____/s/ Steven H. Aden_____
                                      Steven H. Aden
25

26

27

28