1  ETHAN P. SCHULMAN (No. 112466)
   MATT R. SCHULTZ (No. 220641)
2  HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
3  A Professional Corporation
   Three Embarcadero Center, 7th Floor
4  San Francisco, California  94111-4024
   Telephone:   415/434-1600
5  Facsimile:   415/217-5910

6  ELISE K. TRAYNUM (No. 127965)
   General Counsel and Secretary to the Board
7  HASTINGS COLLEGE OF THE LAW
   UNIVERSITY OF CALIFORNIA
8  198 McAllister Street, Mezzanine Level
   San Francisco, California  94102
9  Telephone:   415/565-4787
   Facsimile:   415/565-4825
10
   Attorneys for Hastings Defendants
11

12          UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA

14              SAN FRANCISCO DIVISION

15  CHRISTIAN LEGAL SOCIETY            No. C 04 4484 JSW
    CHAPTER OF UNIVERSITY OF
16  CALIFORNIA, HASTINGS COLLEGE OF    Action Filed:    October 22, 2004
    THE LAW, a/k/a HASTINGS CHRISTIAN
17  FELLOWSHIP, a student organization at    DEFENDANTS' NOTICE OF MOTION
    University of California, Hastings College    AND MOTION FOR SUMMARY
18  of the Law,                        JUDGMENT; SUPPORTING
                                       MEMORANDUM OF POINTS AND
19              Plaintiff,             AUTHORITIES AND IN OPPOSITION
                                       TO PLAINTIFF'S MOTION FOR
20         v.                          SUMMARY JUDGMENT

21  MARY KAY KANE, in her official capacity    Date:      December 2, 2005
    as Chancellor and Dean of the University of    Time:      9:00 a.m.
22  California, Hastings College of the Law;    Dep't:     Courtroom 2
    JUDY CHAPMAN, in her official capacity    Judge:     Hon. Jeffrey S. White
23  as Director of Student Services for
    University of California, Hastings College
24  of the Law; et al.,

25              Defendants.

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**TABLE OF CONTENTS**

| | Page |
|---|---|
| NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT | 1 |
| SUMMARY OF ARGUMENT | 2 |
| MEMORANDUM OF POINTS AND AUTHORITIES | 3 |
| STATEMENT OF FACTS | 3 |
| A. Hastings' Registration Of Student Groups And The Policy On Nondiscrimination. | 3 |
| B. For Years Prior To 2004-2005, CLS And HCF Did Not Bar Gay And Lesbian Students Or Non-Christians From Their Membership Or Leadership Positions. | 4 |
| C. In 2004-2005, CLS Changes Its Bylaws And Refuses To Comply With The Policy On Nondiscrimination. | 5 |
| D. CLS's Activities During The 2004-2005 And 2005-2006 Academic Years. | 6 |
| ARGUMENT | 7 |
| I. HASTINGS' REQUIREMENT THAT REGISTERED STUDENT GROUPS BE OPEN TO ALL INTERESTED STUDENTS DOES NOT VIOLATE CLS'S FREEDOM OF SPEECH. | 7 |
| A. Hastings May Impose Reasonable, Viewpoint-Neutral Rules For Registration And Participation In The College's Limited Public Forum. | 7 |
| B. The Nondiscrimination Policy Is Not Viewpoint Discriminatory. | 9 |
| C. The Nondiscrimination Policy Is Reasonable. | 11 |
| II. REQUIRING CLS TO ABIDE BY THE NONDISCRIMINATION POLICY IN ORDER TO BECOME A REGISTERED STUDENT ORGANIZATION DOES NOT VIOLATE ITS RIGHT OF EXPRESSIVE ASSOCIATION. | 13 |
| A. *Dale* Does Not Apply To Reasonable Viewpoint-Neutral Conditions On Participation In A Limited Public Forum And Access To Government Benefits. | 13 |
| B. Even If *Dale* Applied, CLS's "Expressive Association" Claim Fails Because CLS Has Not Shown That Admitting Interested Gay And Non-Christian Students Would Significantly Burden Its Message. | 16 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF CONTENTS

**Page**

    C.    The Nondiscrimination Policy Is Justified By A Compelling Government Interest.     20

III.    HASTINGS' NONDISCRIMINATION POLICY DOES NOT VIOLATE CLS' RIGHT TO THE FREE EXERCISE OF RELIGION.     23

    A.    The Policy Is A Neutral, Generally Applicable Policy That Is Rationally Related To Promoting Legitimate Public Interests In Preventing Discrimination.     23

    B.    Strict Scrutiny Does Not Apply Because The Policy Does Not Substantially Burden CLS's Practice Of Religion And Because CLS's Other Constitutional Claims Are Not Viable.     25

    C.    Even If Strict Scrutiny Applied, The Policy Is Narrowly Tailored To Advance A Compelling Government Interest.     27

IV.    HASTINGS' NONDISCRIMINATION POLICY DOES NOT VIOLATE EQUAL PROTECTION.     28

    A.    Hastings Has Not Treated CLS Differently Than Any Other Registered Student Organization.     29

    B.    CLS Has Not Proven That Hastings Acted With Discriminatory Intent.     29

CONCLUSION     30

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) — 23

*Barren v. Harrington*, 152 F.3d 1193 (9th Cir. 1998) — 29

*Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) — 10, 21

*Board of Regents of the Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217 (2000) — 8, 12

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) — 15, 28

*Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999) — 24, 27

*Bowen v. Roy*, 476 U.S. 693 (1986) — 23

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) — 2, 3, 14, 15, 16, 17, 20, 21

*Boy Scouts of America v. District of Columbia Comm'n on Human Rights*, 809 A.2d 1192 (D.C. 2002) — 17

*Boy Scouts of America v. Till*, 136 F. Supp. 2d 1295 (S.D. Fla. 2001) — 17

*Boy Scouts of America v. Wyman*, 335 F.3d 80 (2d Cir. 2003) — 10, 14, 15

*Brown v. California Dep't of Transp.*, 321 F.3d 1217 (9th Cir. 2003) — 8

*Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527 (2004) — 24, 25

*Chicago Area Council of Boy Scouts of America v. City of Chicago Comm'n on Human Relations*, 748 N.E.2d 759 (Ill. App. Ct. 2001) — 17

*Christian Gospel Church v. City & County of San Francisco*, 896 F.2d 1221 (9th Cir. 1990) — 26, 27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) — 23

*Cogswell v. City of Seattle*, 347 F.3d 809 (9th Cir. 2003) — 9, 11, 12

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985) — 8, 11

*Dillingham v. INS*, 267 F.3d 996 (9th Cir. 2001) — 29

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958 (9th Cir. 1999) — 7, 8, 9

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

*Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872 (1990)    23, 25

*Flint v. Dennison*, 361 F. Supp. 2d 1215 (D. Mont. 2005)    13

*Gay Lesbian Bisexual Alliance v. Pryor*, 110 F.3d 1543 (11th Cir. 1997)    8, 9

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)    9

*Healy v. James*, 408 U.S. 169 (1972)    13, 15

*Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044 (9th Cir. 2003)    8, 9

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001)    8

*Hsu ex rel. Hsu v. Roslyn Union Free School District*, 85 F.3d 839 (2d Cir. 1996)    18, 19, 20

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995)    17

*Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378 (1990)    26

*Kissinger v. Board of Trustees*, 5 F.3d 177 (6th Cir. 1993)    25

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)    9

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)    29, 30

*Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994)    11

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005)    9, 10, 11

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999)    27

*Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 945 F. Supp. 1355 (D. Or. 1996)    11

*Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*, 902 F. Supp. 492 (D.N.J. 1995), aff'd, 99 F.3d 101 (3d Cir. 1996)    11

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984)    10, 20, 21, 28

*Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995)    8, 9, 12

*Rounds v. Oregon State Bd. of Higher Educ.*, 166 F.3d 1032 (9th Cir. 1999)    8

*San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004)    23, 24, 25, 26, 27

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

Page(s)

*Serrano v. Francis*, 345 F.3d 1071 (9th Cir. 2003)     29

*Smith v. Fair Employment & Housing Comm'n*, 12 Cal. 4th 1143 (1996)     26, 28

*Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274 (Alaska 1994)     28

*Truth v. Kent Sch. Dist.*, No. C03-785P (W.D. Wash. Sept. 23, 2004), *appeal pending* (9th Cir. No. 04-35876)     21, 22

*United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996)     11

*Vigars v. Valley Christian Ctr.*, 805 F. Supp. 802 (N.D. Cal. 1992)     24

*Widmar v. Vincent*, 454 U.S. 263 (1981)     13

## Statutes

Cal. Educ. Code §220     28

Cal. Gov't Code
   §12940(a)     28
   §12955(a)     28

Cal. Penal Code §422.55     28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on December 2, 2005, at 9:00 a.m., in Courtroom 2 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102, Defendants Mary Kay Kane, in her official capacity as Chancellor and Dean of the University of California, Hastings College of the Law ("Hastings"); Judy Chapman, in her official capacity as Hastings' Director of Student Services; and the members of Hastings' Board of Directors in their official capacities (collectively "the Hastings Defendants") will move the Court for summary judgment against Plaintiff Christian Legal Society Chapter of the University of California, Hastings College of the Law ("CLS") on its remaining claims set forth in the Verified First Amended Complaint for Declaratory and Injunctive Relief (the "FAC"). This motion is brought pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there is no genuine issue as to any material fact and that Defendants are entitled to a judgment as a matter of law. The grounds for the Motion are more fully set forth in the accompanying memorandum of points and authorities set forth below, the Joint Stipulation of Facts for Cross-Motions for Summary Judgment ("JSOF"), the Declaration of Judith Chapman ("Chapman Decl."), the Declaration of Ethan P. Schulman ("Schulman Decl."), the Declarations of April M. Alex ("Alex Decl.") and Jessica Duncan ("Duncan Decl."), and the pleadings and record before the Court in the case.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# SUMMARY OF ARGUMENT

This case poses an important constitutional issue of first impression:   whether a religious student organization may compel a public university law school to fund its activities and to allow the group to use the school's name and facilities, although the group admittedly discriminates in its membership and leadership policies on the basis of both religion and sexual orientation.   CLS claims entitlement to an exemption from the law school's Policy on Nondiscrimination, which applies to all registered student organizations. However, its claims represent a radical extension of existing law that would effectively force public institutions to condone and even promote invidious discrimination, at the expense of the compelling societal interests embodied in broad antidiscrimination laws.

Hastings' Policy on Nondiscrimination does not violate CLS's right to free speech. Hastings is entitled to place reasonable, viewpoint-neutral limitations on the limited public forum it has created by recognizing and funding student groups.   Hastings' Policy draws no distinctions based on the viewpoint of student speech, and the requirement that such groups be open to all students is reasonable in light of the nature of the forum and the surrounding circumstances.   *See* Part I, *infra.*   Nor does the Policy violate CLS's freedom of expressive association.   *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), does not apply, since it involved an attempt to regulate membership in a private group, rather than a condition placed on access to a limited public forum and to government subsidies.   Even if it did, CLS has not shown that admitting interested gay or non-Christian students as members or allowing them to run for office would significantly impair its expressive activities.   Finally, in any event, the state has a compelling interest in enforcing antidiscrimination laws.   *See* Part II, *infra.*   CLS's free exercise claim also lacks merit:   Hastings' Policy is a neutral, generally applicable policy that is rationally related to promoting legitimate government interests in preventing discrimination, and has at most an incidental effect on CLS's practice of religion.   *See* Part III, *infra.*   Finally, its equal protection claim fails, since the Policy applies to all student groups, religious and non-religious alike, and CLS has not shown any proof of intent to discriminate against the former.   *See* Part IV, *infra.*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF FACTS**

3

4

**A.**   **Hastings' Registration Of Student Groups And The Policy On Nondiscrimination.**

5

6

7

8

9

10

11

12

13

14

15

16

Hastings is a public law school located in San Francisco and is part of the University of California. JSOF ¶2. Like many public universities, Hastings permits students to "register" student organizations. *Id.* ¶¶2 & 6. Student organizations must be registered to gain access to various benefits, including use of the Hastings name and logos, eligibility for funding by Hastings and the Associated Students of the University of California at Hastings, the ability to use various means of communicating with Hastings students, and access to various law school facilities. *Id.* ¶¶9-10. Hastings maintains this registration system to encourage students to pursue and develop educational interests related to the study and practice of the law, and to encourage students to pursue and develop personal and social interests together with other Hastings students. Chapman Decl. ¶4. Hastings has concluded that the formation of student groups furthers students' educational opportunities and fosters personal connections between students. *Id.*

17

18

19

20

21

22

23

24

25

26

27

Only student groups which agree to abide by the Policies and Regulations Applying to College Activities, Organizations and Students ("Policies and Regulations") are eligible for registration. JSOF ¶12. This includes the Policy on Nondiscrimination ("Nondiscrimination Policy" or "Policy"). JSOF ¶14, Ex. B at 65. The Policy provides, *inter alia*, that Hastings' programs and activities "shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation." *Id.* Hastings interprets the Policy as requiring registered groups to allow *any* interested student to participate, become a member or seek leadership positions in the group, regardless of the student's status or beliefs. JSOF ¶¶17, 18. Hastings has concluded that this is the most efficient way of ensuring that those groups to whom it provides benefits are furthering the general purposes of its registration system and not discriminating. Chapman Decl. ¶5.

28

CLS contends that Hastings has allowed other student groups to bar members who do

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    not support their beliefs or purposes.  Mot. 6-7, 14-15.  But none of those groups has a

2    membership policy that, like CLS's, explicitly discriminates on the basis of any protected

3    category.[1]  Moreover, all of those groups explicitly open their membership to "any" or "all"

4    Hastings students.[2]  While some of their bylaws contain general language referring to the

5    groups' objectives, Hastings' Director of Student Services has always interpreted such

6    language as informational only, not as authorizing those organizations to deny membership

7    to any Hastings student interested in joining.  JSOF ¶¶20-21; Chapman Decl. ¶8.  Indeed,

8    *none* of the student organizations CLS identifies has ever, to Hastings' knowledge, barred

9    any student from joining as a member.  Chapman Decl. ¶7.[3]  Hastings has never received a

10   complaint that any student was denied membership or the opportunity to participate in

11   leadership in any registered student organization on the basis of religion or sexual

12   orientation, nor has any registered student organization (including CLS) ever sought a

13   hearing for denial of registration.  JSOF ¶¶16, 19, 20.  Other than CLS, no registered student

14   organization, current or former, has ever sought an exemption from the Policy on

15   Nondiscrimination, which was adopted in 1990.  *Id.* ¶16.

**B.    For Years Prior To 2004-2005, CLS And HCF Did Not Bar Gay And Lesbian Students Or Non-Christians From Their Membership Or Leadership Positions.**

18        From the 1994-1995 through the 2003-2004 academic years, a student group known as

19   Hastings Christian Legal Society ("HCLS") or Hastings Christian Fellowship ("HCF") was a

---

20        [1]The bylaws of one student group (La Raza Law Students Association) registered in

21   the 2004-2005 academic year could be interpreted as requiring a "Raza background" for voting membership.  *See* Aden Decl., Ex. O.  The director of Student Services had not

22   understood La Raza's bylaws to impose this requirement and, after the issue was raised during her deposition (*see* Schulman Decl. Ex. A at 35-39), confirmed that La Raza does not

23   actually enforce this membership requirement.  Chapman Decl. ¶10.  La Raza currently is in the process of amending its bylaws to, *inter alia,* make it clear that membership in La Raza

24   is open to all students.  Chapman Decl. Ex. A.

25        [2]*See* Aden Decl. Exs. G, H, I, J, K, L, M, N, P.

26        [3]Of the ten groups CLS mentions, four—Students Raising Consciousness, Silenced Right, Motorcycle Riders Club, and Hastings ATLA—no longer exist as registered

27   organizations at Hastings.  Chapman Decl. ¶9.  The organization "Silenced Right" (which was founded in 2004 by CLS's co-leader Dina Haddad) never held a single meeting and

28   never functioned as an active student organization at Hastings.  Schulman Decl. Ex. B at 20.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   registered student organization at Hastings. JSOF ¶22. From the 1994-1995 through the

2   2001-2002 academic years, these groups used the same set of CLS bylaws, which provided

3   that the group would comply with Hastings' Policies and Regulations. *Id.* ¶24 & Ex. C.

4   From the 2002-2003 through 2003-2004 academic years, the group used a different set of

5   bylaws that provided that all students were welcome to become members. *Id.* ¶25 & Ex. D

6   ("MEMBERSHIP. . . . HCF welcomes all students of the University of California, Hastings

7   College of Law"). Although earlier HCLS bylaws contained a version of the CLS Statement

8   of Faith, in practice few HCLS members, and no members of HCF, actually signed that

9   statement (thereby becoming a member of CLS-National). *Id.* ¶29.

10   These groups did not bar gay and lesbian or non-Christian students from membership

11   or leadership positions. *Id.* ¶¶25, 57; Schulman Decl. Ex. B at 153; Alex Decl. ¶¶2-3;

12   Duncan Decl. ¶3. In practice, any Hastings student could become a member of the

13   organization, regardless of their sexual orientation or religion. *See id.* Indeed, during the

14   2003-2004 school year, HCF welcomed a lesbian student as a regular participant in its

15   meetings, including participation in group prayers and Bible studies, and at least two other

16   participants held beliefs inconsistent with what CLS considers to be "orthodox" Christianity.

17   JSOF ¶¶27, 28; Schulman Decl. Ex. B at 41-45; Duncan Decl. ¶4.

18   **C.   In 2004-2005, CLS Changes Its Bylaws And Refuses To Comply With The**
19       **Policy On Nondiscrimination.**

20   At the close of the 2003-2004 academic year, three students—Isaac Fong (President),

21   Dina Haddad (Vice President), and Julie Chan (Treasurer)—assumed leadership of HCF.

22   JSOF ¶30. They were not elected to these positions but, rather, assumed them informally.

23   *Id.* During the summer of 2004, they decided to formally associate the group with the

24   national Christian Legal Society ("CLS-National"). JSOF ¶31. They made this decision

25   without consulting other members or putting the decision to a vote. JSOF ¶46.

26   CLS-National required CLS to adopt a specific set of bylaws in order to become a

27   formal student chapter. JSOF ¶¶32-33 & Ex. E; Schulman Decl. Ex. C at 60-61, 68, 71-72;

28   Exs. 29-31. The bylaws for the 2004-2005 academic year require all members to sign a

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   "Statement of Faith," which CLS interprets as barring gay and lesbian and non-Christian

2   students from becoming members or officers of the group.  JSOF ¶¶33-35; FAC ¶3.8 ("A

3   person who engages in homosexual conduct . . . would not be permitted to become a

4   member or serve as [a CLS] officer").  No gay and lesbian or non-Christian students were

5   seeking to become members or officers in CLS at that time, and none have done so since.

6   JSOF ¶¶50, 54.  The officers' decision to adopt the new bylaws and affiliate with CLS

7   caused a number of HCF members to cease attending and one officer (Julie Chan) to resign.

8   *Id.* ¶¶46-47.

9       When CLS submitted these bylaws to Hastings at the beginning of the year, Hastings

10  requested that CLS change them to conform with the Nondiscrimination Policy.  JSOF ¶¶38-

11  39.  When CLS refused, Hastings informed CLS that it could not become a registered

12  student group, but that it nevertheless could use Hastings' facilities for meetings.  JSOF

13  ¶¶40-41 & Ex. H. However, CLS never requested to do so.  JSOF ¶58.

14  **D.   CLS's Activities During The 2004-2005 And 2005-2006 Academic Years.**

15      CLS's activities during the 2004-2005 academic year largely consisted of weekly

16  Bible study meetings and a handful of social activities regularly attended by some nine to

17  fifteen students.  JSOF ¶¶44, 48.  Other than CLS's three officers, only one other student

18  actually signed the Statement of Faith and became an official "member" of CLS.  JSOF ¶48.

19  These meetings were run as they had been during the prior year:  CLS's officers led the

20  group in Bible studies, and the meetings opened and closed with prayers.  JSOF ¶49.[4]  CLS

21  made no distinction between "members" of CLS who had signed the Statement of Faith and

22  "attendees" who had not:  either could lead the group in prayer or otherwise participate.

23  JSOF ¶51.  Other than its officers, CLS does not identify to the public who is or is not a

24  "member."  Schulman Decl. Ex. E at 2-3.  And all of CLS's meetings continued to be open

25

26      [4]CLS contends that its members "have the power" to lead Bible studies.  Mot. 12.
    However, the evidence is that although any attendee or member was welcome to lead the
27  group in prayer, only its officers led Bible studies.  JSOF ¶¶49, 51;  Schulman Decl. Ex. B at
    124 ("The discussions were led by the leaders").
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   to gay and lesbian and/or non-Christian students (although none, to CLS's knowledge,

2   attended), whose presence CLS officers stated would be a "joy" and "beneficial" to any

3   meeting.  Schulman Decl. Ex. B at 41, 43, 45, 127.  Aside from requiring that members or

4   officers sign the Statement of Faith, CLS does not have any procedure for ensuring that its

5   members or officers are not gay or non-Christian.  *See* Schulman Decl. Ex. C at 58-59.

6        During his deposition, CLS's President testified that CLS did not intend to submit the

7   officers' positions for the coming year to a vote by the membership.  Schulman Decl. Ex. D

8   at 60-62.  After the issue was raised, however, CLS held a vote among its few "members,"

9   and leadership passed to three new students.  JSOF ¶63.  In response to requests by CLS to

10  use its facilities, Hastings again confirmed that CLS may have access to its rooms and public

11  spaces for meetings and events and may use chalkboards and billboards to post

12  announcements about the organization and its events.  JSOF ¶61 & Ex. K.



13                              **ARGUMENT**

14  **I.   HASTINGS' REQUIREMENT THAT REGISTERED STUDENT GROUPS BE
        OPEN TO ALL INTERESTED STUDENTS DOES NOT VIOLATE CLS'S
15      FREEDOM OF SPEECH.**

16       CLS contends that by requiring it to admit all interested students as members, Hastings

17  has excluded it from a speech forum in violation of its right to free speech.  Mot. 14-17.  It

18  acknowledges that "Hastings may 'act[] to preserve the limits of the forum it has created.'"

19  Mot. 14 (citation omitted).  However, CLS does not address either the nature of the forum

20  involved or the corresponding legal standard.

21  **A.   Hastings May Impose Reasonable, Viewpoint-Neutral Rules For
            Registration And Participation In The College's Limited Public Forum.**

22

23       When faced with a challenge to a government regulation based on a claim that the

24  regulation violates a litigant's First Amendment right to freedom of speech, a court makes

25  three inquiries:  first, it determines whether the speech at issue is protected by the First

26  Amendment; second, it determines the nature of the forum in which the speech is regulated;

27  and third, it assesses whether the defendant's justification for the regulation satisfies the

28  requisite standard.  *E.g.*, *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958,

965 (9th Cir. 1999).   The standards by which limitations on access to the forum are evaluated depend heavily on the nature of the forum involved.  *See Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) ("The Supreme Court instructs us that, in assessing a First Amendment claim for speech on government property, 'we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic'") (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985)).

Generally speaking, there are three kinds of fora:  public fora, designated public fora, and nonpublic fora.  *DiLoreto*, 196 F.3d at 964-65.  "A traditional public forum, such as a public park or sidewalk, is a place 'that has traditionally been available for public expression.'"  *Id.* at 964.   In contrast, "[w]hen the government intentionally opens a nontraditional forum for public discourse it creates a designated public forum."  *Id.* Regulation of expressive activity in either a traditional or a designated public forum is generally subject to strict scrutiny.  *Id.* at 964-65.  "All remaining property is classified as nonpublic fora."  *Id.* at 965; *see also Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044, 1049 (9th Cir. 2003) (same); *Brown v. California Dep't of Transp.*, 321 F.3d 1217, 1222 (9th Cir. 2003) (same).   This includes "limited public forums," which are a "type of nonpublic forum that the government intentionally has opened to *certain groups* or to certain topics." *DiLoreto*, 196 F.3d at 965 (emphasis added).

The courts have repeatedly recognized that where, as here, a college or secondary school makes benefits available to certain registered groups comprised of its enrolled students, it creates a "limited public forum." *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995) (student activity fund available to registered student groups at university constituted a "limited public forum"); *see also, e.g., Board of Regents of the Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 229-30, 234 (2000) (same); *Rounds v. Oregon State Bd. of Higher Educ.*, 166 F.3d 1032, 1039 (9th Cir. 1999) (university's system for funding registered student groups with mandatory fees "created a limited public forum") (citing *Rosenberger*); *Gay Lesbian Bisexual Alliance v. Pryor*, 110 F.3d 1543,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1548-49 (11th Cir. 1997) (university's system for funding student groups created "limited public forum").

"In limited public fora, a *lenient reasonableness standard* applies to determine the validity of governmental regulations." *Cogswell v. City of Seattle*, 347 F.3d 809, 814 (9th Cir. 2003) (emphasis added). "Under this reasonableness test, the State can restrict access to a limited public forum so long as (1) the restriction does not discriminate according to the viewpoint of the speaker, and (2) the restriction is reasonable." *Id.*; *see also Hills,* 329 F.3d at 1049 (same); *DiLoreto*, 196 F.3d at 964-65 (same). "'The necessities of confining a [limited public] forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics.'" *Cogswell,* 347 F.3d at 815 (quoting *Rosenberger*, 515 U.S. at 829). Here, the Nondiscrimination Policy readily satisfies the twin requirements of viewpoint-neutrality and reasonableness.

**B.    The Nondiscrimination Policy Is Not Viewpoint Discriminatory.**

"Viewpoint discrimination occurs 'when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject.'" *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n.30 (9th Cir. 2005) (citation omitted). Here, however, Hastings' Policy does not prohibit any particular viewpoint, and it applies equally to all student groups, religious and non-religious alike, whatever the content or viewpoint of their speech.

Viewpoint discrimination arises when the government targets "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829, 832 (university's denial of funding to a student newspaper because of its Christian editorial viewpoints where the school funded other editorial viewpoints was viewpoint discriminatory); *see also, e.g., Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) ("speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint"); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 387-88, 393-94 (1993) (school district's denial of church's request to show films that dealt with family issues from a religious perspective where it allowed other

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   community groups to use its facilities to put on presentations about family issues was

2   viewpoint discriminatory).

3       Here, in contrast to the cited cases, the Policy is not viewpoint discriminatory, as it

4   makes no distinction between religious and non-religious speech, viewpoints or groups.

5   Instead, it prohibits *all* student groups from discriminating against other students based on

6   their membership in protected groups, regardless of their reasons for doing so.  In short, the

7   Nondiscrimination Policy—like numerous other federal and state nondiscrimination laws

8   that similarly prohibit invidious discrimination—is viewpoint neutral.  *See, e.g., Roberts v.*

9   *United States Jaycees*, 468 U.S. 609, 615, 623 (1984) (Minnesota Human Rights Act, which

10  bars denial of access to public accommodations "because of race, color, creed, religion,

11  disability, national origin or sex," "does not distinguish between prohibited and permitted

12  activity on the basis of viewpoint"); *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,

13  481 U.S. 537, 549 (1987) (Unruh Act similarly barring discrimination in public

14  accommodations "makes no distinctions on the basis of the organization's viewpoint"); *Boy*

15  *Scouts of America v. Wyman*, 335 F.3d 80, 93-95 (2d Cir. 2003) (Connecticut's Gay Rights

16  Law "prohibits discriminatory membership and employment policies not because of the

17  viewpoints such policies express, but because of the immediate harms—like the denial of

18  concrete economic and social benefits—such discrimination causes homosexuals").[5]

19      CLS nevertheless contends that because "only religious student organizations like

20  Plaintiff are prohibited by university policy from requiring that their members and officers

21  agree with their views," religious student organizations are placed at "a distinct disadvantage

22

23      [5]CLS contends that despite the plain language of the Policy, Hastings has allowed other
24  student groups to "discriminate" while at the same time prohibiting CLS from doing so.
    Mot. 14-15.   Not so.   As discussed above, *all* student groups are precluded from
25  discriminating against potential members based on their protected status.  In none of the
    examples CLS proffers did any other student group purport to exclude all members of a
26  protected group, such as all non-Christians or all gay and lesbian students.  *See* pp.3-4,
    *supra*.  In any event, even if Hastings *had* granted other student groups "exemptions" from
27  the Policy—and it did not—that would not render it viewpoint discriminatory "because these
    exemptions did not enable [Hastings] to discriminate against ideas it disfavored."  *Menotti*,
28  409 F.3d at 1130 (citation omitted).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  from other groups." Mot. 16-17.   However, a law of general application that prohibits

2  certain *conduct* (in this instance, discrimination based on sexual orientation or religion) is

3  not discriminatory merely because it may disproportionately affect a group holding a

4  particular viewpoint.   *E.g., Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994)

5  ("[T]he fact that the injunction covered people with a particular viewpoint does not itself

6  render the injunction content or viewpoint based"); *Menotti*, 409 F.3d at 1129 (that an

7  injunction barring access to areas close to international trade conference "predominantly

8  affected protestors with anti-WTO views" did not render it content-based).[6]   "The mere fact

9  that a class of persons with a particular viewpoint are more likely to violate the statute does

10  not render the law a viewpoint-based regulation of speech."   *Planned Parenthood of*

11  *Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 945 F. Supp. 1355, 1376-

12  77 (D. Or. 1996).[7]

13  **C.   The Nondiscrimination Policy Is Reasonable.**

14      Hastings' Nondiscrimination Policy also meets the second prong of the "lenient

15  reasonableness" standard applicable to limited public forums:  it is reasonable "'in light of

16  the purpose of the forum and all of the surrounding circumstances.'"   *Cogswell,* 347 F.3d at

17  817 (quoting *Cornelius*, 473 U.S. at 789).   Contrary to CLS's contention (Mot. 21-24),

18

19      [6]*See also, e.g., United States v. Dinwiddie*, 76 F.3d 913, 923 (8th Cir. 1996) (holding
   Freedom of Access to Clinic Entrances Act content- and viewpoint-neutral despite

20  disproportionate effect on those opposed to abortion, noting "there is no disparate-impact
   theory in First Amendment law"); *Presbytery of New Jersey of the Orthodox Presbyterian*

21  *Church v. Florio*, 902 F. Supp. 492, 518, 521-22 (D.N.J. 1995) (rejecting argument that New
   Jersey Law Against Discrimination prohibiting discrimination based on affectional or sexual

22  orientation discriminated against religious viewpoint that homosexuality is immoral, noting
   "[a]s long as a statute 'serves purposes unrelated to the content of expression,' it is content-

23  neutral, 'even if it has an incidental effect upon some speakers or messages but not others'"),
   *aff'd,* 99 F.3d 101 (3d Cir. 1996).

24      [7]CLS then contends that the Nondiscrimination Policy is not viewpoint neutral because
   it proscribes discrimination that is undertaken for religious reasons, but allows other groups

25  to exclude students based on their beliefs, so long as these beliefs are not religious in nature.
   Mot. 16-17.   However, Hastings interprets the Nondiscrimination Policy as requiring *all*

26  student groups to allow *all* students to become members and officers.   Chapman Decl. ¶5.
   That interpretation is binding here.   *See, e.g., Cogswell,* 347 F.3d at 816 ("In evaluating

27  [Cogswell's] facial challenge, we must consider [Seattle's] authoritative construction of the
   ordinance, including its own implementation and interpretation of it") (citation omitted).

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

"[t]here is no requirement that a restriction in a limited public forum be narrowly tailored or the government's interest be compelling for a restriction to be reasonable." 347 F.3d at 817.

Here, the "restriction"—the requirement that membership in registered student organizations be open to all interested students, without discrimination on the basis of protected status—is entirely reasonable in light of the purpose of the forum and its surrounding circumstances. Hastings is a public institution, subject to federal and state laws prohibiting discrimination. By recognizing and funding student organizations, it seeks to further students' education and their participation in the law school environment, and to foster students' interests and connection with their fellow students. Hastings has decided that the best way to effectuate the purpose of this forum is to require that student groups enjoying the benefits of its limited financial and physical resources be open to all interested students. That requirement furthers students' interests and education, including exposure to diverse points of view, while ensuring that public funds—including mandatory activity fees paid by all students—are not used to promote or support invidious discrimination.[8]

The Supreme Court has acknowledged that by opening their facilities to registered student groups and thereby seeking to "facilitate a wide range of speech," universities serve "important and substantial purposes." *Board of Regents v. Southworth*, 529 U.S. at 231.[9] At the same time, the Court has repeatedly recognized that a university may subject such groups to reasonable regulations consistent with its educational purpose.

A university differs in significant respects from public forums such as streets or

---

[8] CLS does not contend, nor could it, that Hastings "recast" a condition of the restriction as the purpose of the forum in light of this litigation. *Cogswell*, 347 F.3d at 817 n.4. To the contrary, Hastings "always intended the forum to be limited" (*id.*), since the Policy on Nondiscrimination has applied to all student groups since its adoption in 1990. JSOF ¶16.

[9] In particular, a university "may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall," and that a mandatory fee is necessary "to sustain an open dialogue to these ends." 529 U.S. at 233; *accord Rosenberger*, 515 U.S. at 840 (a mandatory student activity fee used for the purpose of supporting student groups is "designed to reflect the reality that student life in its many dimensions includes the necessity of wide-ranging speech and inquiry and that student expression is an integral part of the University's educational mission").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied its authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. (*Widmar v. Vincent*, 454 U.S. 263, 267-68 n.5 (1981))

*See also id.* at 276-77 ("we affirm the continuing validity of cases that recognize a university's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education") (citing *Healy v. James*, 408 U.S. 169, 188-89 (1972)); *see also, e.g., Flint v. Dennison*, 361 F. Supp. 2d 1215, 1218-20 (D. Mont. 2005) ("state university may, in the interest of preserving the quality and availability of educational opportunities for its students, place reasonable restrictions on free speech that would be impermissible outside of the academic environment"; upholding university's restrictions on student government campaign expenditures, which were designed to encourage and enable all students to participate in the university's system of student government).

## II. REQUIRING CLS TO ABIDE BY THE NONDISCRIMINATION POLICY IN ORDER TO BECOME A REGISTERED STUDENT ORGANIZATION DOES NOT VIOLATE ITS RIGHT OF EXPRESSIVE ASSOCIATION.

### A. *Dale* Does Not Apply To Reasonable Viewpoint-Neutral Conditions On Participation In A Limited Public Forum And Access To Government Benefits.

CLS's central argument is that Hastings' requirement that CLS agree to abide by its Nondiscrimination Policy in order to participate as a registered student group violates its right of expressive association. Mot. 9-14. CLS relies heavily on the Supreme Court's decision in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), which held that the application of New Jersey's public accommodations law to require the "forced inclusion" in the Boy Scouts of America of an "avowed homosexual and gay rights activist" (*id.* at 643, 648) as an assistant scoutmaster unconstitutionally infringed on the Boy Scouts' First Amendment right to expressive association. However, *Dale* involved an attempt to regulate membership in a private group in a way that would have forced the organization to send a message with which it disagreed, rather than a condition placed on access to a limited public forum or government subsidies, and therefore does not apply here.



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    In *Boy Scouts of America v. Wyman*, 335 F.3d 80 (2d Cir. 2003), the Second Circuit

2    considered a claim by the Boy Scouts against the State of Connecticut for denying its

3    application to participate in a workplace charitable contribution campaign. Like CLS, the

4    Boy Scouts sought to participate in this forum, but objected to complying with the State's

5    condition that participating groups agree to abide by a written policy of nondiscrimination.

6    *Id.* at 84-85. Like CLS, the Boy Scouts barred "known or avowed homosexuals" from

7    membership (or employment). *Id.* at 85. And like CLS, the Boy Scouts contended that its

8    right of expressive association had been violated. The court rejected this argument, on

9    grounds that apply equally here.

10    As *Wyman* explained, *Dale* does not apply where, as here, a private group is not being

11    directly forced to admit a member whose presence would impair its message, but, rather, is

12    seeking access to a nonpublic forum or government benefit that is conditioned upon

13    compliance with a reasonable and viewpoint-neutral condition of nondiscrimination:

> While *Dale*'s recognition of the Boy Scouts' expressive-associational right
> to exclude a gay activist from a leadership position sets the stage for the issues in
> this case, it does not determine their resolution. *Dale* considered New Jersey's
> attempt *to require* the Boy Scouts to admit a person who, the Supreme Court
> found, would compromise the Boy Scouts' message. Not surprisingly, the
> Supreme Court held that such state compulsion "directly and immediately
> affects . . . associational rights that enjoy First Amendment protection" and
> imposes a "serious burden" on them. The effect of Connecticut's removal of the
> BSA from the Campaign is neither direct nor immediate, since its conditioned
> exclusion does not rise to the level of compulsion. (*Wyman*, 335 F.3d at 91
> (citation omitted))

20    Instead, the court held that the Boy Scouts' claim "lies at the intersection" of two lines of

21    First Amendment cases: those involving nonpublic forums, discussed above (*see* Part I,

22    *supra*); and the doctrine of unconstitutional conditions. *Id.* at 92. The court found no need

23    to decide which line of authority applies, since under both, the restriction or condition at

24    issue will be upheld so long as it is both viewpoint neutral and reasonable. *Id.* The court

25    went on to hold that the state's requirement that organizations agree to abide by the

26    nondiscrimination policy as a condition of participation in the workplace campaign met both

27    requirements: it was viewpoint neutral, both facially and as applied, since it was not intended

28    to penalize the Boy Scouts for its viewpoint and the Boy Scouts presented no evidence that it

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

was applied selectively (*id.* at 92-97); and it was "a reasonable means of furthering Connecticut's legitimate interest in preventing conduct that discriminates on the basis of sexual orientation." *Id.* at 98.

Precisely the same conclusion follows here.  In contrast to *Dale*, where the state sought directly to force a private group to admit a leader whose very presence would have been antithetical to its message, this case, like *Wyman*, involves reasonable, viewpoint-neutral conditions placed upon a private group's right of access to a limited forum and to the government benefits (including funding and use of facilities) that accompany it.  Hastings, like the State of Connecticut, "has not prevented the [CLS] from exercising its First Amendment rights; it has instead set up a regulatory scheme to achieve constitutionally valid ends . . . ." 335 F.3d at 95 n.8.  The Policy does not directly compel CLS to admit members whose presence may impair its message.  Rather, CLS is free to maintain its policy barring gay and non-Christian students, but will only lose the benefits associated with being a registered student group at Hastings.  Nothing prevents it from continuing to meet, to speak and to advocate its viewpoints, just as it did during the entire 2004-05 academic year after this litigation was filed, and just as it continues to do to this day.[10]  If CLS chooses to avail itself of the benefits made available by Hastings, on a viewpoint-neutral basis, to all student organizations, it may do so only by agreeing to those conditions.  It may not, under the guise of protected First Amendment rights, force Hastings to exempt it from those conditions, and thereby force it to subsidize discrimination that Hastings would never tolerate in its own employment and other practices.  *Cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 602-04 (1983) (private schools that enforced racially discriminatory admissions standards on the basis of religious doctrine were properly denied tax-exempt status despite free exercise

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[10]Moreover, even as an "unregistered" student organization at Hastings, CLS continues to enjoy access to certain benefits, including the use of Hastings' facilities to hold meetings on campus and access to certain bulletin boards and chalkboards to communicate with prospective members and to publicize its activities.  In contrast, in *Healy v. James*, 408 U.S. 169 (1972), on which CLS relies for the proposition that denying it registered status is a "significant" burden (Mot. 13), the student group was not even allowed to meet in a cafeteria on campus. *See* 408 U.S. at 176.

1    claims; "Denial of tax benefits will inevitably have a substantial impact on the operation of

2    private religious schools, but will not prevent those schools from observing their religious

3    tenets").

4    **B.    Even If *Dale* Applied, CLS's "Expressive Association" Claim Fails Because
5    CLS Has Not Shown That Admitting Interested Gay And Non-Christian
     Students Would Significantly Burden Its Message.**

6        Even assuming that *Dale* applied in this very different context, CLS's claim still fails.

7    Under *Dale,* the elements of an expressive association claim are (1) whether the group

8    engages in "expressive association" (530 U.S. at 648); (2) whether the governmental action

9    at issue "affects *in a significant way* the group's ability to advocate public or private

10   viewpoints" (*id.* (emphasis added)); and (3) whether the government interest at stake fails to

11   justify the burden it imposes on the group's expressive association. *Id.* at 659.  Failure to

12   establish any one of these three elements is fatal to a group's claim.  Here, Hastings does not

13   dispute that CLS engages in "expressive association."  *See* Mot. 10-11.  However, CLS's

14   heavy reliance on *Dale* is misplaced, and on the undisputed facts, it cannot establish either of

15   the remaining elements.

16       The issue in *Dale* was whether the Boy Scouts had the right to prevent Dale, "an

17   avowed homosexual and gay rights activist" (*Dale,* 530 U.S. at 644), from becoming an

18   assistant scoutmaster.  The Court found first that the Boy Scouts was engaged in expressive

19   association, since its stated general mission was "'[t]o instill values in young people.'"  *Id.* at

20   648-50.   Next, it undertook to determine "whether the forced inclusion of Dale as an

21   assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or

22   private viewpoints."  *Id.* at 650.  The Court found that the Boy Scouts viewed homosexual

23   conduct as "not morally straight" (id. at 650-53), and that scoutmasters played an important

24   role as role models and adult leaders who "inculcate [youth members] with the Boy Scouts'

25   values—both expressly and by example."  *Id.* at 649-50.  Emphasizing Dale's background as

26   "the copresident of a gay and lesbian organization at college [who] remains a gay rights

27   activist," the Court concluded that his "presence in the Boy Scouts would, at the very least,

28   force the organization to send a message, both to the youth members and the world, that the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.* at 653.

Thus, *Dale*'s holding, which is premised largely on a "compelled speech" rationale, was based narrowly on the state's attempt to force the Boy Scouts to accept an avowed gay activist in a leadership position, which arguably would have undermined the Boy Scouts' ability to inculcate and promote its views on homosexuality.[11]  *Dale* does *not* stand for the proposition that an organization has the right to discriminate against an *entire class of individuals* based solely on their *non-public, private* religious or sexual orientation *status*. To the contrary:  the Court specifically cautioned that its holding "is not to say that an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message."  530 U.S. at 653.[12]

Here, in contrast, the mere admission of an interested gay or non-Christian student as a member of a student organization such as CLS sends no such message, if indeed it sends any "message" at all:  the mere fact (if it is even known) of a student's sexual orientation hardly renders that student an "avowed homosexual activist," and CLS members, unlike Boy Scouts scoutmasters, play no significant instructional role, either as leaders or as role models. CLS's discrimination is not limited to "avowed" gay and lesbian or non-Christian activists.

---

[11] The lower courts generally read *Dale*'s holding as confined to expressive leadership positions. *See, e.g., Boy Scouts of America v. District of Columbia Comm'n on Human Rights*, 809 A.2d 1192, 1201-03 (D.C. 2002) ("we have no doubt that the Court meant something of legal significance by coupling 'avowed homosexual' with—or distinguishing it from—'gay activist' in describing Dale"); *Chicago Area Council of Boy Scouts of America v. City of Chicago Comm'n on Human Relations*, 748 N.E.2d 759, 767-69 (Ill. App. Ct. 2001) (*Dale* does not apply to "nonexpressive" employment positions where the presence of a homosexual would not derogate from the Boy Scouts' expressive message); *but cf. Boy Scouts of America v. Till*, 136 F. Supp. 2d 1295, 1308 (S.D. Fla. 2001) (school board conceded that Boy Scouts' right to freedom of expressive association included "the right to exclude homosexuals as members or leaders in the organization").

[12] Indeed, *Dale* relied heavily on the earlier decision in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), which held that the organizers of the Boston St. Patrick's Day Parade had a First Amendment right to exclude a group of gay, lesbian and bisexual Irish Americans ("GLIB") from marching in the parade under their own banner. There, as the Court observed:  "[w]e noted that the parade organizers *did not wish to exclude the GLIB members because of their sexual orientations*, but because they wanted to march behind a GLIB banner." *Dale*, 530 U.S. at 653 (emphasis added).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 Nor does it concern an inherently "expressive" position within CLS such as scoutmaster.

2 Instead, it applies to *all* gay and lesbian individuals and non-Christians, *all* membership

3 positions, and *all* officer positions in the organization.

4       In a closely analogous case, *Hsu ex rel. Hsu v. Roslyn Union Free School District*, 85

5 F.3d 839 (2d Cir. 1996), the court found that a Christian high school student group could not

6 properly exclude all non-Christians from membership. The school district denied the

7 group's request for use of school facilities because the group's constitution required that its

8 officers be "professed Christians either through baptism or confirmation." *Id.* at 849-50.

9 The court, in determining whether the group's exclusionary practices constituted "speech"

10 under the Equal Access Act,[13] noted that the case did not present the same "compelled

11 speech" issue as *Hurley*:

> [W]e are not faced with the exclusion of a discrete group that will definitely
> communicate a specific message if included. Rather, a broad cross-section of
> people is excluded from leadership in the Club because they lack a personal
> characteristic or belief, without any showing that they would desire to
> communicate any particular message. (*Id.* at 856)

15 Accordingly, the court noted that "a religious test for membership or attendance" (which the

16 club previously had but agreed to drop) would be "plainly unsupportable" because "[i]t is

17 difficult to understand how allowing non-Christians to attend the meetings and sing (or listen

18 to) Christian prayers would change the Club's speech." *Id.* at 858 & n.17. However, the

19 court held that a religious test for officer positions could properly be regarded as protected

20 "speech"—but *only* as applied to those specific positions whose duties "consist of leading

21 Christian prayers and devotions and safeguarding the 'spiritual content' of the meetings."

22 *Id.* at 858. The group's exclusion of non-Christians from such leadership positions could be

23 upheld only *if* such exclusion occurred "to guarantee that meetings include the desired

24 worship and observance—*rather than for the sake of exclusion itself.*" *Id.* at 859 (emphasis

---

26      [13]The court relied on First Amendment case law, noting that because the Equal Access
27 Act "creates an analog to the First Amendment's default rule banning content-based speech
discrimination, cases discussing the meaning of 'speech' in First Amendment jurisprudence
28 are also interpretive tools for understanding the Act." 85 F.3d at 857.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    added).[14]

2       CLS's across-the-board bar to all gay and lesbian and non-Christian students becoming

3    members is *exactly* the kind of discrimination that *Hsu* recognized would be "plainly

4    insupportable." CLS resorts to hyperbole, claiming that if it were to comply with the Policy,

5    "the group will cease [to] exist" because its discriminatory membership requirements are

6    essential to its "central message." Mot. 11. But it has offered no *evidence* to establish that

7    these requirements are, in fact, necessary at all, let alone that they would "significantly"

8    burden its ability to advocate public and private viewpoints. In fact, the uncontested

9    evidence proves otherwise. Groups known as CLS or HCF operated for over ten years at

10   Hastings *without* explicitly barring students from becoming members or officers on the basis

11   of their religion or sexual orientation, and indeed without requiring members to sign the

12   Statement of Faith. JSOF ¶¶22-25, 29, 48; Alex Decl. ¶¶2-3; Duncan Decl. ¶3. At the time

13   that CLS changed its requirements, no one was seeking to join CLS who was gay or non-

14   Christian, and no one is currently seeking to join the group who is gay or non-Christian.

15   JSOF ¶¶50, 54, 57. It is hard to escape the impression that this is a theory in search of a

16   case.

17       Nor is there any evidence that the mere presence of a gay or non-Christian student

18   member at a CLS meeting would impair its "message" in any way. While the group

19   generally claims to view "unrepentant homosexual" conduct as inconsistent with its

20   Statement of Faith, the group never discussed the topic of homosexuality at its meetings,

21   private or public. JSOF ¶¶34, 52. During the year immediately preceding the filing of this

22   litigation, one participant in the group's meetings was known to be a practicing lesbian, and

23   others held beliefs inconsistent with what CLS considers to be orthodox Christianity, all

24   without any apparent ill effects. *Id.* ¶¶27-28. Indeed, even after this litigation was filed,

25

26       [14]The *Hsu* court based its holding solely on the Equal Access Act, and did not reach the
27   question whether the school district violated the group's constitutional right to free
     association by applying its nondiscrimination policy to the group. *See* 85 F.3d at 854 n.6,
28   873.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    any attendee or member—regardless of their faith or sexual orientation—was "welcome" to

2    *lead the group in prayer. Id.* ¶51. Under the circumstances, CLS's claim that it is entitled to

3    exclude all gay and non-Christian students from membership merely "because they lack a

4    personal characteristic or belief, without any showing that they would desire to communicate

5    any particular message" (*Hsu*, 85 F.3d at 856) is indefensible.[15]

6        Finally, CLS does not offer any persuasive reason that an across-the-board ban on gay

7    and lesbian students serving as officers is essential to its right of expressive association.  In

8    contrast to *Dale*, the group does not actively "inculcate" values relating to homosexual

9    conduct, nor do its student leaders serve as "role models" analogous to that of adult

10   scoutmasters leading Boy Scouts troops composed of minors.  As to CLS's requirement that

11   its officers be avowed Christians, in the unlikely event a student who holds "non-orthodox"

12   Christian beliefs, or who was raised in a different faith, joins the group as a member, the

13   group's members retain the power to decide whether to elect such a student an officer.  CLS

14   does not need, and is not entitled to, an exemption from the Nondiscrimination Policy that

15   would authorize it automatically to bar all such students from seeking office.

16   **C.    The Nondiscrimination Policy Is Justified By A Compelling Government
17          Interest.**

18       Finally, even if the Court were to conclude that the Nondiscrimination Policy imposes

19   a "significant" burden on CLS's free association rights, CLS still fails to meet the third

20   element required in *Dale*, because the Nondiscrimination Policy is justified by "compelling

21   state interests, unrelated to the suppression of ideas, that cannot be achieved through means

22   significantly less restrictive of associational freedoms."  *See Dale*, 530 U.S. at 648 (quoting

23   *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)).  As *Dale* itself acknowledged,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[15]*Hsu* did not present any issue regarding discrimination on the basis of sexual orientation.  However, the court observed that discrimination on other grounds such as race and sex "is almost always invidious" (85 F.3d at 868), and that if there were any indication that the exclusion of non-Christians from leadership would "subordinate or stigmatize them . . . , the School might be justified in refusing an exemption from its nondiscrimination policy."  85 F.3d at 869.  Thus, nothing in *Hsu* can be read to support CLS's across-the-board disqualification of gay and lesbian students from membership and leadership roles.

"the freedom of expressive association, like many freedoms, is not absolute."  530 U.S. at 648.  Thus, the Court did not disavow the holding in its earlier decisions that "States have a compelling interest in eliminating discrimination against women in public accommodations."  *Id.* at 657 (citing *Roberts* and *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987)).  Instead, it made clear that in each of those cases the Court "went on to conclude that the enforcement of these statutes would not materially interfere with the ideas that the organization sought to express."  530 U.S. at 657.  As discussed above, that is precisely the case here.   The state's compelling interest in eliminating discrimination on the basis of both religion and sexual orientation provides an alternative basis for upholding Hastings' Policy.

In *Truth v. Kent Sch. Dist.*, No. C03-785P (W.D. Wash. Sept. 23, 2004), *appeal pending* (9th Cir. No. 04-35876),[16] the district court granted a school district's cross-motion for summary judgment on closely similar constitutional claims arising out of a high school Bible club's exclusionary policy that, like CLS's, restricted voting membership and officers to students willing to sign a statement of faith and to comply with "Christian character, Christian speech, Christian behavior, and Christian conduct as generally described in the Bible."  Order at 5.  The court upheld the school's refusal to accord the club recognition and funding, holding that while the club has a First Amendment right to expressive association, "the School can justifiably limit that right in order to further a legitimate and compelling interest in not allowing an [Associated Student Body] club to discriminate on the basis of religion."  *Id.* at 18.  The court reasoned that interest is particularly compelling in the school environment:

> In this case, there is a legitimate and compelling state interest in having public schools provide equal opportunity and treatment to all students to participate in school activities programs without regard to religion, race, or sex (among other things).  The School District's nondiscrimination Policy 3210 is designed to further this compelling state interest. . . .  Providing equal opportunity and treatment includes providing all students with equal access to student clubs

---

[16]A copy of the district court's unpublished order is attached to the Schulman Declaration as Exhibit F.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

allowed to operate on campus.   Therefore, Policy 3210 prohibits denying individual students access to student activities programs such as student clubs on the basis of religion.   It is particularly important in the public school context to prevent race, religion, or sex-based exclusion or discrimination in the provision of school benefits and programs.   Preventing discrimination against these uniquely protected classes addresses past discrimination that our country has struggled to overcome.   A public school must not only prevent such discrimination, but has an affirmative obligation to provide access to all of the school's activities for all students regardless of their religion. (Order at 20-21)

Granting the club recognized status would violate the school's nondiscrimination policy "because it would deny individual students the opportunity to participate in the Club based on their religion." *Id.* at 22.   The court found its conclusion consistent with *Dale* because there was no evidence that enforcement of the policy would materially interfere with the club's expression:

> Here, there is no indication that inclusion of students of differing religious faiths and differing version of the Christian faith as general members will materially interfere with the Club's expression of its ideas.   The general members do not control the Club's Bible study and prayer functions.   They do not lead the Club in its spiritual activities, nor do they dictate or control the other members' religious beliefs.   If the Club were forced to open general membership to all students, the Club could still expound upon its particular religious beliefs, including for example the idea that only certain beliefs, conduct, and speech are truly Christian. (*Id.* at 23)

*See also id.* at 25 ("General members of the Club are merely participants, not leaders").   In short, because the club's exclusionary membership policy had "no integral connection to the Club's expression of its religious ideas," the court concluded that "the School can rightfully prioritize the School's legitimate interest in providing all students access to all student clubs without regard to the students' religious beliefs over the Club's interest in excluding such students as general members." *Id.* at 24.

Precisely the same conclusion follows here.   Hastings, as a state educational institution, has a compelling interest in preventing discrimination on the basis of both religion and sexual orientation. Further, it has a strong pedagogical interest in making educational opportunities, including participation in student organizations, available to all students, no matter what their faith or sexual orientation.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

## III.  HASTINGS' NONDISCRIMINATION POLICY DOES NOT VIOLATE CLS' RIGHT TO THE FREE EXERCISE OF RELIGION.

### A.  The Policy Is A Neutral, Generally Applicable Policy That Is Rationally Related To Promoting Legitimate Public Interests In Preventing Discrimination.

CLS's argument that the Nondiscrimination Policy violates its right to the free exercise of religion (Mot. 17-19) is readily answered.  Like any number of similar federal and state antidiscrimination laws, the Policy is a neutral, generally applicable policy that is rationally related to promoting legitimate government interests in preventing discrimination.  "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"  *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990) (citation omitted).  Thus, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  To withstand scrutiny, such a law must simply be rationally related to a legitimate government interest. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1030-31 (9th Cir. 2004); *see also Bowen v. Roy*, 476 U.S. 693, 707-08 (1986) ("Absent proof of an intent to discriminate against particular religious beliefs or against religion in general, the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest").  Accordingly, "a free exercise violation hinges on showing that the challenged law is either not neutral or not generally applicable."  *American Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1123 (9th Cir. 2002).

"A law is one of neutrality and general applicability if it does not aim to 'infringe upon or restrict practices because of their religious motivation,' and if it does not 'in a selective manner impose burdens only on conduct motivated by religious belief.'"  *San Jose Christian Coll.*, 360 F.3d at 1031 (quoting *Church of the Lukumi*, 508 U.S. at 533, 543).  In *San Jose*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   *Christian College*, the Ninth Circuit affirmed summary judgment for the city on a Christian

2   college's free exercise challenge to the city's denial of its rezoning application.  The court

3   observed that the challenged zoning ordinance applied "throughout the entire City, and there

4   is not even a hint that College was targeted on the basis of religion for varying treatment in

5   the City's application of the ordinance." 360 F.3d at 1032.  On those facts, the Court found

6   the ordinance to be neutral and generally applicable, and the conclusion "unavoidable" that

7   any incidental burden upon the college's free exercise of religion did not violate the First

8   Amendment.  *Id.*

9       Precisely the same conclusion follows here:  Hastings' Nondiscrimination Policy

10   applies throughout the School of Law to "all groups" including all registered student

11   organizations, religious and non-religious alike, and "there is not even a hint" that CLS was

12   targeted on the basis of religion for varying treatment in Hastings' application of the Policy.

13   To the contrary, in dismissing CLS's Establishment Clause claim, this Court found that

14   Hastings' Policy is "facially neutral" (Order at 13), and that it does not target religious

15   groups, as it would equally bar an atheist student group from discriminating against a

16   religious student interesting in joining such a group.  *Id.*  Finally, there can be no question

17   that a facially neutral antidiscrimination law such as Hastings' Policy is rationally related to

18   the legitimate public interest in eliminating discrimination.  As this Court has already ruled,

19   the Policy has as its object the "plausible secular purpose . . . [of] protecting against and

20   eliminating discrimination at Hastings." *Id.* at 6 (citing *Bollard v. California Province of*

21   *the Society of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999) ("This court has already held that

22   Title VII has an obvious secular legislative purpose").[17]



23   _____

24       [17]*Accord Vigars v. Valley Christian Ctr.*, 805 F. Supp. 802, 809 (N.D. Cal. 1992) ("There is no allegation, nor can there be, that Title VII's prohibitions are directed at

25   religious beliefs or the exercise of religion.  Title VII neither regulates religious beliefs, nor burdens religious acts, because of their religious motivation.  On the contrary, it is clear that

26   Title VII is a secular, neutral statute which, in this case, incidentally has a profound impact on defendants' free exercise of their religion") (citation omitted); *see also, e.g., Catholic*

27   *Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 549 (2004) (upholding Women's Contraception Equity Act, requiring certain health and disability insurance

28   contracts to cover prescription contraceptives, against free exercise challenge by church-
(continued . . .)

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**B.    Strict Scrutiny Does Not Apply Because The Policy Does Not Substantially Burden CLS's Practice Of Religion And Because CLS's Other Constitutional Claims Are Not Viable.**

Despite the *Smith* test, CLS briefly argues that strict scrutiny should apply here.  Mot. 17-18.  Its arguments lack merit.

*First*, CLS argues that the Policy is presumptively unconstitutional because it imposes a "special disability" on the basis of religion and directly regulates religious beliefs.  Mot. 17-18.  But as discussed elsewhere, that charge is simply incorrect.  *See* pp.9-11, *supra*.

*Second*, CLS asserts that strict scrutiny applies where the state makes available individual exemptions from its policy.  Mot. 18.  Again, however, the assertion that Hastings has "exempted" any other student group from the Policy is false.  *See* pp.3-4 & nn.5, 7, *supra*.

*Third*, CLS argues that the Policy falls within the so-called "hybrid rights" exception to rational basis review.  Mot. 18.  On this theory, a law that burdens the free exercise of religion *and* some other constitutionally protected activity must satisfy the strict scrutiny test:  *i.e.*, the law must be narrowly tailored to advance a compelling government interest.  *San Jose Christian Coll.*, 360 F.3d at 1031.[18]  However, strict scrutiny applies only if the challenged law *substantially* burdens free exercise; if it "only incidentally burdens the free exercise of religion, with the law being both neutral and generally applicable, it passes

_____

( . . . continued)
affiliated employer which opposed contraceptives on religious grounds because Act's "requirements apply neutrally and generally to all employers, regardless of religious affiliation," and conflicts with employer's religious beliefs "only incidentally, because those beliefs happen to make prescription contraceptives sinful").

[18]There is considerable doubt as to the viability of the so-called hybrid rights exception, which stems from dicta in *Smith*. As the California Supreme Court has observed, "[t]he high court has not, since the decision in *Smith*, determined whether the hybrid rights theory is valid or invoked it to justify applying strict scrutiny to a free exercise claim." *Catholic Charities of Sacramento*, 32 Cal. 4th at 557 (citation omitted).  The lower federal courts are split on the issue.  For example, the Sixth Circuit has rejected as "completely illogical" the proposition that "the legal standard [of review] under the Free Exercise Clause depends on whether a free-exercise claim is coupled with other constitutional rights." *Kissinger v. Board of Trustees*, 5 F.3d 177, 180 (6th Cir. 1993).  Moreover, "no court has relied on [the hybrid rights exception] to grant relief." *Catholic Charities of Sacramento*, 32 Cal. 4th at 557.  Nevertheless, we assume for purposes of these cross-motions that the exception is viable in this Circuit.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

constitutional muster unless the law is not rationally related to a legitimate governmental interest." *Id.* (citing *Miller*, 176 F.3d at 1206); *see also, e.g., Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 384 (1990) (the "free exercise inquiry asks whether government has placed a *substantial burden* on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden") (internal quotation marks omitted; emphasis added).

Here, as discussed in more detail above, Hastings' Policy has at most an incidental effect on CLS's free exercise of religion, and does not impose any substantial burden on free exercise that would trigger strict scrutiny review. If the group chooses to continue to insist on its right to discriminate rather than open its membership rolls to all interested students, it may forego some of the benefits normally accorded to registered student organizations, such as the $250.00 travel funding that is the sole concrete "burden" that CLS has been able to demonstrate on the record before the Court. Nevertheless, it may continue to meet on College facilities, to communicate with members and prospective members utilizing College blackboards and other means of communication, and to fully engage in religious practices including prayer and Bible study.

Thus, the only burdens the Policy imposes are those "of convenience and expense, requiring appellant to find another home or another forum for worship." *Christian Gospel Church v. City & County of San Francisco*, 896 F.2d 1221, 1224-25 (9th Cir. 1990) (affirming summary judgment for city on free exercise challenge to denial of a zoning permit that would have entitled the plaintiff church to hold worship services in a residential area, holding that "the burden on religious practice in this case is minimal").[19] Moreover, the fact that CLS and its predecessor organizations engaged in precisely the same religious practices for years while expressly *agreeing* to comply with the Nondiscrimination Policy weighs

_____

[19] *See also, e.g., Smith v. Fair Employment & Housing Comm'n*, 12 Cal. 4th 1143, 1174 (1996) ("The parties have not brought to our attention a single case in which the Supreme Court exempted a religious objector from the operation of a general law when the court also recognized that the exemption would detrimentally affect the rights of third parties").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

heavily against its free exercise claim: "The burden on religious practice is not great when the government action . . . does not restrict current practice but rather prevents a change in religious practice." *Christian Gospel Church*, 896 F.2d at 1224.

Finally, "a plaintiff does not allege a hybrid-rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." *Miller v. Reed*, 176 F.3d 1202, 1208 (9th Cir. 1999). Rather, "to assert a hybrid-rights claim, a free exercise plaintiff must make out a colorable claim that a companion right has been violated—that is, a fair probability or a likelihood, but not a certitude, of success on the merits." *San Jose Christian College*, 360 F.3d at 1032 (citing *Miller*, 176 F.3d at 1208). Here, however, CLS has not asserted any other viable constitutional claim, since, as discussed elsewhere, its free speech, freedom of association and other claims are all susceptible to summary judgment in Hastings' favor. Where, as here, summary judgment is granted in favor of the defendant on the plaintiff's companion claims, the free exercise claim is analyzed under the *Smith* rational basis test. *San Jose Christian College*, 360 F.3d at 1032-33 (hybrid rights exception did not apply where court affirmed summary judgment on college's freedom of speech and free association claims).[20]

### C.   Even If Strict Scrutiny Applied, The Policy Is Narrowly Tailored To Advance A Compelling Government Interest.

Finally, even if CLS's free exercise challenge to Hastings' Policy must be determined on the basis of strict scrutiny, it would not invalidate that Policy, which is narrowly tailored to advance a compelling government interest. There can be no doubt that the government

---

[20]CLS's further argument that Hastings' Policy "trenches on the chapter's right of religious autonomy" in violation of the "ministerial exception" to Title VII (Mot. 19) requires little response. "The ministerial exception to Title VII 'precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them.'" *Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 945 (9th Cir. 1999) (citation omitted). This is not an employment discrimination dispute under Title VII; CLS's student leaders are not "ministers"; and a student group is not a church or other organized religious organization entitled to invoke the exception.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

has a compelling interest in preventing discrimination.   At the federal level, that interest, which is embodied in a variety of statutory antidiscrimination laws, has been repeatedly recognized by the United States Supreme Court.[21]   In this State, there are similar express statutory prohibitions against discrimination on the basis of, among other things, religion and sexual orientation.[22]   Hastings' Policy, which squarely prohibits such discrimination, is directly and narrowly tailored to advance precisely these compelling state interests.   As one court has observed, "The most effective tool the state has for combating discrimination is to prohibit discrimination; these laws do exactly that.   Consequently, the means are narrowly tailored and there is no less restrictive alternative."   *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 280 n.9 (Alaska 1994).[23]

## IV.   HASTINGS' NONDISCRIMINATION POLICY DOES NOT VIOLATE EQUAL PROTECTION.

In its Order, this Court dismissed CLS's Equal Protection claim, on two independent grounds.   CLS subsequently amended that claim by adding three paragraphs of new allegations in its First Amended Complaint.   FAC ¶¶10.2-10.4.   However, the amended



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[21] *See, e.g., Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) (compelling government interest in preventing discrimination based upon gender); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) ("overriding interest" in eradicating racial discrimination).

[22] *See* Cal. Gov't Code §§12940(a), 12955(a) (prohibiting discrimination based on religion or sexual orientation); Cal. Educ. Code §87100 (same); Cal. Educ. Code §220 (prohibiting discrimination on the basis of sex, ethnic group identification, race, national origin, religion, color, mental or physical disability, or any actual or perceived characteristic as defined in California Penal Code Section 422.55, which includes sexual orientation).

[23] Applying strict scrutiny, two state supreme courts have rejected closely comparable challenges to state nondiscrimination laws by landlords who objected on free exercise grounds to renting to unmarried couples, finding that the laws were narrowly tailored to advance the compelling state interest in preventing discrimination on the basis of marital status.   *Smith v. Fair Employment & Housing Comm'n*, 12 Cal. 4th 1143, 1165-76 (1996); *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 280-84 (Alaska 1994).   As *Swanner* eloquently explained, the government's "interest in preventing discrimination based on irrelevant characteristics directly conflicts with [landlord's] refusal to rent to unmarried couples. . . . Allowing . . . discrimination that degrades individuals, affronts human dignity, and limits one's opportunities results in harming the government's . . . interest in preventing such discrimination," which "will clearly 'suffer if an exemption is granted to accommodate the religious practice at issue.'"   874 P.2d at 283.   Moreover, any burden placed on the landlord by the law "falls on his conduct and not his beliefs."   *Id.*

1   claim is defective on the same grounds as the original claim.

2   **A.   Hastings Has Not Treated CLS Differently Than Any Other Registered
3        Student Organization.**

4        The first flaw in CLS's Equal Protection claim is fundamental, and was not cured by

5   CLS's perfunctory amendment.  As this Court stated, "To state a successful Equal Protection

6   claim, a plaintiff must allege that he or she was treated differently than similarly situated

7   persons."  Order at 12 (citing *Dillingham v. INS*, 267 F.3d 996, 1007 (9th Cir. 2001)).

8   CLS's original complaint contained no such allegation, and was defective for that reason:

9        Here, HCF does not allege it has been treated differently than other
10       similarly situated groups or persons.  Rather, HCF alleges that Defendants'
         "refus[al] to recognize HCF's constitutional right to an exemption from [the
11       nondiscrimination] policy" violates the Equal Protection Clause.  As in *Lee* [*v.
         City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)], the gravamen of HCF's
12       complaint is that Defendants *failed* to treat it differently from others similarly
         situated.  (Order at 13 (citation omitted))

13  CLS sought to cure this defect by alleging that Hastings has engaged in differential treatment

14  of religious and non-religious student organizations, an allegation it repeats in its brief.  *See*

15  FAC ¶10.3; Mot. 20.  However, the undisputed factual record before the Court establishes

16  that this allegation is simply false.  In fact, Hastings does *not* treat religious student

17  organizations any differently than it treats other registered student organizations.  To the

18  contrary, *all* registered student organizations are required to comply with the Policy and to

19  open their membership rolls and officer slates to all Hastings students who desire to join.

20  *See* pp.3-4, *supra*.

21  **B.   CLS Has Not Proven That Hastings Acted With Discriminatory Intent.**

22       The second defect in CLS's original Equal Protection claim was that it failed to allege

23  a critical second element of such a claim:  discriminatory *intent*.  "Additionally, a plaintiff

24  must allege that the defendant acted with the intent or purpose to discriminate against him or

25  her based upon membership in a protected class."  Order at 12 (citing *Serrano v. Francis*,

26  345 F.3d 1071, 1082 (9th Cir. 2003); *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir.

27  1998) (footnote omitted)).  "Where, as here, the policy is facially neutral, HCF would need

28  to allege that some invidious or discriminatory purpose underlies the policy."  Order at 13

1  (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001)).  In response, CLS

2  added a perfunctory allegation of discriminatory intent.  FAC ¶10.4 ("Defendants intended

3  to discriminate invidiously against religious student organizations, like HCF, and single out

4  such groups for disparate treatment"); Mot. 20-21.  Again, however, CLS cannot point to a

5  shred of *evidence* to substantiate that allegation, and the undisputed record conclusively

6  disproves it.[24]  Thus, in addition to CLS, there are two other religious student organizations

7  at Hastings, neither of which has asserted any right to discriminate on the basis of religion or

8  sexual orientation or objected to complying with Hastings' Policies and Regulations,

9  including the Policy on Nondiscrimination.  JSOF ¶¶7, 16.

## CONCLUSION

For the foregoing reasons, the Court should grant the Hastings Defendants' motion for summary judgment, and should deny CLS's motion for summary judgment.

DATED:  October 21, 2005.                    Respectfully,

HOWARD RICE NEMEROVSKI CANADY
    FALK & RABKIN
A Professional Corporation


By: _____/s/_____
                ETHAN P. SCHULMAN

Attorneys for Hastings Defendants

W03 102105-160410001/Y09/1245683

---

[24]CLS contends that evidence of intent "can be found in a statute's 'improper execution' just the same as it can be deduced from the circumstances surrounding a statute's passage" (Mot. 20), but it offers no such circumstances.  To the contrary, it is undisputed that the Policy was originally enacted in 1990, and has been applied to all student groups. JSOF ¶¶16, 18.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*