CAROL LYNN THOMPSON (Bar No. 148079)
CHRISTOPHER F. STOLL (Bar No. 179046)
BRIAN D. MCDONALD (Bar No. 224201)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: (415) 772-6000 / Facsimile: (415) 772-6268
Email: christopher.stoll@hellerehrman.com

SHANNON MINTER (Bar No. 168907)
COURTNEY JOSLIN (Bar No. 202103)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA  94102
Telephone: (415) 392-6257 / Facsimile: (415) 392-8442
Email: minter@nclrights.org

Attorneys for Defendant-Intervenor
HASTINGS OUTLAW

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTIAN LEGAL SOCIETY CHAPTER OF UNIVERSITY OF CALIFORNIA, HASTINGS COLLEGE OF THE LAW, a/k/a HASTINGS CHRISTIAN FELLOWSHIP, a student organization at the University of California, Hastings College of the Law,<br><br>                                    Plaintiff,<br><br>          v.<br><br>MARY KAY KANE, in her official capacity as Chancellor and Dean of the University of California, Hastings College of the Law; JUDY CHAPMAN, in her official capacity as Director of Student Services for University of California, Hastings College of the Law; and MAUREEN E. CORCORAN, EUGENE L. FREELAND, CARIN T. FUJISAKI, JOHN T. KNOX, JAN LEWENHAUPT, JAMES E. MAHONEY, BRIAN D. MONAGHAN, BRUCE J. SIMON, JOHN K. SMITH, and TONY WEST, in their official capacities as the Board of Directors of University of California, Hastings College of the Law,<br><br>                                    Defendants. | Case No.: C 04 4484 JSW<br><br>**HASTINGS OUTLAW'S NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS  AND AUTHORITIES**<br><br>Date:    December 2, 2005<br>Time:    9:00 a.m.<br><br>The Honorable Jeffrey S. White |

CHRISTIAN LEGAL SOCIETY CHAPTER
OF UNIVERSITY OF CALIFORNIA,
fHASTINGS COLLEGE OF THE LAW, a/k/a
HASTINGS CHRISTIAN FELLOWSHIP, a
student organization at the University of
California, Hastings College of the Law,

                                        Plaintiff,

        v.

HASTINGS OUTLAW, a registered student
organization at the University of California,
Hastings College of the Law,

                            Defendant-Intervenor.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION FOR SUMMARY JUDGMENT ........................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 2

I.    INTRODUCTION ................................................................................................ 2

II.   STATEMENT OF FACTS .................................................................................... 3

III.  SUMMARY JUDGMENT IS APPROPRIATE IF THERE IS NO
      GENUINE ISSUE AS TO ANY MATERIAL FACT .......................................... 4

IV.   HASTINGS' POLICY REGULATES CONDUCT, NOT SPEECH,
      AND IS CONSTITUTIONAL UNDER THE APPLICABLE
      *O'BRIEN* STANDARD ........................................................................................ 4

V.    EVEN ASSUMING, *ARGUENDO*, THAT HASTINGS POLICY IS
      TREATED AS A RESTRICTION ON SPEECH, EQUAL
      APPLICATION OF THE POLICY TO CLS DOES NOT VIOLATE
      PLAINTIFFS' RIGHT TO FREE SPEECH ........................................................ 11

      A.    Hastings' Policy Does Not Discriminate Based On Viewpoint ................... 12

      B.    Hastings' Policy, Which Seeks To Ensure That Registered
            Organizations Are Open To All Students, Is Reasonable In
            Relation To The Purpose Of The Forum ..................................................... 16

VI.   HASTINGS' POLICY DOES NOT VIOLATE CLS'S FREEDOM
      OF ASSOCIATION ............................................................................................ 18

      A.    *Dale* Does Not Govern This Case .............................................................. 18

      B.    Hastings May Set Reasonable, Viewpoint Neutral Parameters
            For The Student Group Forum, Including The Requirement
            That Groups Must Be Open To All Students ................................................ 19

      C.    Even Assuming, *Arguendo*, That Hastings' Policy Infringes
            The Freedom of Association, It Does Not Impose A
            Substantial Burden On CLS's Right To Free Association ............................ 21

VII.  EVEN IF HASTINGS' POLICY DID SUBSTANTIALLY
      BURDEN CLS'S RIGHTS TO FREE SPEECH OR
      ASSOCIATION, IT IS NARROWLY TAILORED TO ACHIEVE
      THE COMPELLING STATE INTERESTS OF ENSURING
      EQUAL ACCESS TO EDUCATIONAL OPPORTUNITIES AND
      COMBATING INVIDIOUS DISCRIMINATION .............................................. 23

VIII. CLS'S CLAIMS FOR VIOLATION OF THE FREE EXERCISE
      AND EQUAL PROTECTION CLAUSES ARE WITHOUT MERIT ................. 25

IX.    CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Board of Directors of Rotary Int'l v. Rotary Club*,
    481 U.S. 537 (1987)...................................................................................................... 12

*Board of Regents v. Southworth*,
    529 U.S. 217, 229-32 (2000) ......................................................................................... 6

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983)....................................................................................................5, 7

*Boy Scouts of America v. Dale*,
    530 U.S. 640 (2000) ................................................................................................ *passim*

*Boy Scouts of America v. Wyman*,
    335 F.3d 80, (2d Cir. 2003) ..................................................................................... *passim*

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*,
    473 U.S. 788 (1985)...................................................................................................... 17

*Diloreto v. Downey Unified School District Board of Educ.*,
    196 F.3d 958 (9th Cir. 1999) ......................................................................12, 17, 18, 19

*Good News Club v. Milford Centr. Sch.*,
    533 U.S. 98 (2001).......................................................................................2, 11, 13, 20

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)...............................................................................................3, 5, 23

*Healy v. James*,
    408 U.S. 169 (1972) .............................................................................................. 5, 20, 22

*Hernandez-Montiel v. I.N.S.*,
    225 F.3d 1084 (9th Cir. 2000) ..................................................................................... 15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*,
    515 U.S. 557 (1995).................................................................................................. *passim*

*International Soc. for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992)...................................................................................................... 17

*Invisible Empire of the Knights of the Klu Klux Klan v. Kelly*,
    700 F.Supp. 281 (D.Md.1988) ....................................................................................... 5

*Jews for Jesus v. Jewish Cmty. Relations Council*,
    968 F.2d 286 (2d.Cir. 1992) .....................................................................................5, 10

*Karouni v. Gonzales*,
    399 F.3d 1163 (9th Cir.2005)....................................................................................... 15

*Lamb's Chapel v. Center Moriches Union Free Sch.*,
  508 U.S. 384 ........................................................................................................... 19

*Lawrence v. Texas*,
  539 U.S. 558, 559 (2003)....................................................................................... 7, 15

*Madsen v. Women's Health Center, Inc.*,
  512 U.S. 753 (1994)............................................................................................... 13, 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ........................................................................................... 11, 17, 19

*Presbytery of New Jersey v. Florio*,
  902 F.Supp.492 (D.N.J.1995).................................................................................. 5, 10

*R.A.V. v. City of St. Paul, Minn.*,
  505 U.S. 377 (1992)............................................................................................... 13, 15

*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984).............................................................................................. *passim*

*Romer v. Evans*,
  517 U.S. 620 (1996) ..................................................................................................... 7

*Rosenberger v. Rector & Visitors of the Univ. of Virginia*,
  515 U.S. 819 (1995).............................................................................................. *passim*

*Rowland v. Mad River Local Sch. Dist.*,
  470 U.S. 1009 (1985) .................................................................................................... 7

*Souders v. Lucero*,
  196 F.3d 1040 (9th Cir. 1999)...................................................................................... 20

*South Boston Allied War Veterans Council v. City of Boston*,
  875 F.Supp. 891 (D. Mass. 1995) .................................................................................. 5

*United States v. Kokinda*,
  497 U.S. 720 (1990)...................................................................................................... 17

*United States v. O'Brien*,
  391 U.S. 367 (1968)............................................................................................... 4, 8, 11

*Vlasak v. Superior Court of California ex rel. County*,
  329 F.3d 683 (9th Cir. 2003) ......................................................................................... 4

*Widmar v. Vincent*,
  454 U.S. 263, 267 (1981)..................................................................................... 12, 14, 20

*Wisconsin v. Mitchell*,
  508 U.S. 476, 487 (1993)............................................................................................... 8

## STATE CASES

*Butt v. State of California*,
4 Cal.4th 668 (1992).............................................................................5

*Gay Law Students Ass'n v. Pacific Tel. & Tel. Co*.
24 Cal.3d 458 (1979)...........................................................................7

*Gay Rights Coalition v. Georgetown Univ.*,
536 A.2d 1 (D.C. 1987).........................................................................6

*In re Joshua H.*,
13 Cal. App. 4th 291 (1993)...............................................................23

*Kovatch v. California Cas. Mgmt*,
65 Cal. App. 4th 1256 (1998)............................................................23

*People v. Garcia*,
77 Cal. App. 4th 1269 (2000)..............................................................7

*Stouman v. Reilly*,
37 Cal. 2d 713 (1951).........................................................................23

## STATUTES

Fed. R. Civ. P.
§ 56(c)....................................................................................................7

Cal. Educ. Code
§ 220......................................................................................................7

Cal. Gov't Code
§ 12940..................................................................................................7

10 CCR
§ 2695.7.................................................................................................7

Cal. Executive Order No. B-54-79...........................................................7

## OTHER AUTHORITIES

Michael Burns, *The Exclusion of Women from Influential Men's Clubs: The Inner Sanctum and the Myth of Full Equality*, 18 Harv. C.R.-C.L. L. Rev. 321, 323 (1983)..................6

1

**SUMMARY OF ARGUMENT**

2

Defendants are entitled to judgment as a matter of law on each of CLS's constitutional

3

claims. *First,* Hastings' Policy on Nondiscrimination (hereinafter "Policy") regulates conduct,

4

not speech. As such, it is properly analyzed under *United States v. O'Brien*, 391 U.S. 367

5

(1968). Application of the four-factor *O'Brien* test demonstrates that the Policy is

6

constitutional: (1) the authority to implement a Nondiscrimination Policy is within Hastings'

7

constitutional power; (2) Hastings' Policy furthers a substantial—in fact, compelling—

8

government interest in eradicating discrimination based on sexual orientation and religion; (3)

9

the Policy is unrelated to the suppression of free expression; and (4) the Policy is narrowly

10

tailored to further that interest. *See* Part IV, *infra*.

11

*Second*, even if Hastings' Policy were analyzed under the cases applicable to direct

12

restrictions on speech, it would not violate CLS's right to free speech. The parties agree that

13

Hastings' student organization program is a limited public forum. Hastings' Policy is a

14

permissible limitation on speech within this limited public forum because it does not

15

discriminate based on viewpoint and is reasonable in light of the purposes served by the forum.

16

The Policy was not designed to penalize disfavored viewpoints, but merely to ensure that

17

official student organizations are open to all members of the student body. *See* Part V, *infra*.

18

*Third,* Hastings' Policy does not violate CLS's freedom of association. Hastings may

19

set up reasonable, viewpoint neutral parameters for the student group forum, including the

20

requirement that groups must be open to all students. Moreover, even if the Policy somehow

21

infringes plaintiffs' freedom of association, it does not impose a substantial burden on

22

plaintiffs' freedom of association. *See* Part VI, *infra*.

23

*Fourth,* even if the Policy did substantially burden CLS's right to free speech or

24

association, it is narrowly tailored to achieve the compelling state interests of ensuring equal

25

access to educational opportunities and combating invidious discrimination. See Part VII,

26

infra. CLS's other constitutional challenges also are without merit.

27

28

HASTINGS OUTLAW'S NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS
AND AUTHORITIES – CASE NO. C 04-4484 JSW

## NOTICE OF MOTION FOR SUMMARY JUDGMENT

TO ALL PARTIES AND THEIR COUNSEL:

PLEASE TAKE NOTICE THAT, pursuant to order of this Court filed September 29, 2005, on December 2, 2005, at 9:00 a.m., or as soon thereafter as the matter may be heard, at the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, 17th Floor, Courtroom 2, before the Honorable Judge Jeffrey S. White, Defendant-Intervenor Hastings OUTLAW ("Outlaw") will and hereby does move the Court for summary judgment of CLS's constitutional claims on the grounds that there is no genuine issue as to any material fact and that Outlaw is entitled to judgment as a matter of law for the reason that CLS's constitutional claims are not supported by any evidence in the record and are untenable as a matter of law.

Defendants seek an order denying CLS's Motion for Summary Judgment of CLS's constitutional claims and granting Defendant Outlaw's Motion for Summary Judgment of CLS's constitutional claims.

This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the previously-filed Declaration of Michael W. Flynn in Support of Hastings Outlaw's Motion to Intervene; all pleadings and other documents filed in this case; and the arguments of counsel.

HASTINGS OUTLAW'S NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. C 04-4484 JSW

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Hastings' application of its Policy on Nondiscrimination to CLS does not run afoul of the First Amendment.  Indeed, considered in proper perspective, the question is not even a close one.  To understand why, it is important to realize what this case is *not*.  This is not a case in which a public university has excluded religious groups or religious speech from a limited public forum, as in *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819 (1995) or *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001).  Unlike the restrictions in those cases, Hastings' Policy does not single out religion, nor does it restrict the issues student groups may address or the views they may express.  Indeed, the Policy contains no restrictions on speech at all. The Policy merely imposes the reasonable, viewpoint neutral and common-sense requirement that in order to be an officially sanctioned student organization, student groups must be open to participation by all members of the Hastings community.  Because Hastings applies this requirement neutrally to all groups, the Policy is constitutional under the principles set forth in *Rosenberger* and other forum cases.

Nor is this a case in which a governmental entity has legislatively mandated that a group accept as members or leaders individuals whose very presence the group contends would impair its rights of expressive association, as in *Boy Scouts of America v. Dale* 530 U.S. 640 (2000).  Hastings has not compelled CLS to accept any unwanted individual as a member or leader.  Hastings' Policy merely provides that if a student group wishes to discriminate on a prohibited basis, it must do so without institutional recognition or support. Even as an unrecognized group, CLS remains free to meet on campus, to communicate with the student body, and to present a unified message to the world, free of any dissenting voice.  There is no issue of compelled association; accordingly, as the Second Circuit recently held in an analogous case, *Dale* has no application here.  *Boy Scouts of America v. Wyman*, 335 F.3d 80 (2d Cir. 2003) *cert denied* 541 U.S. 903 (2004) (holding that *Dale*

- 2 -

does not address or resolve the question of whether the government may exclude groups who discriminate from a limited or nonpublic forum).  Moreover, even if the analysis in *Dale* were applied, any burden on CLS's associational rights is not substantial.

Because this case involves neither compelled association nor an express restriction on speech, the appropriate framework is the familiar *O'Brien* test for regulations that have an incidental effect on speech.  Like most nondiscrimination laws, Hastings' Policy prohibits harmful conduct, not speech.  Moreover, the interests served by the Policy are compelling and go to the very foundations of our democratic society.  As the U.S. Supreme Court has recognized, "ensuring that public institutions are open and available to all segments of American society . . . represents a paramount government objective." *Gruttinger v. Bollinger*, 539 U.S. 306, 331 (2003).  Viewed in this light, as it must be, Hastings' Policy meets the *O'Brien* standard.

Undoubtedly, the values of equality and freedom of expression may sometimes conflict and, when they do, courts may be called upon to resolve cases that pose close, complex, and difficult constitutional questions.  This case however, does not pose such a conflict.  Regardless of whether it is analyzed under *O'Brien*, *Rosenberger* or even *Dale*, Hastings' Policy simply does not unlawfully infringe CLS's First Amendment rights.

## II.   STATEMENT OF FACTS

Outlaw adopts the Statement of Facts set forth in the Hastings Defendants' Memorandum of Points and Authorities.  Outlaw also notes the following additional undisputed facts not included in the other parties' Statements of Facts.

Outlaw is a registered student organization at Hastings that seeks to combat discrimination on the basis of sexual orientation.  Declaration of Michael W. Flynn in Support of Hastings Outlaw's Motion to Intervene ("Flynn Decl."), ¶ 2.  The purposes of Outlaw include promoting a positive atmosphere at Hastings for lesbian, gay and bisexual students.  *Id*.  Many members of Outlaw are the very individuals whom CLS seeks to exclude from its membership:  openly gay, lesbian and bisexual students.  Outlaw intervened in this litigation as a party defendant to protect the interests of its members and

- 3 -

of other gay, lesbian and bisexual students who wish to attend law school in an environment free from discrimination and who wish to have an equal opportunity to become members of any registered student organization without regard to sexual orientation.

## III.   SUMMARY JUDGMENT IS APPROPRIATE IF THERE IS NO GENUINE ISSUE AS TO ANY MATERIAL FACT

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). In this case, there are no genuine disputes of material fact with respect to any of CLS's claims, and judgment as a matter of law is appropriate as to all causes of action.

## IV.   HASTINGS' POLICY REGULATES CONDUCT, NOT SPEECH, AND IS CONSTITUTIONAL UNDER THE APPLICABLE *O'BRIEN* STANDARD

On its face, Hastings' Policy prohibits discriminatory conduct, not speech.  The Policy, in its entirety, reads as follows:

> The University of California, Hastings College of the Law shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation.  This nondiscrimination policy covers admission, access and treatment in Hastings-sponsored programs and activities.

Because the policy on its face contains no speech restriction, if it limits CLS's speech in any way, which Outlaw disputes, any such restriction is incidental.  Accordingly, the constitutionality of Hastings' policy must be analyzed under the standard applicable to government restrictions that indirectly regulate expressive activity.  *See United States v. O'Brien*, 391 U.S. 367 (1968).  Under *O'Brien*, "a government regulation [that has an incidental burden on expressive activity] is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial government interest; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377.  *See also Vlasak v. Superior Court of California ex rel. County*, 329 F.3d 683 (9th Cir. 2003) (evaluating a city ordinance prohibiting possession of certain objects during demonstrations for safety

1  reasons under the four-factor *O'Brien* test).[1]  Hastings' Policy satisfies all four of these

2  elements.

3  First, there can be no doubt that governmental entities such as Hastings have the

4  constitutional authority to bar discrimination on the basis of sexual orientation, religion, and

5  the other characteristics included in the Policy.  *See, e.g., Hurley v. Irish-American Gay,*

6  *Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 572 (1995) (noting that

7  regulations barring discrimination based on sexual orientation "are well within the State's

8  usual power to enact when a legislature has reason to believe that a given group is the target

9  of discrimination.") (citations omitted).

10  Second, public educational institutions have a substantial—indeed, compelling—

11  interest in eliminating discrimination on the basis of religion and sexual orientation in

12  students' access to educational opportunities, including official student organizations.

13  "[E]nsuring that public institutions are open and available to all segments of American

14  society, including people of all races and ethnicities, represents a paramount government

15  objective." *Grutter v. Bollinger*, 539 U.S. 306, 331-332 (2003).  Moreover, "nowhere is the

16  importance of such openness more acute than in the context of higher education." *Id; see*

17  *also Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) ("the Government has a

18  fundamental, overriding interest in eradicating racial discrimination in education."); *Butt v.*

19  *State of California*, 4 Cal.4th 668, 680 (Cal. 1992) ("In view of the importance of education

---

20   [1] Federal courts have found *O'Brien* to be the controlling test when analyzing the
21  constitutionality of antidiscrimination laws.  *See, e.g., Jews for Jesus v. Jewish Community*
    *Relations Council*, 968 F.2d 286 (2d Cir. 1992) (finding state and federal antidiscrimination
22  statutes constitutional under *O'Brien* in suit brought by one religious organization against
    another for alleged violation of these statutes); *Presbytery of New Jersey v. Florio*, 902 F.
23  Supp. 492 (D.N.J. 1995) (finding state antidiscrimination statute constitutional under
    *O'Brien* in declaratory relief suit brought by religious organization challenging
24  constitutionality of provisions of statute prohibiting discrimination based on "affectational
    or sexual orientation"); *see also South Boston Allied War Veterans Council v. City of*
25  *Boston*, 875 F.Supp. 891 (D. Mass. 1995) (applying *O'Brien* to state antidiscrimination law
    in a suit brought by a Veteran's association seeking a judgment that city could not condition
26  a parade permit on allowing gay and lesbian groups to participate, but declining to rule on
    the issue due to lack of evidence concerning the fourth *O'Brien* prong); *Invisible Empire of*
27  *the Knights of the Klu Klux Klan v. Kelly*, 700 F.Supp. 281 (D.Md. 1988) (applying *O'Brien*
    to state antidiscrimination statute and finding the statute unconstitutional as applied because
28  the statute was selectively applied against plaintiff and was therefore related to the
    suppression of CLS's expression).

to society and to the individual child, the opportunity to receive the schooling furnished by the state must be made available to all on an equal basis. ...").  Although many of the cases addressing discrimination in higher education are focused on race discrimination, a university's determination that its students are entitled to equal access to the benefits of the university community, without regard to their sexual orientation or religion, is also a compelling interest.[2] *See, e.g., Gay Rights Coalition v. Georgetown Univ.*, 536 A.2d 1, 37 (D.C. 1987) (finding that the District of Columbia had compelling interests in "eradicating discrimination against the homosexually or bisexually oriented includ[ing] the fostering of individual dignity, the creation of a climate and environment in which each individual can utilize his or her potential to contribute to and benefit from society, and equal protection of the life, liberty and property that the Founding Fathers guaranteed to us all.").  This includes an interest in ensuring equal access to educational opportunities, including student organizations.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984); *see also Board of Regents v. Southworth,* 529 U.S. 217, 222-24, 229-32 (2000) (recognizing the importance of student organizations on public university campuses).

This interest is particularly important in the context of university clubs, which have a long history of invidious discrimination, and are important for the social and intellectual development, and even future economic success, of students. *See, e.g.,* Michael M. Burns, *The Exclusion of Women from Influential Men's Clubs: The Inner Sanctum and the Myth of Full Equality*, 18 Harv. C.R.-C.L. L. Rev. 321, 323 (1983) ("Although the elite professional schools and employers have succumbed , to some degree, to the societal pressure and have permitted a token integration of women and minorities, the victory for these token admittees has been only partial. The final door to professional advancement remains closed because

---

[2] Discrimination on the basis of a particular characteristic need not be subject to strict scrutiny under the federal constitution in order for the government to have a compelling interest in eradicating it.  In *Roberts*, for example, the Supreme Court held that the state's interest in eliminating sex-based discrimination is compelling, even though sex-based classifications are subject to intermediate rather than strict scrutiny under the U.S. Constitution.  *Roberts v. United States Jaycees*, 468 U.S. 609 (1984).

- 6 -

1   they are denied membership in the most prestigious 'social' clubs, either explicitly in club

2   bylaws or implicitly by custom and practice.").

3          With regard to sexual orientation in particular, there can be no doubt that the state

4   has a compelling interest in combating discrimination, given the long history of denying

5   lesbians and gay men an equal opportunity to participate in American life.  As the

6   California Court of Appeal observed in *People v. Garcia*, 77 Cal. App. 4th 1269 (2000),

7   "[o]utside of racial and religious minorities, we can think of no group which has suffered

8   such 'pernicious and sustained hostility' ... and such 'immediate and severe opprobrium' as

9   homosexuals."  *Id.* at 1279 (citing *Rowland v. Mad River Local Sch. Dist.*, 470 U.S. 1009,

10  1014 (1985)) (Brennan, J., dissenting from denial of cert.).  *See also Lawrence v. Texas*, 539

11  U.S. 558, 559 (2003) ("[F]or centuries there have been powerful voices to condemn

12  homosexual conduct as immoral"); *Romer v. Evans*, 517 U.S. 620, 644 (1996) (Scalia, J.,

13  dissenting) (citing "the centuries-old criminal laws [regarding homosexual conduct] that we

14  held constitutional in *Bowers*.").  Further, all three branches of California government have

15  adopted policies prohibiting discrimination against lesbian and gay people in a wide variety

16  of contexts, including public education.[3]  Through these policies, the state resoundingly has

17  rejected the view that sexual orientation has any correlation with an individual's ability to

18  perform in society or is, in itself, a proper basis for differential treatment.  In light of this

19  strong consensus against sexual orientation discrimination, it would be anomalous to have a

20  public university "blissfully ignore what all three branches . . . had declared."  *Bob Jones*,

21  461 U.S. at 598 (holding that it would be anomalous for IRS to treat Bob Jones University

22  as a charitable tax-exempt organization when all three branches of the federal government

23  _____

24          [3] *See, e.g.*, Cal. Educ. Code § 66270 (prohibiting discrimination in higher education on a variety of bases, including "any basis that is contained in the prohibition of hate crimes set forth in subdivision (a) of Section 422.6 of the Penal Code."); Gov't Code § 12940

25  (prohibiting employment discrimination on the basis of sexual orientation); Cal. Executive Order No. B-54-79 (barring sexual orientation discrimination in agencies of the state government under the jurisdiction of the Governor); 10 CCR 2695.7 (prohibiting sexual

26  orientation discrimination in insurance claims settlement practices); *Gay Law Students Ass'n v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 (holding that California Constitution

27  prohibits the state or governmental entity from arbitrarily discrimination on the basis of sexual orientation); Cal. Code of Judicial Ethics, Canon 3 (prohibiting bias or prejudice on

28  the basis of sexual orientation).)

- 7 -

1   had established a strong public policy against racial discrimination).

2        Third, Hastings' interest in eliminating discrimination on the basis of religion and

3   sexual orientation lies in alleviating the harms caused by discrimination, not in the

4   suppression of speech. *See, e.g., Roberts*, 468 U.S. at 624 (stating that acts of invidious

5   discrimination "cause unique evils that government has a compelling interest to prevent"

6   and that are distinct "from their communicative impact"). The Supreme Court repeatedly

7   has recognized that antidiscrimination laws regulate conduct; they do not regulate speech.

8   *See, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S.

9   557, 572-73 (1995) (explaining that a nondiscrimination statute "does not, on its face, target

10  speech or discriminate on the basis of its content, the focal point of its prohibition being

11  rather on the act of discriminating against individuals in the provision of publicly available

12  goods, privileges, and services on the proscribed ground");[4] *Roberts v. United States*

13  *Jaycees*, 468 U.S. 609, 623-24 (1984) (holding that a non-discrimination law was not

14  "aim[ed] at the suppression of speech, does not distinguish between prohibited and

15  permitted activity on the basis of viewpoint, and does not license enforcement authorities to

16  administer the statute on the basis of such constitutionally impermissible criteria." ). *See*

17  *also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (noting that Title VII is a permissible

18  content-neutral regulation of conduct).

19

20

_____

21      [4] Although the Court in *Hurley* recognized that nondiscrimination statutes typically target conduct rather than speech and thus do not generally violate the First Amendment,

22  the Court went on to explain that the statute in *Hurley* did raise First Amendment concerns because it had "been applied in a peculiar way" to require the admission of an openly gay

23  contingent in a parade. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. at 572 (noting that this unusual application "had the effect of declaring the

24  sponsors' speech itself to be the public accommodation," which the First Amendment does not permit). Contrary to CLS's argument, however, Hastings' application of its Policy does

25  not raise any similar concerns or require any deviation from the usual manner in which the validity of a nondiscrimination measure is analyzed under *O'Brien*. Hastings' Policy targets

26  conduct rather than speech, and Hastings has not sought to apply the Policy to regulate CLS's message or viewpoint. To the contrary, CLS can continue to express any viewpoint

27  that it wishes to express; to participate in the student group program, however, it must not expel or exclude students on any of the bases in the Policy. While this requirement may

28  have an incidental impact on Plaintiffs' speech (or may have no impact at all), it is nonetheless permissible so long as it meets the test in *O'Brien*.

1    Fourth, the incidental restriction on Plaintiffs' alleged First Amendment freedoms is

2    no greater than is essential to the furtherance of Hastings' interest in combating

3    discrimination.  The Policy regulates only the *conduct* of student organizations; it does not

4    restrict in any way the viewpoints those organizations may express or the subjects they may

5    discuss.  There is no less restrictive means of achieving the goal of preventing invidious

6    discrimination than to prohibit groups that practice discrimination from obtaining official

7    recognition and eligibility for funding.  Although CLS contends that providing an

8    exemption from the Policy for religiously-based groups would not substantially undermine

9    Hastings' interest in eradicating discrimination, there is no *constitutional* basis for limiting

10   such an exemption to groups whose objections to a nondiscrimination policy are based on

11   religious principles.  The federal courts have not held that the First Amendment's free

12   speech clause provides different or greater protection for religious expression than for

13   speech that is grounded in political philosophy, personal preference, or even simple

14   animosity.  *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S.

15   819, 831 (1995) (holding that a religious viewpoint is entitled to the same protection as

16   "political, economic, or social viewpoint.").  If CLS were entitled to such an exemption,

17   then so would any group that contended its message would be impaired if it agreed to

18   comply with the Policy.  Under CLS's reasoning, any student organization that claimed

19   ideological opposition to including women, African Americans, gays and lesbians, or

20   people with disabilities would be entitled to force a public university to grant it official

21   recognition, with attendant financial and other benefits.  In addition, although CLS states

22   that it is willing to abide by the portions of the Hastings' Policy that prohibit discrimination

23   on bases other than religion and sexual orientation, there would be no basis for

24   distinguishing between CLS and other groups that have religious or other ideological

25   reasons for wishing to discriminate on other bases.  *See*, *e.g*., *Bob Jones University v.*

26   *United States*, 461 U.S. at 583 (addressing claim by private religious university that federal

27   policy of withholding tax-exempt status from schools that discriminate on the basis of race

28

1  should not "be applied to schools that engage in racial discrimination on the basis of

2  sincerely held religious beliefs").

3      Other federal courts have found similar antidiscrimination laws constitutional under

4  *O'Brien*. For example, in *Jews for Jesus v. Jewish Cmty Relations Council*, 968 F.2d 286

5  (2d. Cir. 1992), a religious group sued another religious group under state and federal

6  antidiscrimination laws for allegedly coercing a resort facility to cancel its contract with

7  plaintiffs. Defendants argued that their actions constituted expression and, as such, the anti-

8  discrimination statutes were unconstitutional as applied to them because they impermissibly

9  regulated defendants' "speech." The Second Circuit disagreed and held that "[t]hese

10  statutes are plainly aimed at conduct, i.e., discrimination, not speech." *Id.* at 295. The court

11  explained, "these statutory prohibitions against discrimination can be violated by speech or

12  other expressive conduct. However, simply because speech or other expressive conduct can

13  in some circumstances be the vehicle for violating a statute directed at regulating conduct

14  does not render that statute unconstitutional." *Id.* at 295. The court then applied the four-

15  factor *O'Brien* test and held that the antidiscrimination statutes were constitutional.

16      Similarly, in *Presbytery of New Jersey v. Florio*, 902 F. Supp. 492 (D.N.J. 1995), a

17  Presbyterian minister objected to the New Jersey antidiscrimination statute prohibiting

18  discrimination based on "affectional or sexual orientation" and sought a declaratory

19  judgment that the statute was unconstitutional. The District Court ruled that the statute

20  regulated conduct and therefore *O'Brien* was the proper constitutional measuring stick. The

21  court held that New Jersey's interest in eliminating discrimination on the basis of sexual

22  orientation, among other characteristics, was "of 'preeminent social significance'" and that

23  it was "not directed at or related to suppressing expression." *Id.* at 521. The court also

24  found that the statute was narrowly tailored since it did not "prohibit all speech or written

25  materials containing discriminatory statements" and therefore "do[es] not unreasonably

26  limit Reverend Cummings and other OPC members' ability to express and to disseminate

27  their belief that homosexuality, bisexuality, and sex outside of marriage are wrong." *Id.* at

28  521-22. The same analysis applies here. Nothing in Hastings' Policy prevents CLS from

- 10 -

expressing any views it wishes to express concerning sexual orientation, religion, or any other subject.  The Policy easily satisfies the *O'Brien* test.

Contrary to Plaintiffs' argument, *Dale* does not change this analysis.  In *Dale*, the Court held that New Jersey could not require the Boy Scouts to accept a gay Scout leader where the Boy Scouts claimed that doing so would significantly alter their chosen message.  The Court held that such state compulsion would "directly and immediately affect" the Boy Scouts associational rights.  530 U.S. at 658-59.  In contrast, there is no direct burden on Plaintiffs' associative rights here.  Hastings has not required CLS to accept gay members or else cease to exist or meet on the Hastings campus.  Rather, Hastings simply has declined to exempt CLS from the general rule that student groups must agree to comply with the Policy in order to be eligible for registration and funding.  Accordingly, because any burden on CLS's expressive rights is indirect, it is *O'Brien*, not *Dale*, that must be applied.  *See, e.g., Boy Scouts of America v. Wyman*, 335 F.3d at 91 (holding that *Dale* did not apply to the Boy Scout's exclusion of a group from a government-forum "since its conditioned exclusion does not rise to the level of compulsion" and thus does not create any direct burden on associational rights).

## V.  EVEN ASSUMING, *ARGUENDO*, THAT HASTINGS POLICY IS TREATED AS A RESTRICTION ON SPEECH, EQUAL APPLICATION OF THE POLICY TO CLS DOES NOT VIOLATE PLAINTIFFS' RIGHT TO FREE SPEECH

Even if Hastings' Policy is treated as a direct restriction on speech (which Outlaw does not concede), it is well settled that a public university may impose reasonable, viewpoint neutral rules for a student group forum without running afoul of any First Amendment rights.  In a traditional or open public forum, such as a park or street, "the State's restrictions on speech are subject to stricter scrutiny than are restrictions in a limited public forum."  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)).  In a limited public forum, as in any other nonpublic forum, restrictions on speech will be upheld against constitutional challenge as long as they are: (1) viewpoint neutral; and (2) reasonable in light of the purpose served by the forum.  *Good News Club*, 533 U.S. at 107 (citations

- 11 -

omitted); *see also Diloreto v. Downey Unified School District Board of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999) ("The government may limit expressive activity in nonpublic fora if the limitation is reasonable and not based on the speaker's viewpoint."). As CLS concedes, "Hastings may 'act[] to preserve the limits of the forum it has created.'" Pl.'s Memo. at 14, quoting *Widmar v. Vincent*, 454 U.S. 263, 267 (1981) and *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995).

All of the parties agree that by creating a program for student organizations to register with the College and thereby obtain eligibility for funding and other benefits, Hastings has created a limited public forum. The program is not open to the general public either by tradition or by government designation. Indeed, Hastings is under no obligation to offer such a program at all. Rather, the program is a forum that Hastings has established for a specific and limited purpose, namely permitting registered Hastings students to form student organizations to enrich the academic and social environment on campus. Joint Stipulation of Facts for Cross-Motions for Summary Judgment ("Joint Stip."), ¶¶ 6-8. Accordingly, Hastings may establish any restrictions on the forum that it chooses, so long as they are reasonable and viewpoint neutral. *Good News Club*, 533 U.S. at 107.

### A.    Hastings' Policy Does Not Discriminate Based On Viewpoint

The Supreme Court repeatedly has recognized that uniformly applied antidiscrimination laws are viewpoint neutral and generally do not violate the First Amendment rights of speakers. For example, in *Roberts*, the Court held that a Minnesota law banning discrimination in public accommodations on the basis of race, color, creed, religion, disability, national origin or sex did "not distinguish between prohibited and permitted activity on the basis of viewpoint." 468 U.S. at 623. Rather, the law reflected "the State's strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services," a goal that was "unrelated to the suppression of expression." *Id.* at 624. Three years later, the Court reaffirmed this holding in *Board of Directors of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 549 (1987) ("On its face the Unruh Act, like the Minnesota public accommodations law we considered in

- 12 -

1  Roberts, makes no distinctions on the basis of the organization's viewpoint."). *See also*

2  *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557,

3  572 (1995) (holding that nondiscrimination laws "do not, as a general matter, violate the

4  First or Fourteenth Amendment.").

5  These cases apply directly here. Hastings' Policy merely prohibits discrimination.

6  Nothing in the Policy restricts participation in the student group forum based on the

7  viewpoint of the speaker. The Policy does not limit or preclude the expression of religious

8  or any other views, nor does it exclude CLS or other religious groups from obtaining

9  registered student organization status because of the religious nature of their speech.[5]

10  Rather, any groups that discriminate on the basis of sexual orientation or any other

11  enumerated characteristic, regardless of their reasons for doing so, are excluded.

12  When a law is viewpoint neutral on its face but has a differential impact among

13  viewpoints, whether the law is viewpoint discriminatory depends on the law's purpose. *See*

14  *Wyman,* 335 F.3d at 94; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992) ("We have long

15  held, for example, that nonverbal expressive activity can be banned because of the action it

16  entails, but not because of the ideas it expresses—so that burning a flag in violation of an

17  ordinance against outdoor fires could be punishable, whereas burning a flag in violation of

18  an ordinance against dishonoring the flag is not.") (citing cases); *Madsen v. Women's*

19  *Health Ctr.*, 512 U.S. 753, 763 (1994) (holding that an injunction against anti-abortion

20  protesters was not viewpoint discriminatory because "none of the restrictions imposed by

21  the court were directed at the contents of petitioner's message.").

22  Here, there is no evidence that Hastings' Policy was enacted to prevent or curtail

23  expression of CLS's viewpoint. To the contrary, Hastings enacted the Policy for the

24  purpose of ensuring that registered student organizations, like other educational

25  opportunities at the College, would be open to all students regardless of their membership in

26  

27  [5] This fact distinguishes Hastings' Nondiscrimination Policy from the speech restrictions at issue in *Good News Club, Rosenberger, Widmar* and other cases. In each of those cases, the challenged regulation, on its face, precluded school property or student activity fees from being used for specified religious purposes. Hastings' Policy includes no such viewpoint-based restrictions.

28  

- 13 -

1   a protected category.  *See* Joint Stip., ¶¶ 15-18.  Because CLS has not shown that the

2   purpose of the Policy was to single out disfavored viewpoints for unfavorable treatment, it

3   has failed to carry its burden of demonstrating that the Policy constitutes viewpoint

4   discrimination.

5        CLS does not dispute that Hastings' Policy is viewpoint neutral on its face.  Nor does

6   CLS cite any evidence showing that the Policy was enacted to burden any form of

7   expression, much less the specific viewpoint of CLS.  Rather, CLS claims that because

8   religion is the only protected class in the Policy that constitutes "belief," religious groups

9   are placed at a "distinct disadvantage" to other groups because they are forced to open their

10  membership and leadership to those who reject their religious beliefs.  But even if CLS

11  were able to demonstrate that the Policy had the ancillary effect of placing certain religious

12  groups at a disadvantage compared to other types of student groups, such an incidental

13  effect is insufficient to demonstrate that the Policy constitutes viewpoint discrimination.

14       The two cases cited by CLS do not demonstrate otherwise.  In both *Widmar v.*

15  *Vincent*, 454 U.S. 263, 267 (1981) and *Rosenberger v. Rector & Visitors of the Univ. of*

16  *Virginia*, 515 U.S. 819, 829 (1995), the court found the University programs

17  unconstitutional precisely because the programs involved  regulations which, on their face,

18  specifically singled out religious speech as ineligible for participation in each of the

19  respective programs at issue.  Unlike the policies in *Widmar* or *Rosenberger*, Hastings'

20  Policy contains no restrictions precluding religious organizations from becoming registered

21  student organizations.  Indeed, Hastings has recognized as registered organizations a variety

22  of religious groups that comply with the Policy.  Because the Policy has neither the purpose

23  nor the effect of excluding religious topics or viewpoints from the forum, *Widmar* and

24  *Rosenberger* are inapposite.

25       CLS also erroneously argues that the Policy discriminates against its viewpoints

26  merely because the effect is to exclude CLS from the forum because it disagrees with the

27  Policy and wishes to discriminate on the basis of religion and sexual orientation.  But as the

28  Second Circuit recently explained in a closely analogous case, "all anti-discrimination laws

- 14 -

that govern organizations' membership or employment policies have a differential and

adverse impact on those groups that desire to express through their membership or

employment policies viewpoints that favor discrimination against protected groups. . . . But

viewpoint disparity, standing alone, does not constitute proof of viewpoint discrimination."

*Boy Scouts of America v. Wyman*, 335 F.3d 80, 93-94 (2d Cir. 2003) (holding that

Connecticut did not violate First Amendment by excluding Boy Scouts from state charitable

campaign due to the Boy Scouts' policy of discriminating on the basis of sexual

orientation).  The Supreme Court has long supported this principle.  See *R.A.V. v. City of St.

Paul*, 505 U.S. 377, 390 (1992) ("Where the government does not *target* conduct on the

basis of its expressive content, acts are not shielded from regulation merely because they

express a discriminatory idea or philosophy."); *see also Madsen v. Women's Health Ctr.*,

512 U.S. 753, 763 (1994) ("[T]he fact that the injunction covered people with a particular

viewpoint does not itself render the injunction content or viewpoint based.").  Hastings'

Policy is neutral and not viewpoint-based.  It excludes groups that discriminate, regardless

of why they do so or whether they are on any side of a given issue (e.g., whether they are

anti-gay or anti-straight, anti-black or anti-white).  Therefore, although CLS has what may

fairly be characterized as an anti-gay viewpoint, it is not excluded from the registered

student organizations program because it holds that viewpoint, but rather because it

discriminates on the basis of sexual orientation.[6]  A discriminatory group with exactly the

opposite viewpoint would be similarly excluded.  For example, if Outlaw refused to admit

---

[6] CLS suggests that it does not discriminate based on sexual orientation, but only excludes persons who engage in or advocate homosexual conduct.  The Supreme Court and the Ninth Circuit, however, have rejected attempts to recast discriminatory laws and practices by arguing that they are directed only to conduct and not to sexual orientation. *See Lawrence v. Texas*, 539 U.S. 558, 575 (2003)  ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres."); *see also id.*  at 583 (O'Connor, J., concurring) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than conduct. It is instead directed toward gay persons as a class."); *Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005) ("[W]e see no appreciable difference between an individual, such as Karouni, being persecuted for being a homosexual and being persecuted for engaging in homosexual acts."); *Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir. 2000).

- 15 -

heterosexual members, it would be ineligible for registration under the Policy, and rightly so.

Nor can CLS plausibly claim that Hastings applied the Policy in a discriminatory manner only against CLS. A key fact that CLS has ignored is that Hastings' refusal to recognize CLS was prompted in the first instance by the actions of CLS itself. Hastings applies the Policy to *all* student organizations and requires *all* organizations to agree to abide by the Policy as a prerequisite to participation in the Program. Joint Stip., ¶¶ 12-18. CLS is the only campus organization—religious or non-religious, political or non-political—that refused to comply with the Policy. *Id.*, ¶ 59. Moreover, contrary to CLS's claim that Hastings permits other groups to discriminate, there is no evidence that any other group has ever done so. All of the bylaws CLS cites expressly incorporate by reference Hastings' Policy on Nondiscrimination and agree to be bound by it. For example, the bylaws of the Hastings Republicans state "Membership is open to all Hastings Students, and membership shall not violate the Nondiscrimination Compliance Code of Hastings." Aden Decl., Exh. K. CLS has not shown, nor can it, that Hastings does not apply its Policy consistently.

Finally, as this Court held in its April 12, 2005 Order on the Motion to Dismiss, "HCF's own allegations defeat its argument that the policy singles out religious associations as disfavored forms of association. According to its complaint, prior to the 2004-2005 academic year, HCF was registered as a student organization at Hastings. (Complaint, ¶ 3.3.) It was not until HCF informed Defendants that it intended to exclude members and officers based on their religious beliefs and sexual orientation that HCF was denied the opportunity to register. (Complaint, ¶¶ 4.1-4.5.)." April 12, 2005 Order at 8.

**B.** **Hastings' Policy, Which Seeks To Ensure That Registered Organizations Are Open To All Students, Is Reasonable In Relation To The Purpose Of The Forum**

"The Supreme Court has held that, so long as it is viewpoint neutral, a restriction in a nonpublic forum 'need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.'" *Boy Scouts of America v. Wyman*, 335 F.3d 80, 97 (2nd Cir.2003),

- 16 -

1   quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 808 (1985).

2   "'The reasonableness of the Government's restriction [on speech in a nonpublic forum]

3   must be assessed in light of the purpose of the forum and all the surrounding

4   circumstances.'" *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672,

5   687 (1992), quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788

6   (1985).  This analysis applies equally to a limited public forum and "focuses on whether the

7   limitation is consistent with preserving the property for the purpose to which it is

8   dedicated." *Diloreto v. Downey Unified School District Board of Educ.*, 196 F.3d 958, 967

9   (9th Cir.1999), citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. at 50-51

10  (1983).

11       In this case, the registered student organization program has two primary purposes,

12  each of which seeks to enhance and improve the educational experience of *all* law students

13  at Hastings.  First, Hastings seeks to promote conversation and debate among the student

14  body by encouraging students to meet and discuss issues that are important to them, or

15  simply to socialize.  Second, Hastings seeks to promote awareness of the diverse interests

16  and experiences of students by providing all Hastings students with the opportunity to

17  explore new subject areas and viewpoints through membership and participation in these

18  organizations.  Joint Stip., ¶ 8.

19       In light of the purposes and attributes of the registered student organization program,

20  Hastings' Policy is eminently reasonable.  Hastings has created a forum to promote dialogue

21  and awareness of diversity among the entire student body.  By requiring that each

22  organization in the forum must open its membership to all members of the law school

23  community regardless of race, gender, religion, sexual orientation or other factors, Hastings

24  directly advances the program's underlying purpose.  The Policy is one means of ensuring

25  that the forum will serve the purpose for which it was established—*i.e.,* providing

26  educational and social opportunities for the *entire* student body.  As such, Hastings'

27  application of the Policy on Nondiscrimination to the registered student organization

28  program is "consistent with preserving the property for the purpose to which it [was]

- 17 -

1  dedicated." *Diloreto v. Downey Unified School District Board of Educ.*, 196 F.3d 958, 967
2  (9th Cir.1999).

3       In sum, Hastings' decision that discrimination on the basis of religion or sexual
4  orientation is incompatible with the purposes for which the registered student organizations
5  program was established was both viewpoint neutral and reasonable.  Accordingly, it does
6  not violate CLS's freedom of speech.

7  **VI.   HASTINGS' POLICY DOES NOT VIOLATE CLS'S FREEDOM OF ASSOCIATION**

8       **A.   *Dale* Does Not Govern This Case**

9       Under well-settled law, a public university may restrict access to a nontraditional
10  forum based on reasonable, viewpoint neutral rules.  The issue in this case is whether CLS
11  must be given access to Hastings' student group forum despite its noncompliance with such
12  rules.  Thus, contrary to the Plaintiffs' argument, it is the Supreme Court's forum cases, and
13  not the framework applied in *Dale*, that governs their free association claim.  Citing *Dale*,
14  CLS erroneously argues that complying with the University's policy would violate its right
15  to free association because it would force CLS to open its membership to students who do
16  not share its religious and moral beliefs.  In *Dale*, the Supreme Court held that New Jersey
17  could not force the Boy Scouts to accept a gay activist as a Scout leader pursuant to a state
18  nondiscrimination statute.  Unlike this case, however, *Dale* did not involve access to a
19  nontraditional forum and government funding.  If New Jersey had prevailed, the Boy Scouts
20  would have had to choose between either including unwanted persons or ceasing to exist at
21  all.  In contrast, Hastings is not seeking to force CLS to accept gay people or people of other
22  faiths.  Even if Hastings prevails, CLS will *not* have to choose between accepting unwanted
23  members or disbanding.  Rather, just as it does now, CLS can continue to meet on campus
24  and to exclude potential members based on their sexual orientation or religion without
25  regard to Hastings' Policy.  The only question is whether Hastings must provide a forum for
26  CLS to do so, or whether it may continue to limit the student group forum to groups that are
27  willing to abide by its viewpoint neutral rules, without restricting the right of students to
28  form other groups outside of that forum or to meet in those groups on campus.  As the

Second Circuit correctly held in resolving a similar case, *Dale* does not resolve this question, or even address it. *See Boy Scouts of America v. Wyman*, 335 F.3d at 91 (holding that *Dale* "does not . . . mandate a result" in a case challenging a group's exclusion from a nonpublic forum based on the group's noncompliance with the rule that all participating organizations must comply with state nondiscrimination laws, including those prohibiting sexual orientation discrimination).

> ### B. Hastings May Set Reasonable, Viewpoint Neutral Parameters For The Student Group Forum, Including The Requirement That Groups Must Be Open To All Students

Hastings' Policy does not implicate, much less violate, the right to freedom of association. It is well settled that the government can limit a designated public forum for use "by certain groups." *Perry Educ. Ass'n*, 460 U.S. at 45-46 & n.7; *see also Rosenberger*, 515 U.S. at 829 ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups . . ."). Under this standard, some restrictions on the rights of student groups to associate plainly are permissible and raise no constitutional issues. The only requirements are that any restrictions must be "viewpoint neutral and reasonable in light of the purpose served by the forum." *Diloreto v. Downy Unified Sch. Dist. Bd. of Educ.*, 196 F.3d at 965 (citing *Rosenberger*, 515 U.S. at 829; *Lamb's Chapel v. Center Moriches Union Free Sch.*, 508 U.S. 384, 392-93).

Hastings' Policy clearly passes muster under this standard. In creating a forum for student groups, Hastings did not open the forum indiscriminately to any group that wishes to meet; rather, as the law permits it to do, Hastings chose to define the forum to include only groups that are willing to abide by its Policy and thus are open to all students. As explained in Section V above, this limitation is both reasonable and viewpoint neutral. It no more violates the right to freedom of association than does limiting a forum to students rather than non-students, or to Hastings students rather than students from other schools, or to law students rather than other types of students.

While any of these limitations could be characterized, in a literal sense, as restricting

HASTINGS OUTLAW'S NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES – CASE NO. C 04-4484 JSW

the right to freedom of association, the U.S. Supreme Court has held that such restrictions are permissible.  In *Rosenberger*, for example, while the Court found the University's express exclusion of religious student groups to be unconstitutional, it did not find the University's limitation of recognition to groups with a majority of students to be so.  515 U.S. at 823.  See also *Widmar*, 454 U.S. at 267 n. 5 ("We have not held . . . that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings."); *Souders v. Lucero*, 196 F.3d 1040, 1044 (9th Cir. 1999) (holding that a public university may exclude a non-student from its campus).

The requirement that student groups must comply with a nondiscrimination policy is no different.  In *Healy v. James*, 408 U.S. 169 (1972), for example, the Court expressly held that the University could require a student group to affirm its willingness "to abide by the Student Bill of Rights," which included a prohibition against infringing the rights of others, as a necessary condition of being recognized as an official student group.  *See also id*. at 184 n.11 (noting that the University required that student groups not discriminate on the basis of race, religion or nationality).  As the Court explained:

> A college administration may impose a requirement . . . that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law.  Such a requirement does not impose an impermissible condition on the students' associational rights.  Their freedom to speak out, to assemble, or to petition for changes in school rules is in no sense infringed.  It merely constitutes an agreement to conform with reasonable standards respecting conduct.  This is a minimal requirement, in the interest of the entire academic community, of any group seeking the privilege of official recognition.

*Healy v. James*, 408 U.S. at 192-93.  Likewise, in *Rosenberger*, the Court noted that, in order to apply for funding as a student organization, a group "must pledge not to discriminate in its membership."  While striking down the exclusion of religious groups, the Court did not suggest that the requirement of nondiscrimination raised any constitutional concerns.  *Rosenberger*, 515 U.S. at 823.  In *Good News Club v. Milford Central School*, 533 U.S. at 102, the Court invalidated a school policy excluding religious groups, but did not strike the school's policy of permitting groups to use its facilities only "provided that

such uses shall be nonexclusive and shall be opened to the general public." These cases stand for the proposition that while a public school may not discriminate on the basis of viewpoint in defining the boundaries of a nontraditional forum, it may require student groups to comply with reasonable viewpoint neutral rules, including a viewpoint neutral nondiscrimination policy, in order to obtain official recognition and funding.

### C. Even Assuming, *Arguendo*, That Hastings' Policy Infringes The Freedom of Association, It Does Not Impose A Substantial Burden On CLS's Right To Free Association

Even assuming that Hastings' Policy implicates CLS's right to freedom of association, application of the Policy to CLS does not violate the Constitution because any burdens the Policy imposes on those rights are not substantial and must be weighed against the University's compelling interests in ensuring equal access to educational opportunities and combating invidious discrimination. In determining whether a government action or policy violates the right to freedom of association, it is not enough to show that the right to freedom of association is implicated in a particular case; rather, the plaintiff also must show that the challenged government conduct imposes a *significant burden* on that right. *Boy Scouts of America v. Dale*, 530 U.S. at 656 (finding "that the forced inclusion of Dale would significantly affect" the Boy Scouts' expressive association); *see also Roberts v. United States Jaycees*, 468 U.S. at 626 ("Indeed, the Jaycees has failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association."). Only if the burden on associational rights is found to be significant must the court then consider whether a compelling state interest justifies the governmental practice. *Dale*, 530 U.S. at 648. There is no such burden here.

First, this case does not present a situation like that in *Dale*, where an organization was being forced to "inclu[de] an unwanted person." *Dale*, 530 U.S. at 648. CLS is not being forced to "open its membership and leadership to persons who oppose or reject its religious beliefs." CLS Motion at p. 24. Being excluded as a registered student organization does not compel CLS to change its membership policies in any way, or to accept an "unwanted person" as a member or leader. *See, e.g., Boy Scouts of America v.*

- 21 -

1    *Wyman*, 335 F.3d 80, 91 (2nd Cir. 2003) ("The effect of Connecticut's removal of the BSA

2    from the Campaign is neither direct nor immediate, since its conditioned exclusion does not

3    rise to the level of compulsion."). The element of compulsion that was critical to the

4    Supreme Court's finding of a "substantial burden" on associational rights in *Dale* is lacking

5    in this case.

6         Second, even as an unregistered group, CLS is eligible to use Hastings' classrooms

7    and other school resources and has access to multiple channels to communicate with other

8    students, faculty and staff. As the Supreme Court has stressed, whether the First

9    Amendment has been violated depends heavily upon the specific facts in each case. *See,*

10   *e.g.*, *Hurley*, 515 U.S. at 567 ("the reaches of the First Amendment are ultimately defined

11   by the facts it is held to embrace"); *Healy*, 408 U.S. at 183 (holding that courts must

12   consider the "practical realities" and must conduct a careful and detailed inquiry to

13   determine how denial of official recognition affects the plaintiffs in a particular case). In

14   this case, the facts make clear that Hastings' Policy does not interfere in any meaningful

15   way with the Plaintiffs' freedom to form a CLS chapter on the Hastings campus. CLS is

16   free to meet on campus and to use Hastings' rooms and audio-visual equipment for

17   meetings. Joint Stip., ¶ 10. It also retains access to bulletin boards to make announcements.

18   *Id.*, ¶ 11. And it is free to shape its message and to define its own membership without any

19   interference or limitation imposed by Hastings. The only thing it may not do is claim a

20   right to official recognition, financial support and use of Hastings' name and trademarks, as

21   well as use of certain media resources that are restricted to official student groups. Joint

22   Stip., ¶¶ 42, 60, 62.

23        In contrast, in *Healy*, the plaintiffs were not simply barred from the student group

24   forum; rather, they were completely barred from meeting or publicizing their group

25   anywhere on campus. See *Healy,* 408 U.S. at 181 ("The *primary impediment* to free

26   association flowing from nonrecognition is the denial of use of campus facilities for

27   meetings and other appropriate purposes.") (emphasis added). Accordingly, the Court

28   found that the impact on their right to free association was substantial. *Id.*, at 182. In this

case, the significant burdens found in *Healy* simply do not exist.

**VII.  EVEN IF HASTINGS' POLICY DID SUBSTANTIALLY BURDEN CLS'S RIGHTS TO FREE SPEECH OR ASSOCIATION, IT IS NARROWLY TAILORED TO ACHIEVE THE COMPELLING STATE INTERESTS OF ENSURING EQUAL ACCESS TO EDUCATIONAL OPPORTUNITIES AND COMBATING INVIDIOUS DISCRIMINATION**

Even if Hastings' Policy did create a substantial burden on CLS's freedom of speech or association, the Policy must be upheld because it was (1) "adopted to serve compelling state interests"; (2) it is "unrelated to the suppression of ideas"; and (3) the state's interest in eradicating discrimination "cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts*, 468 U.S. at 623.

As set forth in Section I, above, the Supreme Court has acknowledged that government entities have a compelling interest in eliminating discrimination in education and other areas.  *See, e.g., Gruttinger v. Bollinge*r, 539 U.S. at 331 (finding a compelling state interest in ensuring that education is "open and available to all segments of American society:); *Roberts*, 468 U.S. at 624 (finding compelling a state's "strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services.").  Moreover, given the long and well-documented history of societal discrimination against lesbians and gay men[7] and against religious minorities —a phenomenon which persists to this day—Hastings' interest in ensuring equal access to educational opportunities for all students and shielding students from the effects of invidious discrimination on the basis of sexual orientation and religion is plainly compelling.

Contrary to CLS's contention (Pl.'s Memo. at 21), the existence of certain exemptions for religious institutions in Title VII and other employment discrimination

---

[7] California case law documents the longstanding and pervasive nature of anti-gay discrimination in this state.  *See, e.g.*, *Stouman v. Reilly*, 37 Cal. 2d 713 (1951) (describing standard practice on the part of bars and restaurants of refusing service to patrons suspected of being lesbian or gay); *Kovatch v. California Casualty Management*, 65 Cal. App. 4th 1256 (1998) (describing anti-gay workplace harassment) (overruled on other grounds); *In re Joshua H.*, 13 Cal. App. 4th 1734 (1993) (discussing hate violence against lesbians and gay men); *Gay Law Students Ass'n*, 24 Cal. 3d 458 (1979) (discussing anti-gay workplace discrimination).

1   statutes to permit some discrimination on the basis of religion does not suggest that the

2   government's interests in eradicating discrimination on the basis of sexual orientation and

3   religion are not compelling. There is a world of difference between forcing a church to hire

4   a minister who does not share that church's beliefs and denying the benefits of official

5   student organization status to a religious club that wishes to discriminate in violation of

6   school regulations.  The fact that Congress and other legislative bodies have chosen, as a

7   matter of public policy, to strike a balance between protecting individuals from

8   discrimination and permitting religious institutions in some instances to discriminate in

9   employment does *not* mean that government *must,* as a matter of constitutional law, provide

10  such an accommodation, nor does it mean that government lacks a compelling interest to

11  deny eligibility for public funding or benefits to religious institutions that maintain

12  discriminatory practices.  *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. at 604.

13      Second, Hastings' nondiscrimination policy is "unrelated to the suppression of

14  ideas."  *Roberts v. United States Jaycees*, 468 U.S. at 609.  As discussed in Section IV

15  above, the Supreme Court consistently has recognized that nondiscrimination laws and

16  policies generally are not aimed at expressive activity.  *See, e.g., Roberts*, 468 U.S. at 624.

17  Similarly, in this case, there is no dispute that Hastings' purpose in adopting the policy was

18  to ensure that the benefits associated with official recognition are granted only to student

19  organizations that are open to all students.  Joint Stip., ¶¶ 17-18. That goal is unrelated to

20  the suppression of ideas.

21      Finally, as set forth in Section I, the Policy is narrowly tailored to achieve Hastings'

22  compelling interest in eliminating discrimination based on irrelevant characteristics,

23  including sexual orientation and religion.  The only way to advance this interest effectively

24  is to prohibit discrimination directly and to enforce that prohibition consistently, without

25  exceptions.  In contrast, the exceptions sought by CLS are incapable of any principled

26  limitation.  If granted in this case, they would effectively prohibit Hastings, or any other

27  public school, from enacting and enforcing any type of nondiscrimination policy with

28  regard to student groups.

- 24 -

**VIII.  CLS'S CLAIMS FOR VIOLATION OF THE FREE EXERCISE AND EQUAL PROTECTION CLAUSES ARE WITHOUT MERIT**

CLS also contends that Hastings' Policy violates its rights under the Free Exercise and Equal Protection Clauses.  For the reasons stated in the Hastings Defendants' motion for summary judgment, those arguments are wholly without merit.

**IX.   CONCLUSION**

For the foregoing reasons, Outlaw respectfully requests that CLS's Motion for Summary Judgment be denied and Outlaw's Motion for Summary Judgment be granted.

October 21, 2005                          Respectfully submitted,

                                         HELLER EHRMAN LLP


                                         By s/CHRISTOPHER F. STOLL
                                              CHRISTOPHER F. STOLL


                                         Attorneys for Proposed Defendant-Intervenor
                                         HASTINGS OUTLAW