**United States District Court**

For the Northern District of California

1
2
3
4
5
6              IN THE UNITED STATES DISTRICT COURT
7
8              FOR THE NORTHERN DISTRICT OF CALIFORNIA
9  CHRISTIAN LEGAL SOCIETY CHAPTER
   OF UNIVERSITY OF CALIFORNIA,
10 HASTINGS COLLEGE OF THE LAW, a/k/a          No. C 04-04484 JSW
   HASTINGS CHRISTIAN FELLOWSHIP,
11
         Plaintiff,
12
                                               **AMENDED ORDER RE**
   v.                                          **MOTIONS FOR SUMMARY**
13                                             **JUDGMENT**
   MARY KAY KANE, et al.,
14
         Defendants.
15 _____/
16
17       **This Amended Order is issued to correct a clerical error Defendants brought to the**
18 **Court's attention.  In the Court's original order, the header "Hastings' Nondiscrimination**
19 **Policy Regulates Speech" should have read "Hastings' Nondiscrimination Policy Regulates**
20 **Conduct."  The Court issues this amended order solely to correct this clerical error.**
21       Now before the Court is the motion for summary judgment filed by plaintiff Christian
22 Legal Society Chapter of University of California, Hastings College of the Law, a/k/a Hastings
23 Christian Fellowship ("CLS") and cross-motions for summary judgment filed by defendants
24 Mary Kay Kane, Judy Chapman, Maureen E. Corcoran, Eugene L. Freeland, Carin T. Fujisaki,
25 John T. Knox, Jan Lewenhaupt, James E. Mahoney, Brian D. Monaghan, Bruce L. Simon, John
26 K. Smith, and Tony West (collectively "Hastings" or "Hastings Defendants") and intervenor-
27 defendant Hastings Outlaw ("Outlaw").  Having carefully reviewed the parties' papers and
28 considered their arguments and the relevant legal authority, and good cause appearing, the Court

**United States District Court**

For the Northern District of California

1   hereby DENIES CLS's motion for summary judgment and GRANTS Hastings' and Outlaws'

2   cross-motions for summary judgment.[1]

3                                      **FACTUAL BACKGROUND**

4          This case concerns whether a religious student organization may compel a public

5   university law school to fund its activities and to allow the group to use the school's name and

6   facilities even though the organization admittedly discriminates in the selection of its members

7   and officers on the basis of religion and sexual orientation.

8          CLS is an unincorporated student organization comprised of students attending

9   University of California, Hastings College of the Law (the "Law School").  (Joint Stipulation of

10  Facts for Cross-Motions for Summary Judgment ("Joint Stip."), ¶ 1.)  The mission of CLS is "to

11  maintain a vibrant Christian Law Fellowship on the School's campus which enables its

12  members, individually and as a group, to love the Lord with their whole beings–hearts, souls,

13  and minds–and to love their neighbors as themselves."  (*Id.*, Ex. E.)  In the beginning of the

14  2004-2005 academic year, CLS applied for, but was denied the privilege of becoming a

15  recognized student organization at the Law School.  (*Id.*, ¶¶ 38-42.)

16         University of California, Hastings College of the Law is a public law school located in

17  San Francisco and is part of the University of California school system.  (*Id.*, ¶ 2.)  Mary Kay

18  Kane is the Chancellor and Dean of the Law School.  Judy Chapman is the Director of the

19  Office of Student Services, and the remaining defendants, Maureen E. Corcoran, Eugene L.

20  Freeland, Carin T. Fujisaki, John T. Knox, Jan Lewenhaupt, James E. Mahoney, Brian D.

21

22

23         [1] Hastings objects to portions of the Declaration of Steven H. Aden submitted by
    CLS.  Outlaw joined in the evidentiary objections.  The Court sustains the objection based on
24  lack of personal knowledge to paragraph 13 of the Aden Declaration to the extent it declares
    that the "Hastings Republicans is (sic) a chapter of California College Republicans and as
25  such, abides by its constitution" and the portion of Exhibit K attaching the Constitution of the
    California College Republicans.  The Court overrules the remaining evidentiary objections.
26         Since the hearing on the cross-motions, the parties have each filed several requests for
    leave to file supplemental authority.  To the extent the parties seek leave to provide briefing
27  on the supplemental authority and on the issues raised by the parties' cross-motions, the
    requests are DENIED.  To the extent the parties merely seek leave to file additional authority,
28  the Court has reviewed and considered the new authority, and thus DENIES the requests as
    MOOT.

**United States District Court**

For the Northern District of California

1    Monaghan, Bruce L. Simon, John K. Smith, and Tony West, are members of the Board of

2    Directors of the Law School.  (*Id.*, ¶¶ 3-5.)

3         The Hastings Defendants permit student organizations to register with the Office of

4    Student Services.  (*Id.*, ¶ 6.)  Student organizations must be registered in order to gain access to

5    the following benefits: (a) use of the Law School's name and logo; (b) use of certain bulletin

6    boards in the basement of Snodgrass Hall; (c) eligibility for a Law School organization email

7    address; (d) eligibility to send out mass emails through the Associated Students of the

8    University of California at Hastings; (e) eligibility for a student organization account with fiscal

9    services at the Law School; (f) eligibility to apply for student activity fee funding; (g) eligibility

10   to apply for limited travel funds; (h) ability to place announcements in the Hastings Weekly, a

11   weekly newsletter prepared and distributed by the Office of Student Services; (I) eligibility to

12   apply for permission to use limited office space; (j) eligibility for the use of an organization

13   voice mailbox for telephone messages; (k) listing on the Office of Student Services' website and

14   any hard copy lists, including the Student Guidebook and admissions publications; (l)

15   participation in the annual Student Organizations Faire; and (m) use of the Student Information

16   Center for distribution of organization materials to the Law School community.  (*Id.*, ¶ 9.)

17   Registered student organizations may also apply for permission to use the Law School's rooms

18   and audio-visual equipment for meetings.  The Hastings Defendants have extended this benefit

19   to CLS even though it is not a registered student organization.  (*Id.*, ¶ 10.)  The Hastings

20   Defendants provide non-registered organizations access to certain bulletin boards and chalk

21   boards at the Law School to make announcements.  (*Id.*, ¶ 11.)   Although the Hastings

22   Defendants informed CLS that it could use the facilities at the Law School for its meetings, CLS

23   never requested to use such facilities during the 2004-2005 academic year.  (*Id.*, ¶¶ 58, 61.)

24        As a condition of becoming a "registered student organization," the Hastings Defendants

25   require a student organization to comply with the Law School's Policies and Regulations

26   Applying to College Activities, Organizations and Students, which requires, *inter alia*,

27   registered student organizations to abide by the Policy on Nondiscrimination

28   ("Nondiscrimination Policy").  (*Id.*, ¶¶ 12, 14.)  The Nondiscrimination Policy provides:

3

**United States District Court**

**For the Northern District of California**

1

2

3

> The College is committed to a policy against legally impermissible, arbitrary or unreasonable discriminatory practices. All groups, including administration, faculty, student governments, College-owned student residence facilities and programs sponsored by the College, are governed by this policy of nondiscrimination....

4

5

> The University of California, Hastings College of the Law shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation.  This nondiscrimination policy covers admission, access and treatment in Hastings-sponsored programs and activities.

6   (*Id.*, ¶ 15.)  Hastings requires registered student organizations to allow any student to participate,

7   become a member, or seek leadership positions, regardless of their status or beliefs.  (*Id.*, ¶ 18.)

8         From the 1994-1995 academic year to the 2003-2004 academic year, a student

9   organization calling itself either Hastings Christian Legal Society or the Hastings Christian

10  Fellowship was a registered student organization at Hastings.  (*Id.*, ¶ 22.)  From the 1994-1995

11  academic year through the 2001-2002 academic year, the student organization used a set of

12  bylaws which appear to be an old version of the chapter bylaws distributed by the National

13  Christian Legal Society.  (*Id.*, ¶ 23.)  These bylaws provided that the objectives of the

14  organization were to "encourage those who identify themselves as followers of Jesus Christ to

15  more faithfully live out their commitment in their personal and academic lives, to prepare

16  members for future lives as Christian attorneys, and to provide a witness and outreach for Jesus

17  Christ in the Hastings community."  (*Id.*, Ex. C.)  The bylaws required voting members to

18  acknowledge in writing their agreement with the following "Statement of Faith":

19

20

21

22

> Trusting in Jesus Christ as my Savior, I believe in:
> • The Bible as the inspired word of God;
> • The Deity of our Lord, Jesus Christ, God's son;
> • The vicarious death of Jesus Christ for our sins; His bodily resurrection and His personal return.
> • The presence and power of the Holy Spirit in the work of regeneration.
> • Jesus Christ, God's son, is Lord of my life;

23  (*Id.*, Ex. C.)  However, there is no evidence that Hastings Christian Legal Society or the

24  Hastings Christian Fellowship ever enforced this requirement.  (*Id.*, ¶ 57.)  Moreover, the

25  bylaws also stated that the members and the organization would "comply with the Policies and

26  Regulations Applying to College Activities, Organizations, and Students."  (*Id.*, Ex. C.)

27         During the 2002-2003 and 2003-2004 academic years, the student organization used a

28  different set of bylaws.  These bylaws provided: "HCF welcomes all students of the University

United States District Court

For the Northern District of California

of California, Hastings College of law." (*Id.*, ¶ 25.)  This organization did not exclude members on the basis of religion or sexual orientation.  (*Id.*)

During the 2003-2004 academic year, approximately five to seven students attended their meetings and events.  (*Id.*, ¶ 26.)  During that year, one of the participants in the meetings was an openly lesbian student and two were students who held beliefs inconsistent with what CLS considers to be orthodox Christianity.  (*Id.*, ¶¶ 27-28.)

At the end of the 2003-2004 academic year, Isaac Fong ("Fong"), Dina Haddad ("Haddad") and Julie Chan ("Chan") became the leaders of the Hastings Christian Fellowship. Fong and Haddad decided to affiliate their student organization officially with a national organization known as the Christian Legal Society ("CLS-National").  (*Id.*, ¶ 30-31.)  CLS-National requires its formally-associated student chapters to use a specific set of bylaws.  (*Id.*, ¶ 32, Ex. E.)  The bylaws require any student who wants to become a member to sign a "Statement of Faith" which provides:

> Trusting in Jesus Christ as my Savior, I believe in:
> •     One God, eternally existent in three persons, Father, Son and Holy Spirit.
> •     God the Father Almighty, Maker of heaven and earth.
> •     The Deity of our Lord, Jesus Christ, God's only Son conceived of the Holy Spirit, born of the virgin Mary; His vicarious death for our sins through which we receive eternal life; His bodily resurrection and personal return.
> •     The presence and power of the Holy Spirit in the work of regeneration.
> •     The Bible as the inspired Word of God.

(*Id.*, ¶ 33.)  CLS will not permit students who do not sign the Statement of Faith to become members or officers.  CLS also bars individuals who engage in "unrepentant homosexual conduct" or are members of religions that have tenets which differ from those set forth in the Statement of Faith from becoming members or officers.  (*Id.*, ¶¶ 34-35.)  The bylaws also pronounce a "code of conduct" for officers which provides that officers "must exemplify the highest standards of morality as set forth in Scripture."  (*Id.*, Ex. E at 2.)

While only actual members of CLS may vote for or remove officers, stand for election to become an officer, or vote to amend the organization's constitution, CLS's meetings and activities are open to all students, regardless their religion or sexual orientation.  (*Id.*, ¶ 36.)

**United States District Court**

For the Northern District of California

In early September 2004, CLS also applied to the Office of Student Services for travel funds to attend CLS-National's annual conference, and initially, Hastings informed CLS that such funds were being set aside for CLS. (*Id*., ¶ 37.) On September 17, 2004, CLS submitted its registration form and set of bylaws to the Office of Student Services. (*Id*., ¶ 38.) Hastings informed CLS that its bylaws did not appear to be compliant with the Nondiscrimination Policy, in particular the religion and sexual orientation provisions, and invited CLS to discuss changing them. Hastings further advised CLS that to become a recognized student organization, CLS would have to open its membership to all students irrespective of their religion or sexual orientation. (*Id*., ¶¶ 39-41.) Subsequently, due to CLS's failure to become a registered student organization, Hastings informed CLS that the travel funds previously set aside for CLS had been withdrawn. (*Id*., ¶ 42.)

Despite not being a recognized student organization, throughout the 2004-2005 academic year, CLS held weekly Bible-study meetings, and hosted a beach barbeque, a Thanksgiving dinner, a campus lecture on the Christian faith and legal practice, several fellowship dinners, an end-of-year banquet, and several informal social activities. CLS also invited Hastings students to attend Good Friday and Easter Sunday church services with the organization. (*Id*., ¶ 44.) The Bible studies were led by one of CLS's officers, but any attendee or member was welcome to lead the group in prayer, share prayer requests, and otherwise participate in prayer. (*Id*., ¶¶ 49, 51.)

Between nine to fifteen Hastings students regularly attended CLS's meetings and activities during the 2004-2005 academic year. (*Id*., ¶ 48.) Julie Chan, CLS's treasurer, resigned from her position and membership in January 2005. In addition to CLS's officers, one other student became an official member of CLS during the academic year. (*Id*., ¶¶ 47-48.) No known non-Christian, gay, lesbian, or bisexual students sought to join CLS as a member or officer, or attend any of its meetings during the 2004-2005 academic year. (*Id*., ¶¶ 50, 54.) As of October 2005, seven Hastings students, including three officers, joined CLS as members for the 2005-2006 academic year. (*Id*., ¶ 64.)

United States District Court

For the Northern District of California

CLS filed a complaint in this action asserting that Hastings is violating: (1) CLS's rights to freedom of expressive association pursuant to the First Amendment of the United States Constitution; (2) CLS's free speech pursuant to the First Amendment; (3) the Establishment Clause of the First Amendment; (4) the Due Process Clause of the Fourteenth Amendment; (5) the Free Exercise Clause of the First Amendment; and (6) the Equal Protection Clause of the Fourteenth Amendment.  On April 12, 2005, the Court granted a motion by Hastings to dismiss CLS's establishment, due process, and equal protection claims, but granted CLS leave to amend its equal protection claim.  On May 3, 2005, CLS filed an amended complaint which asserts an amended equal protection claim.  CLS, Hastings, and Outlaw have each filed cross-motions for summary judgment on each of CLS's claims for free speech, expressive association, free exercise and equal protection.

**ANALYSIS**

**A.     Legal Standard on Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v. Cattret*, 477 U.S. 317, 323-24 (1986).  Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  A party who moves for summary judgment who does bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial.  *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

**B.      Cross-Motions for Summary Judgment.**

CLS contends that Hastings' enforcement of its Nondiscrimination Policy, and its refusal to grant CLS an exception to exclude students on the basis of religion and sexual orientation, infringes its members' rights to free speech, free association, free exercise, and equal protection. As set forth below, the Court finds that Hastings' uniform enforcement of its Nondiscrimination Policy infringes none of these constitutional rights.

      **1.      First Amendment: Free Speech.**

            **a.      Regulation of Conduct.**

                  **i.      Hastings' Nondiscrimination Policy Regulates Conduct.**

The parties dispute whether Hastings' Nondiscrimination Policy regulates speech or conduct. The Nondiscrimination Policy prohibits discrimination on the basis of religion and sexual orientation, among other categories. (Joint Stip., ¶ 15.) Courts have consistently held that regulations prohibiting discrimination, similar to Hastings' Nondiscrimination Policy, regulate conduct, not speech. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Group*

*of Boston*, 515 U.S. 557 (1995); *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984); *Jews for Jesus, Inc. v. Jewish Cmty Relations Council of New York*, 968 F.2d 286, 295 (2d Cir. 1992).

In *Roberts*, two local chapters of the United States Jaycees ("Jaycees") had been admitting women as full members for years, in violation of the Jaycees' organization's bylaws restricting "regular" membership to men between the ages of 18 and 35. *Roberts*, 468 U.S. at 613-14. When the Jaycees sought to revoke the charters of the local chapters, members of the chapters filed complaints alleging the exclusion of women from full membership violated the state Human Rights Act, which prohibited discrimination in public accommodations on the basis of race, color, creed, religion, disability, national origin or sex. *Id*. at 614-15. The Supreme Court found that "[o]n its face," the state anti-discrimination statute "[did] not aim at the suppression of speech, [did] not distinguish between prohibited and permitted activity on the basis of viewpoint, and [did] not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Id*. at 623. The Court further found that the goal of the statute was to eliminate discrimination and assure the state's citizens equal access to publicly available goods and services and that this goal was "unrelated to the suppression of expression." *Id*. at 624.

In *Jews for Jesus*, under the threat of an economic boycott from the Jewish Community Relations Council of New York ("JCRC") and other organizations, a resort cancelled a contract to provide meals and accommodations to a non-profit religious corporation, Jews for Jesus, Inc. *Jews for Jesus*, 968 F.2d at 290. Jews for Jesus and a member of the organization argued that the JCRC aided or incited the resort to deprive them of their right to public accommodations without discrimination on the basis of race and/or creed under state law. *Id*. at 293. The state statute at issue prohibited discrimination in public accommodations on the basis of race, creed, color, or national origin. *Id*. at 293. The Second Circuit rejected the JCRC's contention that the state anti-discrimination statute was unconstitutional as applied because it impermissibly regulated its "speech" in applying economic pressure on the resort. *Id*. at 295. The court found

United States District Court

For the Northern District of California

9

that the state statue prohibiting discrimination on the basis of, among other things, race and

religion, was "plainly aimed at conduct, *i.e.*, discrimination, not speech." *Id.*

In *Hurley*, Massachusetts enforced a state statute prohibiting discrimination in public

accommodations against a group of private citizens in an unincorporated association, the South

Boston Allied War Veterans Council ("Council"), who were organizing a St. Patrick's Day

parade. *Hurley*, 515 U.S. at 561. Gay, lesbian, and bisexual descendants of Irish immigrants

formed an organization called GLIB "to march in the parade as way to express pride in their

Irish heritage as openly gay, lesbian, and bisexual individuals." *Id.* When the Council refused

to allow GLIB to participate in the parade, GLIB and several of its members filed an action

against the Council alleging it violated the state public accommodations law which prohibited

discrimination on the basis of sexual orientation. *Id.* The state trial court agreed with GLIB and

rejected the Council's claim that requiring it to admit GLIB would violate its First Amendment

rights because the Council's parade had a wide variety of themes and conflicting messages. *Id.*

at 562.

The Supreme Court found that the public accommodations law "[did] not, on its face,

target speech or discriminate on the basis of its content, the focal point of its prohibition being

rather on the act of discriminating against individuals." *Id.* at 572. Nevertheless, the Court

reversed the state court's ruling because of the "peculiar" manner in which the statute had been

applied. *Id.* The Court found that parades are a form of expression and that the selection of a

parade's contingents is entitled to protection under the First Amendment. *Id.* at 568-70. The

Court held that every contingent participating in the parade affects the message conveyed by the

private organizers, and thus, the state court's application of the statute essentially required the

Council to alter the expressive content of its parade. *Id.* at 572-73. It was significant to the

Court's analysis that the dispute did not concern an attempt to exclude participation of all

openly gay, lesbian, or bisexual individuals from marching in approved parade units. In fact, the

Council expressly disclaimed any intent to exclude gay, lesbian or bisexual individuals from

participating generally. Rather, the Court found that the Council was concerned with excluding

a group from marching behind a particular banner. *Id.* at 572.

**United States District Court**

For the Northern District of California

The Supreme Court recently reiterated the distinction between regulating speech and conduct in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 126 S.Ct. 1297 (2006), when it affirmed the enforcement of the Solomon Amendment against law schools with policies that prohibit discrimination on the basis of, among other things, sexual orientation. The Solomon Amendment provides that "if any part of an institution of higher education denies military recruiters access equal to that provided other recruiters, the entire institution will lose certain federal funds." *Id*. at 1302. The Supreme Court rejected the argument by an association of laws schools and law faculties that requiring law schools with anti-discrimination policies to provide the same level of access to the military recruiters as employers who do not discriminate on the basis of sexual orientation infringed the association's members' First Amendment rights. The Court held that:

> [t]he Solomon Amendment neither limits what law schools may say nor requires them to say anything. Law schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds. ... As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do* – afford equal access to military recruiters – not what they may or may not *say*.

*Id*. at 1307 (emphasis in original); *see also Evans v. City of Berkeley*, 38 Cal. 4th 1, 40 Cal. Rptr. 3d 205, 212 (2006) (holding that a city's requirement that an organization comply with a nondiscrimination resolution did not require the organization to espouse or denounce any particular viewpoint).

Akin to *Hurley*, *Roberts*, *Jews for Jesus*, and *Evans*, the Court finds that on its face, Hastings' Nondiscrimination Policy targets conduct, *i.e.* discrimination, not speech. As in *Rumsfeld*, the Court finds that the Nondiscrimination Policy regulates conduct, not speech because it affects what CLS must *do* if it wants to become a registered student organization – not engage in discrimination – not what CLS may or may not *say* regarding its beliefs on non-orthodox Christianity or homosexuality.

In *Hurley*, even though the Court found that the anti-discrimination statute did not target speech on its face, the Court focused on the "peculiar" application of the statute to require a private entity organizing a parade to admit a group seeking to march behind a particular banner.

11

1   Significantly, the private group expressly disclaimed any intent to exclude all openly gay,

2   lesbian, or bisexual individuals from participating in other approved parade contingents.

3   *Hurley*, 515 U.S. at 572-73.  In contrast to *Hurley*, CLS is not excluding certain students who

4   wish to make a particular statement, but rather, CLS is excluding all students who are lesbian,

5   gay, bisexual, or not orthodox Christian.[2]

6          The facts in this case further demonstrate that Hastings' Nondiscrimination Policy is

7   directed at conduct, not speech.  Notably, here, a predecessor of CLS met as a recognized group

8   on Hastings' campus for the previous ten years.  (Joint Stip, ¶ 22: "From the 1994-1995

9   academic year to the 2003-2004 academic year, a student organization calling itself either

10  Hastings Christian Legal Society ("HCLS") or the Hastings Christian Fellowship ("HCF")

11  existed as a registered student organization at Hastings.").  The predecessor group did not

12  exclude members on the basis of religion or sexual orientation.  (*Id*. at 25.)  As long as the

13  organization admitted all students who wanted to join, it was free to express any ideas or

14  viewpoints.  It was not until CLS refused to comply with the Nondiscrimination Policy that

15  Hastings withheld recognition.  (*Id*., ¶¶ 33-35, 39-41.)

16         At the hearing on these motions, CLS argued that Hastings' enforcement of its

17  Nondiscrimination Policy suppressed CLS's speech that "homosexuality is not Christian."  First,

18  as discussed above, the evidence does not show that CLS has been precluded from expressing

19  any particular idea or viewpoint.  Rather, to become a recognized student group, Hastings

20  requires that CLS merely refrain from excluding students on the basis of their religion or sexual

21  orientation.  Second, even if the record could be construed to support CLS's position that its

22  "speech" regarding homosexuality has been suppressed, CLS has not shown that the

23  ─────────────────

24         [2] Although CLS argues that it does not discriminate on the basis of sexual orientation,
    but merely excludes students who engage in or advocate homosexual conduct, (CLS Mot. at
    22), this is a distinction without a difference.  *See Lawrence v. Texas*, 539 U.S. 558, 583
25  (2003 (O'Connor, J., concurring) (rejecting attempt to distinguish statute discriminating
    against "homosexual conduct" from one discriminating on the basis of sexual orientation:
26  "While it is true that the law applies only to conduct, the conduct targeted by this law is
    conduct that is closely correlated with being homosexual.  Under such circumstances, [the
27  State] sodomy law is targeted at more than conduct.  It is instead directed toward gay persons
    as a class."); *see also Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005) (finding "no
28  appreciable difference between an individual ... being persecuted for being a homosexual and
    being persecuted for engaging in homosexual acts").

United States District Court

For the Northern District of California

1   Nondiscrimination Policy targets speech as opposed to conduct.  As the Supreme Court stated in

2   *R.A.V.*, if the government regulates conduct for reasons unrelated to its expressive content, such

3   conduct does not become shielded from regulation merely because it expresses a discriminatory

4   idea or philosophy.  *R.A.V v. City of St. Paul*, 505 U.S. 377, 390 (1992); *see also Jews for Jesus*,

5   968 F.2d at 295 ("simply because speech or other expressive conduct can in some circumstances

6   be the vehicle for violating a statute directed at regulating conduct does not render that statute

7   unconstitutional.").

8          Therefore, the Court concludes that on its face and in its application to CLS, the

9   Nondiscrimination Policy regulates conduct, not speech.

10                  **ii.        Analysis Pursuant to *United States v. O'Brien*.**

11         Because the Court finds that the Nondiscrimination Policy regulates conduct, the Court

12   will analyze whether CLS's free speech rights have been infringed pursuant to the standard from

13   *United States v. O'Brien*, 391 U.S. 367 (1968), which sets forth the standard for determining

14   when government regulation of conduct violates First Amendment speech protections.  *See Jews*

15   *for Jesus*, 968 F.2d at 295 (analyzing constitutionality of nondiscrimination statute under

16   *O'Brien* standard); *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio*,

17   902 F. Supp. 492 (D.N.J. 1995) (same).  Under *O'Brien*, governmental regulation of conduct is

18   valid, even if it incidentally restricts speech, so long as: (1) the regulation is within the

19   constitutional power of the government; (2) it furthers an important or substantial government

20   interest; (3) the government interest is unrelated to the suppression of free expression; and (4)

21   the incidental restriction on the alleged First Amendment freedoms is no greater than is essential

22   to the furtherance of that interest.  *O'Brien*, 391 U.S. at 377.

23         States have the constitutional authority and a substantial, indeed compelling, interest in

24   prohibiting discrimination on the basis of religion and sexual orientation.  *See Roberts*, 468 U.S.

25   at 624 (holding that the state had a compelling interest "of the highest order" in eradicating sex

26   discrimination); *see also Jews for Jesus*, 968 F.2d at 295 ("New York has the constitutional

27   authority to prohibit, and a substantial, indeed compelling, interest in prohibiting racial and

28   religious discrimination in obtaining public accommodations."); *Presbytery of New Jersey*, 902

United States District Court

For the Northern District of California

F. Supp. at 521 (finding state interest in eliminating discrimination on the basis of, *inter alia*, sexual orientation, was "not only substantial but also [could] be characterized as compelling"); *Gay Rights Coal. of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1, 38 (D.C. 1987) ("The eradication of sexual orientation discrimination is a compelling governmental interest."). The interest in prohibiting discrimination is particularly critical in the context of education. *See e.g., Grutter v. Bollinger*, 539 U.S. 306, 331-32 (2003) ("ensuring that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a paramount government objective ... . [N]owhere is the importance of such openness more acute than in the context of higher education.") (quotations and internal citations omitted); *see also Butt v. State of California*, 4 Cal. 4th 668, 680 (1992) ("In view of the importance of education to society and to the individual child, the opportunity to receive the schooling furnished by the state must be made available to all on an equal basis.").

Moreover, "[t]he governmental interest in prohibiting such discrimination ... is not directed at or related to suppression expression." *Jews for Jesus*, 968 F.2d at 295; *see also Roberts*, 468 U.S. at 624 (goal of eliminating discrimination "is unrelated to the suppression of expression"); *Presbytery of New Jersey*, 902 F. Supp. at 521 (same). Therefore, the Court concludes that the Policy prohibiting discrimination on the basis of religion and sexual orientation, among other categories, is within the Hastings' constitutional authority as a state institution, and that the Nondiscrimination Policy furthers a governmental interest unrelated to the suppression of free expression – protecting students from discrimination. Furthermore, as discussed above, the facts here, including Hastings' recognition of a predecessor of CLS for the previous ten years, confirm that Hastings' Nondiscrimination Policy is directed at conduct unrelated to the suppression of expression. (Joint Stip, ¶¶ 22, 25, 33-35, 39-41.) Thus, the first three prongs of the *O'Brien* test have been satisfied.

With respect to the last prong of the *O'Brien* test, courts have found that the incidental restrictions on free speech rights when a government enforces an anti-discrimination statute against an organization seeking to exclude individuals were no greater than essential to the furtherance of the state's interest in prohibiting discrimination. *See Jews for Jesus*, 968 F.2d at

14

296 (holding the nondiscrimination statute was "no broader than necessary to further the legitimate goal of eradicating discrimination."); *see also Evans*, 40 Cal. Rptr. 3d at 217 (holding that requiring a group to agree in advance not to discriminate was "a reasonable and narrowly tailored step to implement the diversity and nondiscrimination provisions" of a city resolution). "[A]n incidental burden on speech is no greater than essential, and therefore permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rumsfeld*, 126 S.Ct. at 1311. The Hastings' Nondiscrimination Policy easily meets this standard. Hastings' interest in eradicating discrimination would certainly be achieved less effectively without a policy which prohibits the harmful conduct. Moreover, the Court notes that the Nondiscrimination Policy only targets the conduct of discrimination. As long as student groups do not exclude students based on the prohibited categories, the groups are free to express any beliefs or perspectives they choose. Thus, the Court finds Hastings' implementation of its Nondiscrimination Policy the most direct method of achieving Hastings' goal of eradicating harmful discrimination.

Accordingly, the Court concludes that Hastings' enforcement of its Nondiscrimination Policy meets all four prongs of the *O'Brien* test, and thus, does not unconstitutionally infringe CLS's freedom of speech.

### b.        Regulation of Speech.

Alternatively, even if Hastings' Nondiscrimination Policy may be construed as regulating speech directly, it still passes constitutional muster. The validity of Hastings restricting access to its campus, and the level of scrutiny the Court must apply, turns on the type of forum Hastings has created. *See DiLoreto v. Downey Unified School Dist. Bd. of Ed.*, 196 F.3d 958, 964 (9th Cir. 1999) ("The existence of a right to access to a public property and the standard by which limitations upon such right must be evaluated differ depending upon the character of the property at issue."). The parties dispute whether the forum at issue is a "designated public forum" or a "limited public forum." As the Ninth Circuit summarized in *DiLoreto*:

United States District Court

For the Northern District of California

Forum analysis divides government property into three categories: public fora, designated public fora, and nonpublic fora. ...

A traditional public forum, such as a public park or sidewalk, is a place that has traditionally been available for public expression. ... Regulation of speech in a traditional public forum is permissible "only if ... narrowly drawn to achieve a compelling state interest. ... When the government intentionally opens a nontraditional forum for public discourse it creates a designated public forum. ... Restrictions on expressive activity in designated public fora are subject to the same limitations that govern a traditional public forum.

All remaining public property is classified as nonpublic fora. The government may limit expressive activity in nonpublic fora if the limitation is reasonable and not based on the speaker's viewpoint.

*Id*. at 964-65 (quotations and citations omitted).  A "limited public forum" is "a type of nonpublic forum that the government has opened to certain groups or to certain topics." *Id*. at 965.  Restrictions on expression in limited public forums are governed by the same standards that apply to nonpublic forums, *i.e.*, "restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." *Id*.[3]

"Generally, school facilities may be deemed to be public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public." *DiLoreto*, 196 F.3d at 966 (quotations and citations omitted).  There is no evidence before the Court, and CLS does not contend, that Hastings has *indiscriminately* opened up its campus and allowed registration, and the attendant benefits, to the public generally.  Nor is there evidence that any group of students may register.  Rather, it is undisputed that Hastings restricts registration to student organizations that comply with Hastings' Policies and Regulations Applying to College Activities.  (*See* Stip. Facts, ¶ 12.)  Hastings also requires student organizations to comply with the Nondiscrimination Policy and to open their membership to all students.  (*Id*. at ¶¶ 14, 17.)  Moreover, registration is restricted to non-commercial student groups.  (*Id*., Ex. B at 62.)  Finally, the Supreme Court and the Ninth Circuit

---

[3] CLS argues that the contours between the terms "designated public forum" and "limited public forum" have not always been clear and that the terms may be used interchangeably, but the Ninth Circuit has made clear that in this circuit, these terms have different meanings. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001).  As the *Hopper* court explained "a limited public forum is a sub-category of a designated public forum that the government has intentionally opened up to certain groups or certain topics. ... In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." *Id*. at 1074-75 (quotations and citations omitted).

have held that where a college or university creates a fund available for student organizations, as Hastings has done here, it creates a limited public forum. *See Board of Regents of the Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 229-30 (2000); *Rounds v. Oregon State Bd. of Higher Educ.*, 166 F.3d 1032, 1039 (9th Cir. 1999); *see also Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829-31 (1995) (applying standards applicable to limited public forums to restrictions on student activity fund available for student groups that, among other things, comply with certain procedural requirements). Therefore, the Court concludes that Hastings created a limited public forum and thus, the restrictions on access to this forum are permissible so long as they are viewpoint-neutral and reasonable.

### i.     Viewpoint Neutrality.

Viewpoint discrimination occurs when the government targets "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. If the rationale for the restriction on expressive activity is the "specific motivating ideology or the opinion or perspective of the speaker," then the government has engaged in viewpoint discrimination. *Id*.

In *Rosenberger*, student groups at the University of Virginia were eligible to submit bills for reimbursement if they became a "Contracted Independent Organization" ("CIO"). *Id*. at 823. An organization entitled Wide Awake Productions ("Wide Awake") met all the requirements to be qualified to become a CIO and receive reimbursements. *Id*. at 825. Wide Awake was formed by a group of students to, among other things, "publish a magazine of philosophical and religious expression." *Id*. Although Wide Awake was given CIO status, the university denied Wide Awake's request to be reimbursed for the cost of printing its publication "for the sole reason that their student paper 'primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality.'" *Id*. at 822-23, 827. The Court concluded that the university had engaged in viewpoint discrimination because it excluded student journalistic efforts with a religious editorial viewpoint. *Id*. at 831. In fact, the university expressly justified denying funds for Wide Awake's publication on the ground that its contents revealed an "avowed religious perspective." *Id*. at 832.

The factual situations presented by *Widmar v. Vincent*, 454 U.S. 263 (1981), *Lambs Chapel v. Center Moriches Union Free School*, 508 U.S. 384 (1993), and *Good News Club v. Milford Center School,* 533 U.S. 98 (2001), provide other clear examples of viewpoint discrimination.  In *Widmar*, the university excluded student groups and speakers "*based* on their desire to use a generally open forum to engage in religious worship and discussion." *Widmar*, 454 U.S. at 269 (emphasis added).  In *Lambs Chapel*, the evidence in the record demonstrated that the school district excluded a particular film series *because* the presentation would have been from a religious perspective. *Lambs Chapel*, 508 U.S. at 393-94.  In *Good News Club*, the school district excluded a club "based on its religious nature." *Good News Club*, 533 U.S. at 107.

In contrast here, Hastings has not excluded CLS *because* it is a religious group but rather because it refuses to comply with the prerequisites imposed on all student organizations.  To become a registered student group, Hastings requires all student groups to comply with Hastings' Policies and Regulations Applying to College Activities, including the Nondiscrimination Policy. (*See* Stip. Facts, ¶¶ 12, 14, 17.)  Pursuant to the Nondiscrimination Policy, a student organization cannot exclude interested students from participating on the basis of, among other things, religion or sexual orientation.  The student groups must remain open to all students who want to join or participate. (*Id*., ¶¶ 15, 17.)

Courts have found nondiscrimination statutes akin to Hastings' Nondiscrimination Policy to be viewpoint neutral. *See Roberts*, 468 U.S. at 615 (holding that a state law prohibiting discrimination on the basis of "race, color, creed, religion, disability, national origin or sex" did "not distinguish between prohibited and permitted activity on the basis of viewpoint"); *see also Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987); *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 94 (2d Cir. 2003).  Notably, in *Roberts*, the Court found that the state statute had not been applied "for the purpose of hampering the organization's ability to express its view." *Roberts*, 468 U.S. at 615.  Rather, the statute "reflect[ed] the State's strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services." *Id*.

In *Rotary Club of Duarte*, similar to *Roberts*, a local chapter of a national organization admitted women as members in violation of the national organization's requirements. As a result, the national organization revoked the local chapter's charter. *Duarte*, 481 U.S. at 541. In evaluating whether enforcing a statute against the national organization which barred discrimination in public accommodations violated the First Amendment rights of the organization's members, the Court held that the state statute made "no distinctions on the basis of the organization's viewpoint." *Id*. at 549.

In *Wyman*, the Connecticut State Employee Campaign Committee denied the application of a local chapter of the Boy Scouts of America to participate in the state's workplace charitable contribution campaign. *Wyman*, 335 F.3d at 83. The decision to exclude the Boy Scout chapter was based on a ruling by a state commission that the Boy Scout's policy of excluding homosexuals from membership and employment opportunities violated Connecticut's Gay Rights Law. *Id*. at 83. The Second Circuit concluded that the state anti-discrimination statute "prohibits discriminatory membership and employment policies not because of the viewpoints such policies express, but because of the immediate harms – like denial of concrete economic and social benefits – such discrimination causes homosexuals." *Id*. at 94.

CLS's arguments regarding viewpoint discrimination are unavailing. CLS contends that Hastings engages in viewpoint discrimination because it prohibits CLS from using religion as a criteria for selecting members and officers. (CLS Mot. at 16.) CLS is confusing the appropriate analysis by focusing on the reasons CLS is acting, as opposed to the reasons underlying Hastings' Nondiscrimination Policy. CLS also asserts that, as a religious group, it is unfairly disadvantaged. It argues that while other organizations, such as sports teams or political groups, may exclude students based on their athletic ability or political beliefs, CLS may not exclude the students of its choice. (*Id*.) Again, CLS is confusing the analysis by focusing on the effect and the reason *CLS* is acting, as opposed to the reasons underlying *Hastings*' conduct. Moreover, the fact that a neutral policy may affect a group with a certain perspective or belief system does not render the policy viewpoint based. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763

United States District Court

For the Northern District of California

(1994).  In *Madsen*, a group of anti-abortion protestors challenged an injunction which prohibited them from demonstrating in certain places and in particular ways outside of a health clinic that performed abortions.  The Court rejected the protesters' argument that the injunction was viewpoint-based:

> That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order.  It suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion regarding abortions being performed at the clinic.  In short, the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based.

*Id.* (emphasis in original).  Rather, the focus of the Court's inquiry for determining neutrality is government's purpose.  *Id.*; *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) (holding that the fact that an injunction barring access near the World Trade Organization conference "predominantly affected protestors with anti-WTO views did not render it content based").

Finally, in its reply brief, CLS argues that Hastings "refuses to recognize the CLS chapter because it takes a decidedly Christian point of view ... on issues of human sexuality and gender identity."  (CLS Reply at 17.)  However, there is no evidence in the record to support CLS's argument that Hastings will not allow CLS to become a recognized student organization because of CLS's religious perspective.  In fact, the evidence in the record demonstrates otherwise.  For the ten years preceding this lawsuit, a predecessor of CLS existed as a registered student organization at Hastings.  (Joint Stip, ¶ 22.)  The predecessor organization used the name of "Hastings Christian Legal Society" and "Hastings Christian Fellowship."  (*Id.*)  From the 1994-1995 academic year through the 2001-2002 academic year, the predecessor organization used the same set of bylaws, which appear to be an old version of the bylaws sent to student chapters by the National Christian Legal Society.  (*Id.*, ¶ 23.)  It was not until the 2004-2005 academic year, when it became clear that CLS would not comply with the Nondiscrimination Policy and Hastings' requirement that registered student organizations be open to all interested students that Hastings' withdrew CLS's recognition.  (*Id.*, ¶¶ 33-35, 39-41.)

20

United States District Court

For the Northern District of California

1    Thus, the Court concludes that the Nondiscrimination Policy, and Hastings' enforcement

2  of this policy, is viewpoint neutral.

3    **ii.    Reasonableness.**

4    In addition to being viewpoint neutral, restrictions on access to a limited public forum

5  must be reasonable.  "The reasonableness of a governmental restriction limiting access to a

6  nonpublic forum must be assessed 'in light of the purpose of the forum and all of the

7  surrounding circumstances.'"  *Cogswell v. City of Seattle*, 347 F.3d 809, 817 (9th Cir. 2003)

8  (quoting *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985)).

9  "The reasonableness analysis emphasizes the consistency of the limitation in the context of the

10  forum's intended purpose."  *Id*. (citing *DiLoreto,* 196 F.3d at 967).

11    In evaluating the reasonableness of Hastings' restrictions, the Court notes that "a

12  university differs in significant respects from public forums such as streets or parks or even

13  municipal theaters.  A university's mission is education, and decisions of [the Supreme Court]

14  have never denied a university's authority to impose reasonable regulations compatible with that

15  mission upon the use of its campus and facilities."  *Widmar*, 454 U.S. at 268 n.5.  Universities

16  have a "right to exclude even First Amendment activities that violate reasonable campus rules or

17  substantially interfere with the opportunity of other students to obtain an education."  *Id*. at 277.

18    Hastings' purpose in recognizing and funding student organizations is to further

19  students' education and participation in the law school environment and to foster students'

20  interests and connections with their fellow students.  Moreover, as a public institution, Hastings

21  is subject to federal and state laws prohibiting discrimination.  To promote the purpose of this

22  forum and to comply with the spirit of the laws prohibiting discrimination, Hastings requires

23  that student groups be open to all interested students, without discrimination on the basis of any

24  protected status. (Stip. Facts, ¶¶ 12, 14, 15, 17.)  The Court concludes that Hastings'

25  requirement of compliance with its Nondiscrimination Policy is a reasonable regulation that is

26  consistent with and furthers its educational purpose.  Accordingly, even if Hastings'

27  Nondiscrimination Policy is considered a regulation of speech, Hastings' enforcement of this

28  policy did not infringe upon CLS's First Amendment rights of free speech.

United States District Court

For the Northern District of California

**2.      First Amendment: Expressive Association.**

Although not expressly included in the First Amendment, the Supreme Court has recognized the freedom of expressive association as an right implicit in this amendment.  As the Supreme Court explained in *Roberts*:

> [a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. ... Consequently, [the Supreme Court has] long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

*Roberts*, 468 U.S. at 622; *see also Boy Scouts v. Dale*, 530 U.S. 640, 647-48 (2000).  The freedom of association may be unconstitutionally burdened in several different ways.  For example, the "government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, ... it may attempt to require disclosure of the fact of membership in a group seeking anonymity, ... and it may try to interfere with the internal organization or affairs of the group."  *Roberts*, 468 U.S. at 622-23 (internal citations omitted).

CLS argues that its right to expressive association has been infringed.  It is undisputed that CLS is being denied the right to official recognition by Hastings and that it is being denied access to particular areas of the campus and some avenues of communicating with its members and other students.  What is disputed is the legal and practical effect of these limitations.

First, it is important to note what this case is not about.  Although CLS relies heavily on *Dale*[4] and *Roberts*, these cases are inapplicable.  *Dale* stands for the proposition that "forced inclusion of an unwanted person in a group infringes on the groups's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints."  *Dale*, 530 U.S. at 649.  Similarly, the Court in *Roberts*

---

[4] In *Dale*, the Boy Scouts, a private organization, that "engage[s] in instilling a system of values in young people," revoked the adult membership of James Dale when it learned that he was "an avowed homosexual and gay rights activist."  *Dale*, 530 U.S. at 643.  The Supreme Court held that applying New Jersey's public accommodations law to require the Boy Scouts to readmit Dale as a scout in a leadership position violated the Boy Scout's right of expressive association.  *Id*.  The Court found that Dale's presence in a leadership position in the Boy Scouts would "force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior."  *Id*. at 653.

22

1    addressed the validity of forcing a group to accept members it did not desire.  *Roberts*, 468 U.S.

2    at 623.  Here, CLS is not being forced, as a private entity, to include certain members or

3    officers.  *See Wyman*, 335 F.3d at 91 (finding *Dale* inapplicable because the conditioned

4    exclusion of organization from a particular forum did not rise to the level of compulsive

5    membership); *see also Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435,

6    445-46 (3d Cir. 2000) (upholding university's withdrawal of recognition of a fraternity that

7    violated campus rules on drug use and distinguishing *Dale* and *Roberts* because those cases

8    involved state laws mandating that groups accept members with whom the groups did not want

9    to associate).

10        In *Wyman*, a state committee refused to allow a local chapter of the Boy Scouts to

11   participate in the state's charitable contribution campaign because the Boy Scouts excluded gays

12   and lesbians from employment and membership positions in violation of a state law prohibiting

13   discrimination on the basis of sexual orientation.  The Boy Scouts argued that "by conditioning

14   its participation in the Campaign on a change in its membership policies, the defendants

15   violated the [Boy Scout's] constitutional right to expressive association."  *Wyman*, 335 F.3d at

16   88.  The court rejected the Boy Scouts' argument that *Dale* determined the resolution of its

17   claims, reasoning that "*Dale* considered [the state's] attempt to *require* the Boy Scouts to admit

18   a person who, the Supreme Court found, would compromise the Boy Scout's message.  Not

19   surprisingly, the Supreme Court held that such state compulsion 'directly and immediately

20   affects ... associational rights that enjoy *First Amendment* protection' and imposes a 'serious

21   burden' on them."  *Id*. (quoting *Dale*, 530 U.S. at 658-59) (emphasis in original).  In contrast to

22   *Dale*, the court found the effect of state's refusal to allow the Boy Scouts to participate in the

23   campaign was "neither direct nor immediate, since its conditioned exclusion does not rise to the

24   level of compulsion."  *Id*.

25        In a case recently decided by the California Supreme Court, the Court rejected an

26   organization's contention that its speech or associational rights were infringed by a requirement

27   that it agree not to discriminate on the basis of religion and sexual orientation as a condition to

28   receiving a city subsidy for a berth at the marina.  *Evans*, 40 Cal. Rptr. 3d at 211.  The Court

1   reasoned that in adopting a nondiscrimination resolution and applying it to an organization, the

2   city

> did not purport to prohibit the [organization] from operating in a discriminatory
> manner; it simply "refused to fund such activities out of the public fisc." ... To the
> extent the [organization] objected to compliance with the [nondiscrimination
> resolution], the organization ... was free to terminate its participation in the free
> berth program and thus avoid the requirement of the nondiscrimination provision;
> "a legislature's decision not to subsidize the exercise of a fundamental right does not
> infringe the right."

7   *Id*. at 213 (quoting *Rust v. Sullivant*, 500 U.S. 173, 198 (1991) and *Regan v. Taxation With*

8   *Representation of Wash*., 461 U.S. 540, 549 (1983)).

9     Similar to *Wyman* and *Evans*, Hastings is not directly ordering CLS to admit certain

10  students. Rather, Hastings has merely placed conditions on using aspects of its campus as a

11  forum and providing subsidies to organizations. If CLS wishes to participate in the forum and

12  be eligible to receive funds, it must comply with Hastings' Nondiscrimination Policy. If not,

13  CLS is "free to terminate its participation ... and thus avoid the requirement of the

14  nondiscrimination provision." *See Evans*, 40 Cal. Rptr. 3d at 213. CLS may continue to meet

15  as the group of its choice on campus, excluding any students they wish, and may continue to

16  communicate its beliefs as it did all through the 2004-2005 academic year. Therefore, *Dale* and

17  *Roberts* are inapplicable here.

    a.  **Analysis Pursuant to *Healy v. James*.**

19    The Supreme Court's analysis in *Healy v. James*, 408 U.S. 169 (1972), is the most

20  instructive case with respect to CLS's claim of expressive association. In *Healy*, the president

21  of a state college refused to grant a student organization official recognition because "he found

22  the organization's philosophy was antithetical to the school's policies." *Id*. at 174. The Court

23  held that denying official recognition to student organizations, *without justification*, burdens or

24  abridges students' right to associate to further their personal beliefs. *Id*. at 181. However, the

25  Court noted that the college could restrict students' associational rights if it imposed the

26  restrictions for a reason "directed at the organization's activities, rather than its philosophy" and

27  such reason was factually supported by the record. *Id*. at 188; *see also Pi Lambda Phi*

28  *Fraternity*, 229 F.3d at 445 (commenting that *Healy* specifically contemplated a situation in

United States District Court

For the Northern District of California

24

1    which a university acts out of non-ideological reasons to restrict a group's non-expressive

2    activity, even when those actions would have an effect on expressive activity); *Tacynec v. City*

3    *of Philadelphia*, 687 F.2d 793, 799 (3d Cir. 1982) (citing *Healy* for the proposition that an

4    individual's right of association may be limited by valid, content-neutral time, place and manner

5    restrictions).

6                       i.      **Under *Healy*, Hastings May Impose Campus Restrictions if**
     **Reasons for Regulating Student Organizations Passes the**

7                               ***O'Brien* Test.**

8            The Court in *Healy* indicated that the appropriate measure for evaluating whether

9    justifications for a restriction on student organizations would be sufficient to pass constitutional

10   muster is the *O'Brien* test – the test for determining when government regulation of conduct

11   violates First Amendment speech protections.  *Healy*, 408 U.S. at 189 n.20.  Moreover, the

12   Court specifically noted that schools may impose a requirement "that a group seeking official

13   recognition affirm in advance its willingness to adhere to reasonable campus law.  Such a

14   requirement does not impose an impermissible condition on the students' associational rights."

15   *Id*. at 193.  The Court concluded "that the benefits of participation in the internal life of the

16   college community may be denied to any group that reserves the right to violate any valid

17   campus rules with which it disagrees."  *Id*. at 193-94; *see also Evans*, 40 Cal. Rptr. 3d at 217-19

18   (applying *Healy* to find an organization's refusal to confirm it would comply with a

19   nondiscrimination resolution justified city's withdrawal of a subsidy to the organization).

20           As discussed above, Hastings has denied CLS official recognition based on CLS's

21   conduct – its refusal to comply with Hastings' Nondiscrimination Policy – not because of CLS's

22   philosophies or beliefs.  Thus, in accordance with the Supreme Court's analysis in *Healy*, this

23   Court must evaluate whether Hastings' enforcement of its Nondiscrimination Policy against

24   CLS unconstitutionally infringes CLS's right of expressive association pursuant to the test set

25   forth in *O'Brien*, *i.e.*, whether the Nondiscrimination Policy is within the state's constitutional

26   power, the policy furthers an important or substantial government interest that is unrelated to the

27   suppression of expression, and the incidental restriction on the alleged First Amendment

28   freedoms is no greater than is essential to the furtherance of that interest.  *See O'Brien*, 391 U.S.

United States District Court

For the Northern District of California

1  at 377.  This Court has already found that Hastings' enforcement of its Nondiscrimination

2  Policy passes constitutional muster under the *O'Brien* test.

3       In the context of CLS's claim of infringement of its associational rights, it is also

4  significant that while CLS was denied the use of the Hastings logo, eligibility for funds, the use

5  of certain bulletin boards, eligibility for a Hastings organization email address, and eligibility to

6  send out mass emails through the Associated Students of the University of California at

7  Hastings, the ability to place announcements in a weekly newsletter, and the ability to

8  participate in the annual student organizations faire, CLS was not prohibited from meeting on

9  campus.  (Joint Stip, ¶¶ 9, 10, 62.)  In fact, CLS was permitted to use campus facilities to meet

10  and its members were permitted to communicate amongst themselves and with other students.

11  (*Id.*, ¶¶ 10, 58.)  As a non-registered group, CLS still had access to bulletin boards and chalk

12  boards on campus to make announcements.  (Joint Stip, ¶ 11.)  Such evidence further

13  demonstrates that Hastings' incidental restriction on CLS's alleged First Amendment freedoms

14  was no greater than necessary.  *See O'Brien*, 391 U.S. at 377 (holding that incidental restriction

15  on alleged First Amendment freedoms must be no greater than necessary to the furtherance of an

16  important governmental interest unrelated to the suppression of expression).  Therefore,

17  according to the analysis required by *Healy* and *O'Brien*, Hastings does not unconstitutionally

18  infringe on CLS's associational rights.

19

20       ii.     **Under *Healy*, Denying Recognition to Student Organizations Must be Justified Sufficiently.**

21       Alternatively, even assuming *arguendo O'Brien* is not the appropriate test, it is

22  important to note that *Healy* merely held that denying official recognition to student

23  organizations, *without justification*, burdens or abridges students' right to associate to further

24  their personal beliefs.  *See Healy*, 408 U.S. at 181.  In determining whether a school's reason for

25  denying recognition provides sufficient justification, the Court examined both whether the

26  reason was directed at the organization's activities or philosophies and the practical impact

27  nonrecognition had on the students' ability to meet as a group and communicate.  *Id*. at 184, 188

28  ("We are not free to disregard the practical realities."); *see also Gay Students Org. of Univ. of*

*New Hampshire v. Bonner*, 509 F.2d 652, 658-59 (1st Cir. 1974) (noting that "the Court's analysis in *Healy* focused not on the technical point of recognition or nonrecognition, but on the practical realities of human interaction. ... The ultimate issue at which inquiry must be directed is the effect which a regulation has on organizational and associational activity, not the isolated and for the most part irrelevant issue of recognition per se.").

The Court in *Healy* found that the "primary impediment to free association flowing from nonrecognition [was] the denial of use of campus facilities for meetings and other appropriate purposes." *Healy*, 408 U.S. at 181.  Most importantly, the organization was barred from using *any* campus facilities to hold meetings.  *Id*. at 176.  When the students attempted to meet a coffee shop on campus, they were disbanded and informed that they could not meet anywhere on college property as a group.  *Id*.  Students in the group were not allowed to place announcements regarding meetings, rallies or other activities in the student newspaper or on the campus bulletin boards.  The students were not provided any opportunity to communicate with each other or other students on campus.  *Id*. at 182-83.  Unremarkably, the Court found that "[i]f an organization is to remain a viable entity in a campus community..., it must possess the means of communicating with [other] students."  *Id*. at 181.  In light of these circumstances, the Court found that "[d]enial of official recognition posed serious problems for the organization's existence and growth" and that these impediments were not insubstantial.  *Id*. at 177, 182. Nevertheless, despite these substantial impediments, the Court remanded the matter for consideration of whether the students were willing to abide by reasonable campus rules and regulations, which, if they were not, would justify the denial of recognition.  *Id*. at 194.

Here, in contrast to *Healy*, it is undisputed that despite Hastings' refusal to grant CLS recognized status, the group continued to meet and hold activities throughout the 2004-2005 academic year.  (Joint Stip., ¶¶ 44, 48.)  The record demonstrates that CLS's efforts at recruiting members and attendees were not hampered by the denial of recognition.  Throughout the 2004-2005 academic year, nine to fifteen students regularly attended CLS meetings and activities. (*Id*., ¶ 48.)  There is no evidence that CLS considered this a small group or that it was smaller than when the group met during the previous ten years as a recognized student group.  In fact,

United States District Court

For the Northern District of California

during the prior academic year, when the predecessor to CLS met as a recognized student group,

fewer students regularly attended the meetings and events. (*Id.*, ¶ 26: "During the 2003-2004

academic year .... [a]pproximately five (5) to seven (7) students attended ... meetings and

events.") Moreover, there is no evidence that the restrictions to certain forms of communication

at Hastings, such as through the Law School newsletter, hindered CLS's ability to communicate

with other students. The president of CLS maintained a Yahoo! group for all members and

attendees and communicated information relating to CLS's activities to them on this group.

(Declaration of Stephen Aden ("Aden Decl."), Ex. B at 44.) Furthermore, even though CLS was

not a recognized student organization at Hastings, Hastings still provided access to bulletin and

chalk boards to make announcements, allowed CLS to meet on campus as an organization, and

offered CLS use of Hastings' rooms and audio-visual equipment for such meetings and

activities. (Joint Stip., ¶¶ 10, 11, 58, 61, Ex. H.)[5] Thus, the Court finds that Hastings' denial of

official recognition was not a substantial impediment to CLS's ability to meet and communicate

as a group. In light of the fact that Hastings' reason for denying recognition was not directed at

CLS's philosophies, the Court concludes that Hastings' denial of recognition was justified and

thus does not unconstitutionally infringe CLS's members' right of expressive association. *See*

*Healy*, 408 U.S. at 181.

### iii.    Denial of Recognition is Not Per Se Unconstitutional.

CLS's reliance on the cases cited in its reply brief to demonstrate the denial of

recognition is a per se unconstitutional infringement of its members' associational rights under

*Healy* is misplaced. (CLS's Reply at 7.) The courts in *Gay and Lesbian Students Ass'n v.*

*Gohn*, 850 F.2d 361 (8th Cir. 1988), *Gay Alliance of Students v. Matthews*, 544 F.2d 162 (4th

Cir. 1976), *Gay Students Org.*, 509 F.2d 652, and *American Civil Liberties Union of Virginia,*

---

[5] CLS argues that its access to such space and forms of communication are at Hastings' discretion and thus that Hastings could decide at any point to withdraw such access. (CLS Mot. at 13.) On the record before the Court, CLS is allowed access to facilities and certain forms of communication at Hastings. Even if CLS has not taken full advantage of the access, it is undisputed that it was made available to the group. CLS's claim regarding what Hastings may do in the future is not yet ripe. If circumstances change, and CLS believes that under the new circumstances, CLS's constitutional rights are being infringed, CLS may challenge the new conduct and conditions at that time.

United States District Court

For the Northern District of California

*Inc. v. Radford College*, 315 F. Supp. 893 (W.D. Va. 1970), each made explicit findings that the that the colleges or universities refused to grant recognition to these student organizations *because* of the organizations' beliefs or views.

In *Gay and Lesbian Students*, the university refused to provide the student group funds, which the group sought to support showing two films and holding a panel discussion. *Gay and Lesbian Students*, 850 F.2d at 363. The court found that the record was "replete" with evidence that the university's decision to deny funds was based on viewpoint discrimination. *Id*. at 366. The evidence included the following statement from one of the student senators voting to deny funding: "This is a group that supports gay and lesbian homosexuality. We cannot use state money to support a homosexual group." *Id*. at 363. Moreover, the court noted the pressure university officials received from state legislators not to fund the group or "to allow in any way the dissemination of opinions tolerant toward homosexuals." *Id*. at 367. Thus, the court concluded that the group was improperly denied funds "because of the views it espoused." *Id*. Accordingly, the court found the denial unconstitutionally infringed the students' First Amendment rights.

In *Gay Alliance of Students*, the university refused to grant the group's application to become a recognized student group because the university feared granting recognition would increase the number of students who might join, would harm students affiliated with a "homosexual activist organization," and would increase the opportunity for "homosexual contacts." *Gay Alliance of Students*, 544 F.2d at 165-66. Thus, the court found that the university targeted the group because of the content of the message it sought to convey. Accordingly, the court held that the university had to demonstrate its refusal to recognize the group was "tailored to serve a substantial governmental interest," and that it failed to do so. *Id*.

In *Gay Students Organization*, the student group was not allowed to sponsor any social functions. *Gay Students Org.*, 509 F.2d at 654. The university's prohibition on any social functions was triggered by the distribution of what the university characterized as "'extremist' homosexual publications" at an event sponsored by the group. *Id*. Thus, the court found that the university's prohibition was unconstitutional under the *O'Brien* test because it was content-

related. *Id*. at 662 ("[T]he curtailing of expression which they find abhorrent or offensive cannot provide the important governmental interest upon which impairment of First Amendment freedoms must be predicated.").

Finally, in *American Civil Liberties Union*, the college did not grant the organization recognition because it felt the "role and purpose of the American Civil Liberties Union" lay outside of the school's scope and objectives. *American Civil Liberties Union*, 315 F. Supp. at 895. The court noted that the school did not define what the objectives of the school were and expressed doubt that the administration and faculty could reach agreement as to what specific objectives the institution was dedicated. *Id*. at 898. Notably, the college recognized the Young Republican Club and Young Democratic Club. The court found it inconsistent to claim these political clubs were within the school's objectives, but not the ACLU. *Id*. at 898-99. Thus, the court held the denial of recognition violated the First Amendment. *Id*.

In contrast here, as noted above, Hastings did not withhold recognition of CLS because of CLS's views, but because CLS refused to comply with the Nondiscrimination Policy. Thus, *Gay and Lesbian Students*, *Gay Alliance of Students*, *Gay Students Organization*, and *American Civil Liberties Union of Virginia* do not support a finding that CLS's right to expressive association has been unconstitutionally fringed.

**b.    Analysis Pursuant to *Dale* and *Roberts*.**

Even assuming *arguendo* that *Roberts* and *Dale* were applicable to CLS's expressive association claim, and this Court finds they are not, the holding of these cases do not support a finding that Hastings' denial of recognition was unconstitutional. Pursuant to *Dale*, courts apply a three-part test to determine whether the right of expressive association has been violated. *Dale*, 530 U.S. at 648-49. First, an organization must engage in expressive association. Second, the state action must significantly affect the group's ability to advocate its viewpoints. Third, the Court must determine if the state's interest justifies the infringement on the right to expressive association. *Id*. Although not as explicit, the Court in *Roberts* follows a similar analysis. *Roberts*, 468 U.S. at 622-28.

i.      **First Prong: Organization Engages in Expressive Association.**

To bring an expressive association claim, CLS "must engage in some form of expression, whether it be public or private." *Dale*, 530 U.S. at 549.  Hastings does not dispute that CLS engages in expressive association.  (Hastings Mot. at 16.)  Therefore, the Court will assume for purposes of these motions that CLS engages in expressive association.

ii.      **Second Prong: Ability to Advocate Viewpoints Significantly Affected.**

Next, the Court must determine whether Hastings' denial of recognition significantly affect CLS's ability to advocate its viewpoints.  *Dale*, 530 U.S. at 650; *Roberts*, 468 U.S. at 626-28.  In *Roberts*, the Court held that a regulation that forces a group to accept members it does not desire is a clear intrusion into the internal structure or affairs of the organization.  *Roberts*, 468 U.S. at 623 ("Such a regulation may impair the ability of the original members to express only those views that brought them together. ... Freedom of association plainly presupposes a freedom not to associate."); *see also Dale*, 530 U.S. at 648 ("The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints.").  However, here, Hastings is not ordering CLS to admit certain members, regardless of where it meets.  Rather, Hastings is merely imposing a condition of participation in certain aspects of the forum on campus.  *See Evans*, 40 Cal. Rptr. 3d at 213 (noting that to the extent an organization objected to compliance with a nondiscrimination policy as a condition of receiving a city subsidy, the organization was free to terminate its participation in the program and thus avoid the requirements of the nondiscrimination provision).  Moreover, even assuming *arguendo* that Hastings' condition for participation could be viewed as requiring CLS to admit gay, lesbian, and non-Christian students, CLS has not demonstrated that its ability to express its views would be significantly impaired by complying with such a requirement.

In *Dale*, the Court found that the Boy Scouts's general mission was to instill values in young people, including being "morally straight." *Dale*, 530 U.S. at 649-50.  The Boy Scouts sought to instill these values by having its adult leaders spend time with the youth members.

31

United States District Court

For the Northern District of California

During the time spent together, scoutmasters and assistant scoutmasters were tasked with inculcating the youth members with the Boy Scouts' values, both expressly and by example. *Id.* at 649-50. The Court further found that the Boy Scouts sincerely believed that "homosexual conduct [was] not morally straight" and did "not want to promote homosexual conduct as a legitimate form of behavior." *Id*. at 651. Although the Court stated that an association's assertions regarding the nature of its expression and its view of what would impair its expression is owed deference, the Court examined the evidence on these points and did not blindly accept the Boy Scouts' arguments. *Id.* at 651-56. Moreover, the Court expressly noted that the group engaged in expressive association could not "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* at 653; *see also Rumsfeld*, 126 S.Ct. at 1312-13 (rejecting the groups' argument that providing access to military recruiters would impair their own expression merely because they *said* it would and citing *Dale* for the proposition that "a speaker cannot erect a shield against laws requiring access simply by asserting that mere association would impair its message") (internal quotations omitted).

In determining whether admitting Dale would significantly impair the Boy Scouts' message, the Court reasoned that Dale was "one of a group of gay Scouts who have become leaders in their community and are open and honest about their sexual orientation. ... Dale was copresident of a gay and lesbian organization at college and remains a gay rights activist." *Dale*, 530 U.S. at 653. In light of these facts, the Court found that Dale's presence in a leadership position in the Boy Scouts would "force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id*. Significantly, the Court found *Hurley* illustrative of this point and noted that in *Hurley* "the parade organizers did not wish to exclude the GLIB members because of their sexual orientation, but because they wanted to march behind a GLIB banner[]" and thus would force the parade organizers to send a message they did not want to propound. *Id*. at 653-54 (citing *Hurley*, 515 U.S. at 574-75.)

1    The broad class of students CLS seeks to exclude significantly differs from the Boy

2    Scouts' conduct in *Dale*.  CLS does not confine its desired discrimination to students who are

3    open and honest about being gay, lesbian, or non-orthodox Christian, let alone leaders on

4    campus advocating for gay rights or non-Christian faiths.  Rather, CLS seeks to exclude *all*

5    lesbian, gay, bisexual or non-orthodox Christian students.  *See Dale*, 530 U.S. at 653 (finding

6    that because Dale was open and honest about his sexual orientation and was a gay rights activist,

7    his presence would force the Boy Scouts to send a message to its youth members and the world

8    regarding homosexuality); *see also Hurley*, 515 U.S. at 572 (noting that the parade organizers

9    disclaimed any intent to exclude gay, lesbian or bisexual individuals from participating

10   generally, but rather, sought to a group from marching behind a particular banner).

11          Moreover, CLS does not demonstrate how admitting lesbian, gay, bisexual or non-

12   orthodox Christian students would impair its mission.  Significantly, unlike the Boy Scouts in

13   *Dale*, CLS has not submitted any evidence demonstrating that teaching certain values to other

14   students is part of the organization's mission or purpose, or that it seeks to do so by example,

15   such that the mere presence of someone who does not fully comply with the prescribed code of

16   conduct would force CLS to send a message contrary to its mission.  According to CLS, its

17   mission is "to maintain a vibrant Christian Law Fellowship on the School's campus which

18   enables its members, individually and as a group, to love the Lord with their whole

19   beings–hearts, souls, and minds–and to love their neighbors as themselves."  (Joint Stip., Ex. E.)

20          CLS now argues that it "seeks to affirm and encourage certain values in its members"

21   and that its officers "serve as role models to the voting members and attendees," but the

22   evidence it cites does not support these assertions.  (CLS Mot. at 10, *citing* Joint Stip., ¶ 33;

23   CLS Reply at 2, 8, *citing* Joint Stip., Ex. E at 2.)  Paragraph 33 of the Joint Stipulation merely

24   states that CLS's bylaws require all members and officers to sign the Statement of Faith and sets

25   forth the substance of the Statement of Faith.  (Joint Stip., ¶ 33.)  Exhibit E to the Joint

26   Stipulation is CLS's Constitution.  The Constitution pronounces a "code of conduct" for officers

27   which provides that officers "must exemplify the highest standards of morality as set forth in

28   Scripture."  (*Id*., Ex. E at 2.)  While CLS's members and officers may be instructed to abide by a

United States District Court

For the Northern District of California

1    code of conduct, CLS does not demonstrate how it portrays what the conduct is or who follows

2    this code to the greater community at Hastings. In other words, it is not clear how anyone at

3    Hastings, other than the individual members and officers, would even be aware that CLS's

4    members and officers are living their private lives in accordance with a certain code of conduct.

5           CLS also argues that if it complied with the Nondiscrimination Policy, it would be

6    stripped of its Christian beliefs and cease to exist. (CLS Mot. at 11.) Because officers and

7    members have the authority to elect officers, and to amend the group's bylaws and constitution,

8    and officers lead bible studies, CLS argues that opening up these functions to all students would

9    lead CLS to cease being a vibrant Christian organization. (CLS Mot. at 12.) However, the

10   evidence in the record does not support CLS's argument. For the previous ten years, a

11   predecessor organization to CLS was on campus as a recognized student organization. (Joint

12   Stip., ¶ 22.) The predecessor organization did not exclude openly gay and lesbian students or

13   non-Orthodox Christians. (*Id.*, ¶¶ 25, 27, 28, Exs. C, D.) In fact, during the 2003-2004

14   academic year, one student who was openly lesbian and at least two students who held beliefs

15   inconsistent with what CLS considers to be orthodox Christianity participated in the group's

16   meetings. (*Id.*, ¶¶ 27, 28.) Yet, there is no indication that the participation of such students

17   made the organization any less Christian or hampered the organization's ability to express any

18   particular message or belief. Nor is there any evidence that during those ten years students

19   hostile to CLS's beliefs tried to overtake the organization or alter its views.

20          Even now, when CLS insists on having members sign the Statement of Faith, CLS

21   allows non-members to attend and participate in all meetings and events, including leading

22   prayers. Again, there is no evidence that allowing such participation has made CLS less

23   Christian, or less able to express its views on what it means to be a Christian. Moreover, there

24   is also no indication that any student who is open and honest about being a non-orthodox

25   Christian, gay, lesbian, or bisexual, and a leader in the community on these issues, is seeking to

26   join CLS. In fact, during the 2004-2005 academic year, CLS stipulated that no known gay,

27   lesbian, bisexual or non-Christian student sought to join CLS as a member or officer, or even

28   attended any of its meetings. (Joint Stip. at ¶¶ 50, 54.)

United States District Court

For the Northern District of California

1    Thus, there is no evidence that complying with the Nondiscrimination Policy, and taking

2    the risk that a non-orthodox Christian, gay, lesbian, or bisexual student become a member or

3    officer, and thus, by their presence alone, would impair CLS's ability to convey its beliefs.

4    Accordingly, the Court concludes that requiring CLS to comply with the Nondiscrimination

5    Policy does not significantly affect CLS's ability to advocate its viewpoints.

6    **iii.      Third Prong: Justification of Infringement.**

7    Because the Court concludes that there is no significant impact on CLS's ability to

8    express itself, the Court need not address the third prong of the *Dale* test.  However, even if

9    there was some infringement, Hastings' interest in protecting its students from discrimination

10   provides sufficient justification.  In *Roberts*, the Supreme Court found that the state had a

11   compelling interest in eliminating discrimination and that the state public accommodations laws

12   at issue served that interest unrelated to the expression of ideas.  *Roberts*, 468 U.S. at 624.  The

13   Court in *Roberts* reasoned that:

15          [o]n its face, the [state public accommodations law] does not aim at the suppression
            of speech, does not distinguish between prohibited and permitted activity on the
16          basis of viewpoint, and does not license enforcement authorities to administer the
            statute on the basis of such constitutionally impermissible criteria. ... Instead, ... the
            Act reflects the State's strong historical commitment to eliminating discrimination
17          and assuring its citizens equal access to publicly available goods and services. ...
            That goal, which is unrelated to the suppression of expression, plainly serves
18          compelling state interests of the highest order.

19   *Roberts*, 468 U.S. at 623-24.  Accordingly, the Court in *Roberts* found that requiring the

20   organizations to admit women did not violate their members' right of expressive association.

21   *Id*. at 628-29; *see also Duarte*, 481 U.S. at 549 (applying similar reasoning to uphold state

22   public accommodations law banning discrimination and requiring the group to admit women).

23   In contrast, the Court in *Dale* found that the interests of the state in its public

24   accommodations law did not justify a "severe intrusion" on the organization's associational

25   rights.  *Dale*, 530 U.S. at 659.  However, in balancing of the State's interest against the

26   organization's, the Court found the State's claim of compelling interest attenuated because the

27   State's public accommodations law extended its anti-discrimination requirements to private

28   groups whose activities fell well beyond those usually involved in providing public

35

United States District Court

For the Northern District of California

accommodations.  *Dale*, 530 U.S. at 657 n.3 (questioning the validity of applying a state public accommodations law to a private entity); *see also Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 946 (Ala. 2004) (commenting that *Dale* "did not broadly rule ... that First Amendment rights should generally be deemed more compelling than laws barring ... discrimination; instead, the Court expressly found [the State's] claim of compelling interest attenuated in the particular situation at issue.").  Thus, the Court concluded that the State's interest did not justify the severe intrusion.

Here, CLS is not being forced to include certain members or officers, let alone individuals who are outspoken advocates for gay rights or non-Christian ideals.  Moreover, Hastings has a compelling interest in prohibiting discrimination on its campus, and, in contrast to *Dale*, there is no reason to find such interest is attenuated.  *See Jews for Jesus*, 968 F.2d at 297 (state has a compelling interest in prohibiting religious and racial discrimination in public accommodations); *see also Presbytery of New Jersey*, 902 F. Supp. at 521 (state interest in eliminating discrimination on the basis of, *inter alia*, sexual orientation was compelling); *Gay Rights Coal.*, 536 A.2d at 38 ("The eradication of sexual orientation discrimination is a compelling governmental interest.").  In balancing Hastings' compelling interest to protect its students from discrimination against any infringement on CLS's members' expressive association, the Court concludes that Hastings' conduct is justified and, thus, does not unconstitutionally infringe CLS members' right to expressive association.

**3.      First Amendment: Free Exercise.**

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. 1.  In *Employment Division, Oregon Department of Human Resources v. Smith*, 494 U.S. 872 (1990), the Supreme Court made clear that a neutral law of general application could prohibit conduct that was prescribed by an individual's religion and such law did not have to be supported by a compelling interest.  *Smith*, 494 U.S. at 885; *see also Church of Lukumi Babalu Aye, Inc. v City of Hialeah*, 508 U.S. 520, 531 (1993) ("A law that is neutral and of general applicability need not be justified by a compelling government interest, even if the law

United States District Court

For the Northern District of California

1    has the incidental effect of burdening a particular religious practice.").  The Supreme Court also

2    made clear that the government need not demonstrate a compelling interest even when the

3    burden on religion by a neutral law of general applicability was substantial.  *San Jose Christian*

4    *College v. City of Morgan Hill*, 360 F.3d 1024, 1030 (9th Cir. 2004) (citing *Smith*, 494 U.S. at

5    883-84).  "A law is one of neutrality and general applicability if it does not aim to 'infringe upon

6    or restrict practices because of their religious motivation,' and if it does not 'in a selective

7    manner impose burdens only on conduct motivated by religious belief[.]'" *Id*. at 1031 (quoting

8    *Lukumi Babalu Aye*, 508 U.S. at 533, 543).

9          CLS argues that strict scrutiny still applies to its free exercise claim because laws

10   targeting or imposing special burdens on religious beliefs are presumptively invalid, and that

11   here, prohibiting discrimination on the basis of religion improperly targets religious beliefs.

12   (CLS Mot. at 17.)  However, the Nondiscrimination Policy does not target or single out religious

13   beliefs, but rather, is a policy that is neutral and of general applicability.  The Policy prohibits

14   discrimination on the basis of protected categories, including religion and sexual orientation,

15   irrespective of the motivation for such discrimination.  *Cf. Vigars v. Valley Christian Ctr.*, 805

16   F. Supp. 802, 809 (N.D. Cal. 1992) (finding that Title VII of the Civil Rights Act, which

17   prohibits, among other thing*s*, employment discrimination on the basis of religion, "neither

18   regulates religious beliefs, nor burdens religious acts, because of their religious motivation.  On

19   the contrary, it is clear that Title VII is a secular, neutral statute which, in this case, incidentally

20   has a profound impact on defendants' free exercise of their religion.")  Contrary to CLS's

21   contention, regulating the conduct of discrimination on the basis, *inter alia*, of religion is not

22   equivalent to regulating religious beliefs.  CLS may be motivated by its religious beliefs to

23   exclude students based on their religion or sexual orientation, but that does not convert the

24   reason for Hastings' policy prohibiting the discrimination to be one that is religiously-based.

25         Next, CLS cites *Smith* for the proposition that "where the state has in place a system of

26   individual exemptions, it may not refuse to extend that system to cases of 'religious hardship'

27   without compelling reasons."  (CLS Mot. at 18, citing *Smith*, 494 U.S. at 884.)  In the portion of

28   *Smith* to which CLS cites, the Court was explaining that the test set forth in *Sherbet v. Verner*,

374 U.S. 398 (1963), requiring governmental actions that substantially burden a religious practice to be justified by a compelling governmental interest, has only been applied in the unemployment compensation field. *Smith*, 494 U.S. at 883-84.  The Court explained that "if [it] were inclined to breathe into *Sherbert* some life beyond the unemployment compensation field, [it] would not apply it to require exemptions from a generally applicable ... law." *Id*. at 884. Even if the test in *Sherbert* were applicable here, CLS has not demonstrated that Hastings has provided exemptions to the Nondiscrimination Policy to other student organizations while refusing to grant CLS an exemption.  CLS submits the bylaws of two registered student organizations at Hastings, the Vietnamese American Law Society and La Raza.  (Aden Decl., Exs. I, O.)

The Vietnamese American Law Society's bylaws provide that "any full-time student at Hastings may become a member ... so long as they do not exhibit a consistent disregard and lack of respect for the objective of the organization," but specifically declares that its "[m]embership rules shall not violate the Nondiscrimination Compliance Code of Hastings."  (Aden Decl., Ex. I.)  Defendant Chapman, the Director of Student Services at the Law School, explains that:

> Simply because a student organization makes reference in its bylaws to interests or objectives of the organization does not violate the Nondiscrimination Policy. Student organizations' bylaws will sometimes make reference in their sections on membership to members' interests and state that any student who holds interests or goals similar to an organization are eligible to become members. [She does] not interpret such references to members' interests as an attempt to establish a test or criteria for membership in any way.  Other than [CLS] during the 2004-2005 and 2005-2006 academic years, [she is] aware of no registered student organization at Hastings that has ever attempted to restrict its membership based on either students' beliefs or agreement with the group's objectives.  If [she] were to become aware that any group was doing so, [she] would inform the group that they were in violation of Hastings' Nondiscrimination Policy.

(Declaration of Judy Hansen Chapman ("Chapman Decl."), ¶ 8.)

La Raza's bylaws provide that it is the organization's policy "not to discriminate on the basis of race, sex, color, creed, national origin, ancestry, age, sexual orientation, or disability." (Aden Decl., Ex. O.)  However, other portions of its bylaws could be read to restrict membership to students of "Raza" background.  (*Id*.)  During the course of the instant litigation, the bylaws of La Raza were brought to Chapman's attention, and she realized that its bylaws

1   during the 2004-2005 academic year "could be interpreted as requiring voting members of the

2   group to be of Hispanic descent." (Chapman Decl., ¶ 10.)  If this were a requirement of La

3   Raza's, it would violate Hastings' requirement that registered student organizations allow all

4   Hastings student to become members.  (*Id.*)  Chapman had previously interpreted La Raza's

5   bylaws as allowing all students to join the organization and become voting members.  In the

6   summer of 2005,Chapman raised this issue with La Raza's officers who confirmed that any

7   Hastings student may become a voting member of La Raza.  (*Id.*)  Hastings allowed La Raza to

8   register as a student organization during the 2005-2006 academic year only with the

9   understanding that it is in the process of revising its bylaws to make clear that all Hastings

10  students are welcome to become voting members.  (*Id.*, ¶¶ 10-11, Ex. A.)  Accordingly, the

11  Court concludes that the evidence fails to demonstrate that Hastings exempted other

12  organizations from complying with the Nondiscrimination Policy.

13          Finally, CLS contends that pursuant to the "hybrid rights" doctrine, the Court should

14  apply strict scrutiny to its free exercise claim.  *Smith* may be read to impose strict scrutiny in

15  "hybrid situation[s]" in which a law "involve[s] not the Free Exercise Clause alone, but the Free

16  Exercise Clause in conjunction with other constitutional protections." *Smith*, 494 U.S. at 881-

17  82.  However, regardless of whether the "hybrid rights" doctrine is even viable, the Ninth

18  Circuit has made clear that "to assert a hybrid-rights claim, a free exercise plaintiff must make

19  out a colorable claim that a companion right has been violated – that is, a fair probability or a

20  likelihood, but not a certitude, of success on the merits." *Miller v. Reed*, 176 F.3d 1202, 1207

21  (9th Cir. 1999) (citation and internal quotations omitted); *see also San Jose Christian College*,

22  360 F.3d at 1032.  Because the Court finds that none of CLS's claims for violations of their

23  constitutional rights have merit, there is no basis for their alleged "hybrid-rights" claim.  Thus,

24  strict scrutiny does not apply to CLS's free exercise claim.  Pursuant to the applicable rational

25

26

27

28

United States District Court

For the Northern District of California

1   basis test, the Court concludes that CLS's right to free exercise of religion has not been

2   unconstitutionally infringed.[6]

3       **4.    Equal Protection Clause.**

4       "The Equal Protection Clause of the Fourteenth Amendment commands that no State

5   shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

6   essentially a direction that all persons similarly situated should be treated alike." *Serrano v.*

7   *Francis*, 345 F.3d 1071, 1081 (9th Cir. 2003) (*quoting Cleburne v. Cleburne Living Center,*

8   *Inc.*, 473 U.S. 432, 439 (1985)).  To bring a successful equal protection claim, a plaintiff must

9   demonstrate that he or she was treated differently from similarly situated persons.  *Dillingham v.*

10  *I.N.S.*, 267 F.3d 996, 1007 (9th Cir. 2001).  Additionally, a plaintiff must allege that the

11  defendant acted with the intent or purpose to discriminate against him or her based upon

12  membership in a protected class.  *Serrano*, 345 F.3d at 1082; *Barren v. Harrington*, 152 F.3d

13  1193, 1194 (9th Cir. 2001).  "Where the challenged governmental policy is 'facially neutral,'

14  proof of its disproportionate impact on an identifiable group can satisfy the intent requirement

15  only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee*

16  *v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).

17      CLS's equal protection claim fails for two independent reasons.  First, it has not

18  presented any evidence that it has been treated differently from other student groups.  Second,

19  CLS has not submitted any evidence of discriminatory intent.

20      CLS argues that Hastings' application of the Nondiscrimination Policy to it is arbitrary

21  because Hastings permits numerous other groups to choose members and/or officers dedicated

22

23      [6] CLS also appears to argue that an exemption analogous to the "ministerial
exception" to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, should
apply here.  (CLS Mot. at 19.)  Courts apply a "ministerial exception" to Title VII because

24  "the ministerial relationship lies so close to the heart of the church that it would offend the
Free Exercise Clause simply to require the church to articulate a religious justification for its

25  personnel decisions." *Bolland v. California Province of the Society of Jesus*, 196 F.3d 940,
946 (9th Cir. 1999).  The "ministerial exception" is limited to clergy and does not apply to

26  lay personnel.  *Id.* at 947.  The "ministerial exception" is clearly inapplicable here.  This
matter does not involve an employment dispute.  CLS is not a church, and its members and

27  officers are not clergy.  CLS has not provided any authority demonstrating the ministerial
exception has been or should be extended beyond Title VII claims.  Accordingly, the Court

28  declines to require Hastings to apply an analogous exception to its requirement that registered
student organizations comply with the Nondiscrimination Policy.

**United States District Court**

For the Northern District of California

1  to their organizations' cause.  As set forth above, CLS has not presented any evidence

2  demonstrating that Hastings exempts other registered student organizations from complying

3  with the Nondiscrimination Policy.

4         CLS also argues that the treatment of CLS was intentional and argues that CLS may rely

5  on evidence of the circumstances surrounding the passage of the policy to demonstrate

6  intentional discrimination against it.  (CLS Mot. at 20.)  Yet, CLS does not submit any evidence

7  with respect to the passage of the Nondiscrimination Policy.  Nor does CLS present any other

8  evidence demonstrating any discriminatory intent by Hastings.  Accordingly, CLS's equal

9  protection claim fails as a matter of law.[7]

10                                    **CONCLUSION**

11        For the foregoing reasons, the Court DENIES CLS's motion for summary judgment and

12 GRANTS Hastings and Outlaw's cross-motions for summary judgment on of all CLS's claims.

13        **IT IS SO ORDERED.**

14

15 Dated: May 19, 2006

16                                             _____
                                               JEFFREY S. WHITE
                                               UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25        [7]  In its reply brief, CLS contends for the first time that Hastings' enforcement of its
   Nondiscrimination Policy violates the doctrine of unconstitutional conditions.  (CLS Reply at
26 26.)  Pursuant to the doctrine of unconstitutional conditions, "the government may not
   require a person to give up a constitutional right ... in exchange for a discretionary benefit
27 conferred by the government."  *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994).  Because
   the Court finds that the enforcement of the Nondiscrimination Policy does not
28 unconstitutionally infringe any of CLS's asserted constitutional claims, the doctrine of
   unconstitutional conditions is inapplicable.